UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

KAREN TICHY,

                              Plaintiff,

        v.

HYATT HOTELS CORPORATION;
HILTON DOMESTIC OPERATING
COMPANY INC.; SIX CONTINENTS
HOTELS, INC. ; MARRIOTT
INTERNATIONAL, INC.; and WYNDHAM
HOTEL GROUP LLC,

                              Defendants.

No. 1:18-cv-01959

**<u>FIRST AMENDED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

**Page**

I.     NATURE OF ACTION ................................................................................. 1

II.     PARTIES ..................................................................................................... 5

       A.     Plaintiff ............................................................................................ 5

       B.     Defendants ...................................................................................... 6

III.    AGENTS AND CO-CONSPIRATORS ...................................................... 7

IV.    JURISDICTION AND VENUE ................................................................. 7

V.     SUBSTANTIVE ALLEGATIONS ............................................................ 8

       A.     The process of finding and renting a hotel room online ................ 8

       B.     The Online Travel Agencies are indispensable to the hotel
            Defendants. ..................................................................................... 9

       C.     The Defendants reach and enforce agreements to prevent branded
            keyword advertising.......................................................................... 11

VI.    THE RELEVANT MARKET AND DEFENDANTS' MARKET POWER................... 19

VII.   MARKET EFFECTS OF AND ANTITRUST INJURY DUE TO
        DEFENDANTS' ANTICOMPETITIVE CONDUCT ................................ 20

VIII.   CLASS ALLEGATIONS ........................................................................... 22

IX.    COUNTS..................................................................................................... 24

COUNT I VIOLATION OF 15 U.S.C. § 1 (*Per Se* Group Boycott/Bid Rigging
       Agreements)............................................................................................... 24

COUNT II VIOLATION OF 15 U.S.C. § 1 (Agreements Unreasonably
       Restraining Trade) ..................................................................................... 26

RELIEF REQUESTED............................................................................................ 28

JURY TRIAL DEMANDED .................................................................................... 28

Plaintiff, by and through her attorneys, on behalf of herself and all others similarly situated, brings this Class Action Complaint and alleges, based upon personal knowledge as to herself and her own acts, and as to all other matters upon information and belief, as follows:

## I.     NATURE OF ACTION

1.     Plaintiff purchased hotel rooms online directly from one or more of the Defendants in the United States.  Plaintiff brings this action to challenge the Defendants' conspiracy and agreements to eliminate branded keyword search advertising against each other, depriving consumers of the free flow of competitive information, raising consumer prices for hotel rooms, and raising the cost of finding hotel rooms for consumers.  Defendants engaged in an anti-competitive horizontal agreement to restrain competition for consumer hotel room purchases.  The scheme is simple: each hotel Defendant agreed it would refrain from using certain readily available online advertising methods to compete for consumers shopping for hotel rooms.  The agreement prevents competitors from bidding for online advertising that uses competitors' brand names.  So, for example, Hilton Hotel could not use competitor Hyatt's brand hotel name to construct a search response that would present comparison benefits, such as price and quality, between the two hotels.  This anticompetitive agreement is like Coke and Pepsi agreeing they would not use each other's names in advertising to compare product benefits— such as taste, price, or other features consumers find attractive.  By doing so, Coke and Pepsi inarguably would be restraining competition to the detriment of consumers.

2.     In the hotel industry, hotel rooms are sold through two primary channels: directly from the hotel's website, or through online travel agencies (OTAs) and their affiliates. OTAs, who generally receive a commission from the hotel when a room is booked on their website, offer consumers a wide choice of available hotels in a particular location and for a particular date range. While they are valuable sales channels for the Defendants, they also are costly to hotels

- 1 -

and put downward pressure on the prices of hotel rooms because they expose the consumer to a wide variety of competitive choices.

3.      This case is about the major hotel companies, the Defendants, seeking to reduce the likelihood that consumers expressing an interest in their brand would visit an OTA to book their room and to refrain from competing with each other for those customers. The Defendants have done this by agreeing to and imposing restrictions on the use of branded keyword search advertising on the major internet search engines like Google and Bing,

4.      When a consumer searching for information on the internet enters a query into one of the major search engines like Google or Bing, the words that comprise the user's query are called "keywords." Typically, search engines generate revenues on their website by auctioning these keywords to advertisers. Advertisers bid an amount they are willing to pay for a "click" from a consumer looking for particular keywords, and, if they are a winning bidder, will have their ad appear in search results for those keywords (typically above the "algorithmic" search results presented to the user). As an example, a car manufacturer like Ford might bid for keywords like "new cars" so that their ads appear to consumers searching Google or Bing for "new cars".

5.      Branded keyword search advertising involves the advertiser bidding for keywords that include a brand or trademarked business name. (For example, "Ford F-150" or, more pertinent to this case, "New York Hilton.") Frequently, the brand owner will bid on these keywords, as will competitors and sellers. A search for "Ford F-150" might deliver advertisements from Ford, Chevrolet, and automobile dealerships seeking to connect with the user looking on the internet for Ford trucks. (An example of that appears below, where a search for "Ford F-150" on Google.com yielded at the top of the results an ad from Chevrolet, an ad

- 2 -

from Ford, and an ad from a local Ford dealer.) Similarly, a search for "New York Hilton" might present advertisements for not only Hilton, but Hilton competitors like Marriott or Hyatt, and sellers of hotel rooms, like online travel agencies, all vying for the potential business of a user searching on the internet for New York Hilton. However, due to the illegal scheme among the Defendants, consumers no longer see those competing advertisements.

6.      There are a variety of incentives for the various marketplace participants to bid for branded keywords. The brand owner wants to maximize the chance of converting that user to a sale, the competitors seek to take that potential business by presenting their alternative offerings, and the sellers hope to participate in the potential sale.

7.      For hotel branded keyword searches, the hotel brand owner would be incented to bid on their own brand for a variety of reasons. First, getting the potential customer to their website for a sale means both avoiding a commission they might have to pay to an online travel agency and getting the opportunity to establish a direct relationship with that customer, including the collection of commercially important data about that customer and the ability to introduce that customer to other offerings within that brand. Second, keeping the customer from visiting an online travel agency or competitor website reduces the chances of that customer being exposed to competitive offerings that might prove more attractive or less expensive. Appearing at or near the top of a search results page is in the brand owner's interest, and bidding for that keyword can help ensure that happens.

8.      For an online travel agency, the incentive to bid on hotel branded keywords is the opportunity to get the customer to visit their website to see offers on that hotel as well as many others, make the booking, earn a commission, and establish a relationship with that customer that might lead to additional business down the road. Appearing at or near the top of a search results

page is in the OTA's interest, and bidding for that keyword can help ensure that happens.

9.    For competing brands, the incentive is to present competing offers to that potential customer in hopes it will prove more attractive than the brand for which the customer was searching. Appearing at or near the top of a search results page is in the competing hotel's interest, and bidding for that keyword can help ensure that happens.

10.    Prior to 2014, branded keyword advertising was an important aspect of competition in the hotel industry. Online travel agencies and competing brands regularly bid for branded keywords, using that tactic to win business, and consumers enjoyed the benefits flowing from robust exchange of competitive marketplace information and the downward pricing pressure that practice imposed on hotel room prices.

11.    The practice of competitors bidding on branded keywords had long frustrated the brand owners in many industries, who saw that method of competition as stealing "their" customer. Many made claims that bidding on branded keywords by competitors was a trademark violation. But by 2013, the law was clear that rivals of a trademark owner are free to bid for trademark keywords and to place competitive advertising on a search results page, provided the content of the advertisement is not itself confusing within the meaning of trademark law.

12.    In or about 2015, the Defendants agreed with each other to curtail the practice of competitive branded keyword advertising in the hotel industry. This unlawful agreement was in two parts. First, each of the Defendants agreed they would refrain from bidding for each other's branded keywords. Second, each of the Defendants agreed they would insert contractual clauses into their lodging agreements with OTAs to prohibit those OTAs from bidding on the branded keywords of the hotel Defendant, and to require the OTAs to attempt to compel any affiliated online travel agencies to refrain from bidding on branded keywords.

- 4 -

13.     Pursuant to these agreements among and between the Defendants and the OTAs, competitive advertising in response to branded keywords has largely ceased in the hotel industry. As a result, Plaintiff and the plaintiff class have been directly harmed by a reduction in the quality and quantity of informative advertising, by higher costs for searching for hotel room options, and by higher prices for hotel rooms than they would otherwise be paying absent the illegal agreements.

14.     Absent Defendants' anti-competitive and illegal agreements and conduct, Plaintiff and other Class members would have paid less for each of the hotel rooms purchased during the Class Period, and would have incurred lower transaction costs.  The direct consequence of Defendants' unlawful conduct was that Plaintiff and other Class members paid overcharges on their purchases of hotel room reservations throughout the Class Period.  Plaintiff thus seeks damages and equitable relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

## II.     PARTIES

### A.     Plaintiff

15.     Plaintiff Karen Tichy is a resident of Clarksville, Virginia. In 2015, 2016, and 2017 on numerous occasions, Ms. Tichy searched for hotel rooms on Google using Defendants' branded keywords. Ms. Tichy recalls in her searches for hotel rooms on Google that she began to notice fewer competitive options being presented. As a result, Ms. Tichy, to save time, increasingly just visited the Marriott website to search for hotel rooms. During this period, Ms. Tichy reserved and purchased Marriott-branded rooms online through the Marriott.com website. Ms. Tichy paid more for those rooms than she would have absent the Defendants' illegal conduct.  During this period, Ms. Tichy also has reserved and purchased hotel rooms from other Defendants using their branded websites. Ms. Tichy has also incurred greater costs in time and

- 5 -

effort to locate suitable hotel rooms as a result of Defendants' illegal conduct. Ms. Tichy has been damaged by the conduct alleged herein.

**B.    Defendants**

16.    Defendant Hyatt Hotels Corporation ("Hyatt") is a Delaware corporation with its principal place of business at 71 South Wacker Drive, 12th Floor, Chicago, Illinois 60606. Hyatt is a global hospitality company that controls 13 premier hotel brands, including 739 properties in 57 countries.

17.    Defendant Hilton Domestic Operating Company Inc. ("Hilton") is a Delaware corporation with its principal place of business at 7930 Jones Branch Drive, Suite 1100, McLean, Virginia 22102. Hilton's parent is one of the largest hospitality companies in the world, controlling 5,168 hotels in 103 countries and territories.

18.    Defendant Six Continents Hotels, Inc. ("Six Continents") is a Delaware corporation with its principal place of business in the United States at 3 Ravinia Drive, Suite 100, Atlanta, Georgia 30346. Six Continents' parent, InterContinental Hotels Group, PLC ("IHG"), is one of the largest hospitality companies in the world, controlling 5,273 hotels in nearly 100 countries around the world.

19.    Defendant Marriott International, Inc. ("Marriott") is a Delaware corporation with its principal place of business at 10400 Fernwood Road, Bethesda, Maryland 20817.  Marriott is one of the world's largest hospitality companies, controlling over 6,000 hotels in 122 countries and territories.

20.    Wyndham Hotel Group LLC ("Wyndham") is a Delaware corporation with its primary place of business at 22 Sylvan Way, Parsippany, New Jersey 07054.  The Wyndham chain is the world's largest hotel company, controlling over 8,300 hotels worldwide.

21.     Defendants Hilton, Hyatt, Marriott, Six Continents and Wyndham ("Defendants")

control a substantial percentage of all hotel room inventory in the United States.

### III.     AGENTS AND CO-CONSPIRATORS

22.     Various other persons, firms, and corporations not named herein as Defendants

have participated as co-conspirators with the Defendants and have performed acts and made

statements in furtherance of the conspiracy.  Some of these firms are as yet unidentified.  The

acts alleged against the Defendants in this complaint were authorized, ordered, or done by their

officers, agents, employees, or representatives, while actively engaged in the management and

operation of Defendants' businesses or affairs.

23.     Whenever this complaint refers to an act, deed, or transaction of a corporation or

entity, the complaint is alleging that the corporation or entity engaged in the act, deed, or

transaction by or through its officers, directors, agents, employees, or representatives while they

were actively engaged in the management, direction, control, or transaction of the corporation or

entity's business or affairs.

### IV.     JURISDICTION AND VENUE

24.     Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15

U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit, and reasonable

attorneys' fees for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

Subject matter jurisdiction is proper pursuant to Section 4(a) of the Clayton Act, 15 U.S.C.

§ 15(a), and 28 U.S.C. §§ 1331 and 1337, because the action arises under the laws of the United

States.

25.     Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28

U.S.C. § 1391(b) and (c), in that at least one of the Defendants resides in, is licensed to do

business in, or is doing business in this judicial district.

- 7 -

## V. SUBSTANTIVE ALLEGATIONS

### A. The process of finding and renting a hotel room online

26.     A consumer that is looking to rent a hotel room online has a number of options. They can navigate directly to a hotel website (like Hilton.com or Marriott.com), they can navigate directly to one of the OTAs (like Expedia.com or Priceline.com) or, as many do, they can begin their search at one of the online search engines like Google.com or Bing.com.

27.     When a consumer enters a query in one of the online search engines, the words that comprise the search term or query are known as "keywords." So, for example, a consumer might search on Google.com for "Hawaii resorts" or "Honolulu Hyatt."

28.     Users searching online with the online search engines are typically presented with both "algorithmic" results, as well as advertisements or "paid search."  Paid search results often appear at the top of search results. Advertisers bid to have their ads appear in response to particular keywords. The number of advertisements presented can vary from search to search and from search engine to search engine.

29.     Since they are in competition for the sale of hotel rooms online, prior to the illegal agreements reached by the hotel Defendants, it was common for hotels and OTAs to bid to have their advertisements placed in response to searches for travel-related keywords including those containing hotel brands.  For example, the keywords "Honolulu Hyatt" might have bids from Hyatt as well as from Marriott (hoping to lure customers down the street to their hotel) and from Expedia (hoping to lure users to their website to either book the Honolulu Hyatt or to view a variety of other competitive options that they might book on Expedia). The consumer enjoyed the free flow of competitive information from potential sellers to buyers and the downward pressure on pricing that that competition brought.

- 8 -

30.     Branded keyword search advertising (for example, "Honolulu Hyatt," which contains the trademarked brand name "Hyatt") is a highly effective advertising strategy because it allows an advertiser to target an audience of people who are searching for a particular product. Prior to 2015, it was very common in the hotel industry to see OTAs as well as competing hotel chains bidding for branded keywords, aggressively competing for those customers' business. A 2013 study by BrandVerity monitored search results for hotels' branded keywords and found that competitor hotels as well as OTAs commonly bid on branded keywords. "OTAs bid on hotels' branded keywords rather extensively. For example, on a given SERP (search engine results page) the brand's ad(s) will typically be situated among multiple OTA ads. OTAs will also occupy the #1 ad position on a significant percentage of SERPs." That study also noted that "In certain situations, brand bidding by OTAs can be useful to the brand—ensuring that a potential customer doesn't book with a competitor. In others, it may be harmful—reducing the brand's traffic and direct bookings."

**B.      The Online Travel Agencies are indispensable to the hotel Defendants.**

31.     As recently as 1997, the concept of an "internet travel company" or online travel agency—an entity organized to effectuate travel plans, reservations, and purchases via the worldwide web—was virtually unknown.  But in recent years, the online travel industry has seen explosive growth and consolidation. Technology advances have increased OTA popularity among consumers.

32.     Today, online travel agencies are responsible for as much as 50% of online bookings for the Defendants, and an even higher percentage for "independent" hotels. Online travel agencies are a critical and essential, but expensive, means of distribution for the Defendants.

- 9 -

33.     Typically, through their web portals, the OTAs allow consumers to rent hotel rooms in many different hotels throughout the country and the world.  The online travel agencies allow consumers to easily view and compare prices, ratings, features, locations, and other relevant data about hotels from major chains, like the Defendants, as well as those of independent hotels. As technology has advanced, so has the popularity of online travel agencies with consumers who can now easily obtain relevant information about thousands of hotel rooms around the world.

34.     The OTAs make their services available to hotels and obtain access to room inventories through lodging agreements with the hotels.

35.     While the Defendants rely on OTAs to sell a large number and percentage of their rooms, the Defendants are reluctant business partners with the OTAs for a number of reasons. First, it is widely accepted in the hotel industry that OTAs provide negative pressure on room pricing. This is because the OTAs make relevant pricing and quality information readily available to and easy for consumers to compare. A consumer that might be considering renting a room at the New York Hilton who uses an OTA will also see offerings from competitors of the New York Hilton, both large and small, and easily be able to see lower priced offerings or offerings with preferable quality. Thus, pricing pressure from competitive alternatives is one reason Hilton would prefer that consumers interested in the New York Hilton instead use the hotel's website for booking rather than an OTA.

36.     Second, OTAs services come at a cost to the Defendants. The Defendants typically pay commissions ranging from 12-20% depending upon property type, location, and time of booking. Bookings made on the Defendants' websites cost the hotel less, and thus an

- 10 -

identically priced room made through the hotel website is usually more profitable to the Defendants.

37.     Third, because the OTAs offer a wide variety of competitive alternatives, the Defendants would prefer that the customer relationship, and any data associated with that customer, be directly with the hotel rather than with an OTA so the hotel can build customer loyalty and sell other hotels within their group for future trips made by that customer.

38.     While the Defendants would prefer that consumers use their websites rather than the OTAs, the consumer preference for the comparative market information offered by the OTAs makes them popular with consumers and means that any single Defendant that decided to stop making inventory available to the OTAs would be at a significant competitive disadvantage to their competitors.  For example, if Hilton pulled its inventory from Priceline, some current customers using Priceline to book rooms with Hilton might migrate to the Hilton website to book their rooms, but many would likely see and book competitive alternatives on the OTA site. Thus, despite the cost to the hotel Defendants and the downward pressure on pricing that the OTAs propagate, the hotel Defendants find it in their business interest to continue to use the OTAs to sell their rooms.

**C.     The Defendants reach and enforce agreements to prevent branded keyword advertising.**

39.     Hotels have long been frustrated with OTAs. The downward pressure they exert on room prices and the cost of commissions were frequent topics of discussion at industry events, meetings, and conferences (including the annual Dallas Hotel Conference and meetings of the American Hotel and Lodging Association) where representatives and executives from the hotel Defendants were in attendance and met.

- 11 -

40.     To put these conference discussions in perspective, antitrust compliance guidelines from many companies inform employees to avoid discussing price at industry meetings.  For example, Exxon Mobil's Antitrust and Competition Compliance Guide warns employees that an "agreement can be inferred from conduct."  The Guide provides that employees should "avoid conversations with competitors concerning prices … [or] terms of sale."  "If such a subject arises in the presence of a competitor you must tell everyone present that discussing this matter is improper and see that the subject is immediately dropped."[1]

41.     The FTC Guide to the Antitrust Laws warns that it is "illegal to use a trade association to control or suggest prices of members.  It is illegal to use information-sharing programs, or standardized contracts, operating hours, accounting, safety codes, or transportation methods, as a disguised means of fixing prices."

42.     Despite standard antitrust compliance advice to avoid price discussions among competitors, Defendants used such gatherings for that purpose and to otherwise coordinate agreements to temper competition among and between them.

43.     At the 2014 Dallas Hotel Conference, held November 19, 2014, at the Omni Dallas Hotel, and attended by representatives of Defendants, industry expert Dan Lesser, President and CEO of LW Hospitality Advisors LLC, highlighted the well-established industry consensus that "technology advances with OTA's continue negative pressure on room pricing."  He also called on

---

[1] Exxon Mobil Corporation, Antitrust and Competition Law Legal Compliance Guide at 6-9 (2014) (available at http://cdn.exxonmobil.com/~/media/global/files/other/2015/antitrust-and-competition-law-legal-compliance-guide.pdf)

the hotels to "RAISE ROOM RATES aggressively NOW."[2] Mr. Lesser was a regular speaker at this annual conference year after year.

44.     Following that presentation, Katherine Lugar, the then new CEO of the American Hotel and Lodging Association ("AHLA," an industry organization of which the hotel Defendants are members) gave a presentation calling for "Unity" and "Stronger, better alignment." She then identified "Deceptive Ad Buys: Unauthorized Purchase of Words" (referring to the purchase of branded keywords by OTAs) as a practice that needed to be addressed.

45.     The AHLA is an organization through which Defendants coordinated their conduct. In 2014, when Katherine Lugar called upon hotels to stop the "unauthorized purchase of words," serving on the AHLA board were Rena Hozore Reiss, Executive Vice President, General Counsel and Secretary of Defendant Hyatt; Jim Holthouser, Executive Vice President, Global Brands of Defendant Hilton; David Grissen, Group President of Defendant Marriott; Keith Pierce, Executive Vice President, Brand Operations of Defendant Wyndham; and Joel Eisemann, Chief Development Officer, The Americas, of IHG. Defendants, through these officers and others, used AHLA meetings and other meetings to discuss, coordinate, and arrive at their illegal scheme to stop competitive branded keyword bidding.

46.     Despite Katherine Lugar's characterization, OTAs do not require "authorization" to compete with hotels by purchasing branded keywords. While some brand owners in various industries have attempted over the years to claim that bidding on branded keywords was a violation of trademark laws, no court has so held, and the law was very clear in 2014 that the

---

[2] Daniel Lesser, "U.S. Lodging Fundamentals: Paradigm Shift or Movie Rerun?" at slide 8 (Nov. 19, 2014) (available at http://www.dallashotelconference.com/Documents/2014_Dallas_Hotel_Conference_Presentations.pdf)

practice was not only legal, but was pro-competitive and pro-consumer.  So clear was the law on this point that in 2016, the Federal Trade Commission brought a lawsuit against 1-800-Contacts for entering into "settlement" agreements, entered into between 2007 and 2013, with their competitors that prohibited bidding on each other's branded keywords. The FTC argued that the restrictions on competitive advertising directly harmed consumers by reducing the quality and quantity or informative advertising displayed to consumers; causing consumers to pay higher prices; and artificially inflating prices across the board.[3]

47.     The FTC prevailed in their claims that the practice was illegal in an Administrative Court decision in December 2017, where the Administrative Court found that restricting the availability of information in the marketplace is an anticompetitive harm and that restrictions on advertising among rivals impair competition and result in harm to consumers by interfering with the flow of information from sellers to buyers and raising the costs to consumers of finding the most suitable offering, which, in turn, leads to higher transaction prices.

48.     The Administrative Court found that the challenged practice disrupted the ordinary give and take of the marketplace by restricting competing advertisements from appearing in response to an internet search for the trademark terms of the parties to the agreements.  The challenged practice interferes with the flow of material information between buyers and sellers, including price information, which disrupts the proper functioning of the price-setting mechanism.

49.     Following the meeting in Dallas, and through that meeting and meetings of the AHLA, in or about 2015, seeking to temper the downward pressure that OTAs exerted on hotel room pricing, the Defendants agreed to prevent branded keyword advertising by three means and

---

[3] *See In the Matter of 1-800 Contacts, Inc.*, Docket No. 9372 (Fed. Trade Comm'n), available at https://www.ftc.gov/enforcement/cases-proceedings/141-0200/1-800-contacts-inc-matter.

agreements. First, they agreed with each other to stop bidding for each other's branded keywords

(for example, a consumer would no longer see advertisements for Marriott in response to queries

that contained the keyword "Hilton"). Second, they agreed with each other to insert in their

lodging agreements with the OTAs provisions that prohibited the OTAs from competing by

bidding on branded keywords. Third, in written agreements, they in fact agreed with the OTAs

that the OTAs would stop competing by bidding for the hotel Defendants' branded keywords.

50.     Beginning in 2015, the Hotel defendants executed their unlawful scheme and

ceased bidding on each other's branded keywords.

51.     Also beginning in 2015, the hotel Defendants executed their unlawful scheme by

imposing roughly identical prohibitions against branded keyword advertising on the OTAs in their

agreements with them. Each of the Defendants inserted language into their lodging agreements

with Expedia and Priceline that prohibited bidding on the Hotel's branded keywords.

52.     One example of the illegal restrictions now included in the agreements between the

OTAs and the Hotel Defendants is Paragraph 6.1 C of the November 2015 agreement between

Marriott and Expedia, which provides:

> No Party will knowingly use in any way, including a bid in paid
> search engine advertising, any other Parties [sic] intellectual
> property, including the trademarks that are listed in Exhibit G and
> are owned by or licensed to Expedia or Marriott, as applicable
> (whether or not registered) for use in connection with hotel
> services. Expedia will list Marriott Marks listed in Exhibit G as
> well as its common misspelling as negative keywords as indicated
> in order to prevent its ads from appearing as a result of a search for
> those terms.

53.     Another example is in Paragraph 12 of the August 2015 agreement between

Hilton and Expedia, which provides:

> neither Party shall knowingly bid on or otherwise use any of the
> other Party's trademarks … or common misspellings for use in
> connection with hotel services with the intent of targeting

- 15 -

specifically the other Party's properties or services. Each Party
shall actively apply negative keywords for the Marks and common
misspellings of the other Party.

54.     Also beginning in 2015, the Defendants began a campaign of sending cease-and-

desist letters to "affiliate" OTAs (OTAs who obtain their inventory from the top tier OTAs like

Expedia or Priceline who have direct relationships with the hotel Defendants) to attempt to

prevent those affiliate OTAs from engaging in branded keyword search advertising.

55.     The result of these agreements between the Defendants, and between Defendants

and Priceline and Expedia, is visible in the search results of the major search engines.

56.     For example, a search for Honolulu Hyatt no longer carries advertisements from

Defendants other than Hyatt, and no longer carries advertisements from Priceline, Expedia, or any

of their owned websites. Instead, the ads that appear, if any, are from Hyatt, and from perhaps one

of the non Expedia or Priceline-owned OTAs who have not yet been intimidated by a cease-and-

desist letter. The screenshots below offer examples.  A search for Honolulu Hyatt on Bing yields

only ads from Hyatt and from non-owned OTAs.  A search for Detroit Marriott on Google yields

only a single ad from Marriott. Neither yields any ads from competitors, nor any from the well-

known Priceline or Expedia websites that make up over 90% of OTA traffic.



57.     A search for Los Angeles InterContinental yields only advertisements for

InterContinental:



58.     The same is true for a search for Chicago Hilton; it yields just advertisements for Hilton:



59.     The effect of these agreements was to impair competition, resulting in direct harm to consumers in interfering with the free flow of information from sellers to buyers, raising the costs to consumers of finding the most suitable offering, increasing transaction prices, and raising

the price of hotel rooms sold online by reducing the downward pricing pressure exerted by OTAs and each other. As a result of the illegal agreements, Plaintiff and the Class have been damaged by paying more for hotel rooms than they otherwise would in the absence of the agreements, and by incurring search and transaction costs higher than they would in the absence of the agreements.

### VI.     THE RELEVANT MARKET AND DEFENDANTS' MARKET POWER

60.     Plaintiff in Count I alleges a *per se* violation of the antitrust laws.  For this reason, there is no need to plead a relevant product or geographic market.

61.     To the extent it is required for Counts I or II, Plaintiff alleges that the relevant product market in this case is the direct online sale of hotel room reservations, which includes bookings through any of the Defendants' websites and those of OTAs.  The online booking penetration rate in the United States is nearly 70%. Hotel Defendants control a substantial percentage of available hotel rooms in the United States, and OTAs Expedia and Priceline (and the affiliates they own and control) account for more than 90% of online travel agency bookings in the United States. Defendants and OTAs account for over 75% of all hotel rooms reserved online.[4]

62.     Online reservations have unique functional characteristics which make them attractive to travelers.  They permit travelers to easily search many different hotel types and locations in their desired areas.  Many online travel agency websites also have reviews provided by consumers with which to evaluate different properties.  There is a distinct group of travelers who want to book hotel rooms online, rather than in person or over the telephone.

---

[4] https://skift.com/2017/07/10/hotel-and-online-travel-agency-direct-booking-winners-and-losers-in-5-charts/

63.     Consumers prefer the ease of internet hotel bookings, which has led to the explosive growth of the online hotel room booking market.

64.     The relevant geographic market in this case is the United States.

65.     To the extent the Rule of Reason needs to be applied to these facts, no elaborate industry analysis is necessary. The agreement is a horizontal agreement among competitors making up a substantial percentage of the marketplace for hotel rooms to withhold competitive information from consumers and to contractually prevent the agents of competitors from doing so. The refusal to compete in this way, and interference with the free flow of information from sellers to buyers, causes direct harm to buyers. There is no countervailing pro-competitive justification. Even without proof of market power, there is no justification for such a naked restraint of trade by agreement among competitors.  However, the hotel Defendants together do possess market power, controlling a substantial percentage of the hotel rooms in the United States, and the contracts with the OTAs have foreclosed over 90% of online travel agents.

### VII.    MARKET EFFECTS OF AND ANTITRUST INJURY DUE TO DEFENDANTS' ANTICOMPETITIVE CONDUCT

66.     The overall effect of Defendants' anti-competitive, exclusionary scheme has been to substantially foreclose and impair competition from each other and from OTAs offering lower-priced or higher quality room reservations.  Indeed, the very purpose of the agreement was to reduce the likelihood that a consumer searching for a branded hotel would be exposed to relevant and potentially attractive information (including information about price) from competing hotels. As alleged above, had the Defendants not improperly foreclosed or stifled each other and OTAs from providing relevant competitive information to consumers in the marketplace, consumers would have enjoyed lower transaction costs and lower room rates. There is a consensus in economic literature that restrictions on advertising among rivals impairs

- 20 -

competition and results in harm to consumers. Here, Defendants recognize the downward pricing pressure that OTAs and their provision of information about competitive alternatives exert on room rates, and limiting consumers' information about OTAs and those alternatives reduces that downward pricing pressure.

67.     There is no credible countervailing pro-competitive justification for the agreements to impede the free flow of competitive information in the marketplace.

68.     The presence of unfettered information about and competitors which were selling lower-priced or higher quality rooms would have forced the Defendants to lower the prices for their rooms in order to remain competitive.

69.     The illegal scheme alleged herein harmed inter-brand as well as intra-brand competition.

70.     During the relevant period, Plaintiff and the other members of the Class purchased hotel rooms directly from the Defendants and from OTAs.  As a result of the Defendants' alleged illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for the hotel rooms they purchased.  Plaintiff would have been able to, *inter alia*, purchase less-expensive hotel rooms had competitors and the agents of competitors been able to engage in unfettered competition.  The prices that Plaintiff and the other Class members paid for hotel rooms during the Class Period were greater than the prices that Plaintiff and the Class members would have paid absent the illegal conduct alleged herein because: (1) the prices of all online hotel rooms were higher due to the Defendants' illegal conduct; and (2) Class members were deprived of information about the opportunity to purchase hotel rooms from the Defendants' competitors at lower prices.  Thus, Plaintiff and the Class have, as a consequence, sustained damages in the form of overcharges and higher transaction costs.

- 21 -

## VIII.   CLASS ALLEGATIONS

71.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this

class action on behalf of themselves and all members of the following class (the "Class"):

> All persons throughout the United States who, during the period
> January 1, 2015 through the present, paid for a room reserved from
> any OTA or Defendants' online websites.

72.     Plaintiff believes that they include thousands of consumers and businesses across

the United States, though the exact number and the identities of the Class members are currently

unknown.

73.     The members of the Class are so numerous that joinder of all Class members is

impracticable.

74.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions affecting solely individual members of the Class.  Nearly all

factual, legal, and statutory relief issues raised in this Complaint are common to each of the

members of the Class and will apply uniformly to every member of the Class.  Among the

questions of law and fact common to the Class members are:

a.      whether Defendants engaged in agreements, contracts, combinations, and

conspiracies, which had the purpose and/or effect of unreasonably restraining competition and

limiting purchaser access to information about competing and lower-priced hotel rooms;

b.      whether Defendants unreasonably restrained trade;

c.      whether Defendants' anti-competitive contracts, combinations, and

conspiracies have caused Plaintiff and the other members of the Class to suffer antitrust injury in

the nature of overcharges and inflated transaction costs;

d.      whether Defendants' unlawful conduct caused Plaintiff and other members

of the Class to pay more for the hotel rooms than they otherwise would have paid;

e.       the appropriate Class-wide measure of damages;

f.       whether, and in what amount, Plaintiff and the other Class members are entitled to recover treble damages, court costs, and attorneys' fees; and

g.       whether Defendants' anti-competitive conduct is continuing, thus entitling the Class to injunctive relief to promote unrestrained trade and free and fair competition.

75.     Plaintiff's claims are typical of the claims of other members of the Class because Plaintiff and every member of the Class have suffered similar injuries as a result of the same practices alleged herein.  Plaintiff has no interest adverse to the interests of the other members of the Class.

76.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained able counsel with extensive experience in class action litigation.  The interests of Plaintiff are coincident with, and not antagonistic to, the interests of the other Class.

77.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

78.     Plaintiff and other members of the Class have suffered damages as a result of Defendants' unlawful and wrongful conduct.  Absent a class action, Defendants will retain substantial funds received as a result of their wrongdoing, and such unlawful and improper conduct shall, in large measure, go unremedied.  Absent a class action, the members of the Class will not be able to effectively litigate these claims and will suffer further losses, as Defendants will be allowed to continue such conduct with impunity and retain the proceeds of their ill-gotten gains.

- 23 -

79.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Moreover, because the damages suffered by individual members of the Class are relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  The Class is readily definable, and prosecution of this action as a class action will eliminate the possibility of repetitious litigation.  There will be no difficulty in the management of this action as a class action.

## IX.     COUNTS

### COUNT I
### VIOLATION OF 15 U.S.C. § 1
### (*Per Se* Group Boycott/Bid Rigging Agreements)

80.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein. This Count is asserted against the Defendants.

81.     Agreements among and between competitors to refuse to bid on each other's branded keywords restrained trade and the free flow of information from sellers to buyers. These agreements to refrain from bidding, and the scheme in restraint of trade, have harmed competition and caused the prices for hotel rooms to be higher than they would have been without the horizontal agreement between the Defendants and between Defendants and the OTAs.

82.     The agreement not to compete by bidding on one another's branded keywords by the Defendants and by the OTAs is a horizontal *per se* bid rigging and group boycott.

83.     The attendant agreements between the Defendants and with the OTAs to prevent competitive advertising specifically intended to protect the Defendants from price competition from one another and to reduce the downward pressure on pricing that OTAs impose upon the Defendants.  By agreeing to refuse to compete to place advertisements on the major search

engines, Defendants agreed to restrain trade, lessen the flow of information to consumers, disrupt the price setting mechanism of the free market, reduce downward pressure on pricing, and enable them to maintain or raise prices above a competitive level. This scheme achieved its goals, and thereby substantially inflated prices to consumers like Plaintiff.

84.     The Defendants did not act unilaterally or independently, or in their own economic interests, when:

         a.      entering into the agreements;

         b.      refusing to engage in competitive branded keyword advertising against one another; and

         c.      imposing branded keyword advertising restrictions on the OTAs.

85.     The agreements, which amount to a group boycott or bid rigging, are designed to maintain and raise prices, and their execution and enforcement constitute contracts, combinations, and conspiracies that substantially, unreasonably, and unduly restrain trade in the relevant market(s), and harmed Plaintiff and the Class thereby.

86.     The Defendants possess market power.

87.     There is no legitimate, pro-competitive business justification for these agreements or any of them that outweighs their harmful effect. Even if there were some conceivable justification, the Agreements are broader than necessary to achieve such a purpose.

88.     Plaintiff and members of the Class were injured in their business or property by the collusion and conspiracy alleged above, which facilitated, enabled, assisted, or furthered Defendants' substantial foreclosure and exclusion of competition in the relevant market(s).

89.     Without limiting the generality of the foregoing, Plaintiff and the other members of the Class have been forced to incur higher transaction costs and to pay higher prices for rooms than they would have paid in the absence of Defendants' unlawful conduct.

**COUNT II**
**VIOLATION OF 15 U.S.C. § 1**
**(Agreements Unreasonably Restraining Trade)**

90.     Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.  This Count is brought in the alternative if the conduct at issue is not a *per se* violation.

91.     The horizontal agreements to stop competitive branded keyword advertising, and the scheme in restraint of trade, have harmed competition in the relevant market and caused prices to be higher in the relevant market than the prices would have been without the horizontal agreement between the Defendants and the agreements between each of the Defendants and the OTAs.

92.     The agreements to restrict and eliminate competitive branded keyword advertising were specifically intended to reduce the availability to consumers of competitive information, including information concerning price and quality of competitive alternatives, in order to reduce downward pricing pressure. Thus, the Defendants sought to, and succeeded in, restricting the availability of competitive information in the marketplace, interfering with the free flow of information from sellers to buyers, and reducing the downward pricing pressure that free flow of information exerted.  This scheme achieved its goals, directly harming consumers and substantially inflating prices to consumers like Plaintiff.

93.     The Defendants did not act unilaterally or independently, or in their own economic interests, when:

        a.      entering into the agreements;

- 26 -

       b.     refusing to engage in competitive branded keyword advertising against one another; and

       c.     imposing restrictions on the OTAs.

94.     The agreements, and their enforcement, constitute contracts, combinations, and conspiracies that substantially, unreasonably, and unduly restrain trade in the relevant market(s), and harmed Plaintiff and the Class thereby.

95.     These agreements cover a sufficiently substantial percentage of relevant market(s) to harm competition.

96.     The Defendants are liable for the creation, maintenance, and enforcement of the agreements under a "quick look" and/or rule of reason standard.

97.     The Defendants possess market power.

98.     These agreements harm intra-brand and inter-brand competition by artificially impeding the flow of competitive information to consumers and raising prices.

99.     There is no legitimate, pro-competitive business justification for these agreements or any of them that outweighs their harmful effect.  Even if there were some conceivable justification, the agreements are broader than necessary to achieve such a purpose.

100.     Plaintiff and members of the Class were injured in their business or property by the collusion and conspiracy alleged above which facilitated, enabled, assisted, or furthered Defendants' substantial foreclosure and exclusion of competition in the relevant market(s).

101.     Without limiting the generality of the foregoing, Plaintiff and the other members of the Class have been forced to incur higher transaction costs and to pay higher prices for rooms than they would have paid in the absence of Defendants' unlawful conduct.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff, on her behalf and on behalf of the Class, prays for judgment, as follows:

A.    For an Order certifying this case as a class action against Defendants and appointing Plaintiff as Representative of the Class;

B.    For money damages against Defendants and in favor of Plaintiff and the Class on all claims asserted in this Complaint as allowed by statute;

C.    For costs of suit incurred herein;

D.    For prejudgment interest to the extent allowed by law;

E.    For penalties as allowed by law;

F.    For permanent injunctive relief to enjoin further violations of the law;

G.    For attorneys' fees; and

H.    For such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues triable of right by jury.

DATED:  May 23, 2018.

HAGENS BERMAN SOBOL SHAPIRO LLP


By: */s/ Steve W. Berman*
    Steve W. Berman

HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

010726-11 1033394 V1

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
455 Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
Email: beth@hbsslaw.com

*Counsel for Plaintiff and the Proposed Class*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on May 23, 2018, a true and correct copy of the foregoing was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record.

/s/ *Steve W. Berman*
Steve W. Berman

010726-11 1033394 V1