**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KAREN TICHY, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:18-cv-01959 |
| HYATT HOTELS CORPORATION; | ) | |
| HILTON DOMESTIC OPERATING | ) | Hon.  Rebecca R. Pallmeyer |
| COMPANY INC.; SIX CONTINENTS | ) | |
| HOTELS, INC.; MARRIOTT | ) | Magistrate Judge M. David Weisman |
| INTERNATIONAL, INC.; and WYNDHAM | ) | |
| HOTEL GROUP, LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**REPLY IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS**
**FIRST AMENDED COMPLAINT**

Dated:    August 10, 2018

## TABLE OF CONTENTS

Page

I.     INTRODUCTION ..................................................................................................1

II.    ARGUMENT ........................................................................................................2

    A.    Plaintiff's Opposition Confirms Her Failure to Plausibly Allege a Conspiracy. ..................................................................................................2

        1.    The Complaint Contains Only *Conclusory*—Not "Direct-Evidence"—Allegations of Agreement. ...................................3

        2.    Plaintiff's Circumstantial Allegations of Agreement Also Fail. ................................................................................................4

        3.    Plaintiff's Claimed "Plus Factors" Fail to Support Her Allegations of Conspiracy...........................................................7

            a.    Plaintiff's allegations do not show a sudden, anomalous change in behavior.....................................7

            b.    Plaintiff's allegations do not show Defendants took any action against their unilateral self-interest. ........................10

    B.    Plaintiff's Opposition Confirms That Her Alleged Injury Is Far Too Remote, Speculative, and Implausible to Confer Antitrust Standing. ............................................................................................11

III.   CONCLUSION..................................................................................................15

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................... *passim*

*El Aguila Food Prods., Inc. v. Gruma Corp.*,
  301 F. Supp. 2d 612 (S.D. Tex. 2003) ..................................................................15

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ...............................................................................................7

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
  998 F.2d 391 (7th Cir. 1993) ................................................................................12

*In re Baby Foods Antitrust Litig.*,
  166 F.3d 112 (3rd Cir. 1999) .............................................................................3, 8

*In re Broiler Chicken Antitrust Litig.*,
  290 F. Supp. 3d 772 (N.D. Ill. 2017) .....................................................................9

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  No. 18 CV 868,2018 WL 2193236 (N.D. Ill. May 14, 2018).................................3

*In re High Fructose Corn Syrup Antitrust Litig.*,
  295 F.3d 651 (7th Cir. 2002) ..................................................................................3

*In re Late Fee & Over-Limit Fee Litig.*,
  528 F. Supp. 2d 953 (N.D. Cal. 2007) ....................................................................8

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) ................................................................................9

*In re Nat'l Ass'n of Music Merchs., Musical Instruments and Equip. Antitrust
  Litig.*,
  MDL No. 2121, 2012 WL 3637291 (S.D. Cal. Aug. 20, 2012) ...............................5

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.*,
  997 F. Supp. 2d 526 (N.D.Tex. 2014) ........................................................... *passim*

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ...................................................................6, 7, 8, 11

*In re Travel Agent Comm'n Antitrust Litig.*,
  583 F.3d 896 (6th Cir. 2009) ..................................................................................4

*Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.*,
    No. 12-CV-3012, 2016 WL 8416760 (D. Colo. July 13, 2016) ...............................................15

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
    775 F. Supp. 2d 1071 (N.D. Ill. 2011) ...........................................................................9, 11

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)............................................................................................................14

*O'Neill v. Coca-Cola Co.*,
    669 F. Supp. 217 (N.D. Ill. 1987) .....................................................................................14

*Papasan v. Allain*,
    478 U.S. 265 (1986)..............................................................................................................3

*Thompson v. 1-800 Contacts, Inc.*,
    No. 2:16-CV-1183, 2018 WL 2271024 (D. Utah May 17, 2018) ...................................13, 14

*United Mine Workers of Am. v. Pennington*,
    381 U.S. 657 (1965) .............................................................................................................7

*US Airways Grp., Inc. v. British Airways PLC*,
    989 F. Supp. 482 (S.D.N.Y. 1997)......................................................................................15

**Agency Proceedings**

*In re 1-800 Contacts, Inc.*,
    Dkt. 9372, 2017 FTC LEXIS 125 (F.T.C. Oct. 27, 2017) ...........................................13, 14, 15

**Statutes**

15 U.S.C. § 15............................................................................................................................15

**Other Authorities**

P. Areeda & H. Hovenkamp, Antitrust Law ¶ 307d (Supp. 2006) ................................................11

I.    **INTRODUCTION**

Plaintiff's Opposition Brief ("Opp.") confirms that she has not pleaded—and cannot plead—a plausible claim of conspiracy among Defendants.  Faced with a fatal lack of the "factual matter" required to state a claim, Plaintiff resorts to misdirection.  Plaintiff argues that her Complaint must be "[r]ead in full" to account for important allegations that Defendants supposedly "neglect[ed]" to address.  Opp. 1.  But the only such allegations Plaintiff points to are *conclusory assertions* of an unlawful agreement—assertions the Supreme Court instructs must be ignored in assessing whether an antitrust plaintiff has stated a claim of conspiracy.  Setting these conclusions aside, the Complaint lacks any real factual allegations to support its conspiracy claim.

Plaintiff also attempts to downplay the significance of the prior—and likewise deficient— lawsuit brought by her counsel, arguing that the "similarities" between the cases "end" with the fact that they both concern hotel companies and OTAs.  Opp. 9-10.  Plaintiff asserts that the conspiracy she alleges is "much simpler" than the "br[oad] and complex[]" conspiracy alleged in the prior case, for which reason she claims—without citation—that "the court concluded that more exhaustive and pointed allegations were required to state a claim for relief that was plausible on its face."  *Id.* at 10.  No such "conclusion" is found anywhere in the court's decision, which simply applies the *Twombly* pleading standards.  And the similarities in the deficiencies between this Complaint and the *OTC Hotel Booking* complaint abound.  Both complaints:

- are grounded in the same factual basis (the same "real nub")—parallel conduct embodied in the lodging agreements between each hotel Defendant and OTA and their alleged enforcement—along with an "obvious alternative explanation" for the terms at issue provided by "common economic experience and the Complaint itself," *see In re Online Travel Co. (OTC) Hotel Booking Antitrust Litig.,* 997 F. Supp. 2d 526, 537-38 (N.D. Tex. 2014) ("*OTC Hotel Booking*"); Memo. in Support of Defendants' Joint Motion to Dismiss ("Brief" or "Br." 9-11);

- rely on the same type of conclusory—and thus legally irrelevant—assertions of an agreement, on which Plaintiff now heavily leans but which should not be accepted as true in assessing the adequacy of her Complaint, *see* 997 F. Supp. 2d at 531, 541

n.25; Br. 13-14 and *infra* at Section II(A)(1);

- employ the same conclusory and internally inconsistent assertions that Defendants' parallel conduct was somehow against their unilateral self-interest, *see* 997 F. Supp. 2d at 538-39; *infra* at Section II(A)(3)(b); and

- fall back on insufficient allegations that Defendants had the mere *opportunity* to conspire through participation in a trade association and attendance at industry meetings (although those allegations were more detailed in *OTC Hotel Booking* than here), *see* 997 F. Supp. 2d at 541-42, embellished with similarly "cherry-pick[ed] words" from related documents, *id.* at 542; Br. 11-14 and *infra* at Section II(A)(2).

In a thorough but straightforward application of *Twombly* and its progeny, the court in *OTC Hotel Booking* rejected these allegations as insufficient to state a plausible claim of conspiracy. The Court should do the same here.

Plaintiff's arguments regarding antitrust standing, in which she focuses on two recent decisions involving 1-800 Contacts' use of settlement agreements to restrict branded keyword bidding by its competitors, are equally deficient. Indeed, the decisions highlight the types of specific market realities necessary to support such an antitrust theory of harm that are wholly lacking here. Plaintiff fails to explain how the conduct she alleges, even if true, could cause the injury she claims. Her Complaint should be dismissed for this independent reason.

## II. ARGUMENT

### A. Plaintiff's Opposition Confirms Her Failure to Plausibly Allege a Conspiracy.

Despite the utter absence in her Complaint of the factual content necessary to plausibly allege an agreement, Plaintiff now claims that she has alleged "direct evidence" of a conspiracy. The Complaint contains nothing of the sort. The allegations Plaintiff points to are pure conclusions, which under the governing pleading standards are legally irrelevant.

Plaintiff also claims she has identified two purported "plus factors" that "contribute" to the sufficiency of her claim—that Defendants engaged in a sudden, suspicious change in behavior, and took actions against their unilateral self-interest. *See* Opp. 7-8. Neither places Defendants'

alleged parallel conduct "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

### 1. The Complaint Contains Only *Conclusory*—Not "Direct-Evidence"—Allegations of Agreement.

Plaintiff now asserts that she alleges "direct evidence of agreement" (Opp. 3) in her Complaint and that Defendants ignored these "significant allegations" (*id.* at 4). The only specific allegations she points to (*see id.* at 4 n.19) are:

- the Complaint's opening paragraph introducing the Defendants' alleged "scheme" and asserting they "engaged in an anti-competitive . . . agreement" (¶ 1);

- paragraphs summarizing the "two parts" (¶ 12)—or three (¶ 49)—of the theorized agreement;

- one paragraph asserting summarily that "[b]eginning in 2015" Defendants "executed their unlawful scheme" (¶ 50); and

- one paragraph stating, in setting forth the Complaint's first Count, that this agreement is "a horizontal per se bid rigging and group boycott" (¶ 82).

These naked assertions are not "direct evidence" of an agreement[1]; they are *conclusions*, and legally incapable of supporting an actionable claim. *E.g.*, *Twombly*, 550 U.S. at 555 (a plaintiff must provide "more than labels and conclusions") (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986) (courts "are not bound to accept as true a legal conclusion couched as a factual allegation" on a motion to dismiss)).[2] If such bare assertions had to be accepted as true, no complaint of an

---

[1] "Direct evidence" means "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted," *In re Baby Foods Antitrust Litig.*, 166 F.3d 112, 118 (3rd Cir. 1999), and is "tantamount to an acknowledgement of guilt." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002). A recent decision from this District cited by Plaintiff (Opp. 8 n.52) includes a clear example of "direct-evidence allegations of . . . agreement." *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18 CV 864, 2018 WL 2193236, at *12 (N.D. Ill. May 14, 2018) (recounting specific allegations that "two of Defendants' executives admitted an agreement to block [plaintiff] and other integrators from accessing dealer data").

antitrust conspiracy would ever be dismissed, and *Twombly* would have no meaning.

Plaintiff seeks to buttress these legally insufficient conclusions by attempting to distinguish her Complaint from the one at issue in *Twombly*, arguing the plaintiffs there "did not 'directly allege illegal agreement' and instead 'proceed[ed] *exclusively* via allegations of parallel conduct.'" Opp. 9 (citing 550 U.S. at 564 n.11) (Plaintiff's emphasis). In fact, the *Twombly* Court characterized the plaintiffs' complaint this way after noting that it included "a few stray statements" in a handful of paragraphs—just like the Complaint here—that "speak directly of agreement," but which "on fair reading [were] merely legal conclusions resting on the prior allegations." 550 U.S. at 564 & n.9. The Court thus fully accounted for these conclusory assertions when it concluded that the complaint before it lacked "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. The only *factual* allegations for the Supreme Court to consider—as is true here—were the complaint's allegations of parallel conduct.

### 2. Plaintiff's Circumstantial Allegations of Agreement Also Fail.

Given the entirely conclusory nature of the assertions of agreement, Defendants' motion focuses on the Complaint's nominally "factual" allegations about Defendants' attendance at an industry conference, and their trade association participation. Br. 7-8, 11-14. Plaintiff simply alleges that: (1) unnamed employees of Defendants *attended* a November 2014 industry conference, while cherry-picking excerpts from slides presented by two of the conference's *speakers* and then *posted on the internet* (Compl. ¶¶ 43-44); (2) Defendants were members of the

---

[2]  *See also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009) (allegations asserting an agreement between defendants were "nothing more than a legal conclusion masquerading as a factual allegation") (quotation marks omitted); *OTC Hotel Booking*, 997 F. Supp. 2d at 541 & n.25 (rejecting "various conclusory references to private communications between Defendants" including that "the conspiracy 'was reached . . . by discussions at industry trade meetings and in private communications where Defendants jointly discussed, urged and agreed to [sic] adoption of rate parity in all channels'").

American Hotel & Lodging Association ("AHLA") (*id.* ¶ 44); and (3) each Defendant had an executive who served on the AHLA's Board in 2014, listed by name (*id.* ¶ 45). None of these allegations—taken individually or together—support a plausible claim of conspiracy as a matter of law. Plaintiff does not allege that these particular executives reached the alleged agreement at the November 2014 conference in Dallas, which was *not* a meeting of the AHLA or its Board (*see id.* ¶¶ 43-45), and Plaintiff does not allege that any particular employees of any Defendant attended that conference, or talked there.

Nor can Plaintiff support a claim by pairing these allegations with the conclusory assertion that "Defendants, *through these officers **and others***, used *AHLA meetings **and other meetings*** to discuss, coordinate, and arrive at" this "scheme." *Id.* ¶ 45 (emphasis added). These allegations provide no more factual content than what anyone with an online roster of board membership could plead, attached to a vague and conclusory assertion of agreement. They mention no "specific time, place, or person involved in the alleged conspirac[y]." Opp. 9 (quoting *Twombly*, 550 U.S. at 565 n.10). They provide only "conclusory allegation[s] of agreement at some unidentified point," thereby failing to "supply facts adequate to show illegality." 550 U.S. at 557.

Plaintiff does nothing more than allege that Defendants attended industry meetings and participated in a trade association, and that they had representatives who sat—along with many others, *see* Br. 12-14—on that association's Board. As Defendants explained in their motion to dismiss, the law is clear that membership, attendance, and participation in trade associations does not render a conspiracy plausible. Br. 11-13. Plaintiff also fails to address the authority (*id.* at 12-13) recognizing that the presence of uninvolved individuals at meetings where alleged conspiracies are formed undermines any "suggestion that a secretive . . . agreement came out of these meetings." *See OTC Hotel Booking*, 997 F. Supp. 2d at 541-42 & n.28 (citing *In re Nat'l Ass'n of Music Merchs., Musical Instruments and Equip. Antitrust Litig.*, MDL No. 2121, 2012

WL 3637291, at *2 (S.D. Cal. Aug. 20, 2012)).

Plaintiff's attempt to analogize her Complaint to the allegations in *In re Text Messaging Antitrust Litigation* is also meritless. Opp. 6-7. The Complaint here lacks any factual allegations that Defendants "exchanged price information directly at association meetings" or belonged to anything like the "elite 'leadership council,'" with its "stated mission . . . to urge its members" not to compete, that were alleged there. 630 F.3d 622, 628 (7th Cir. 2010). Plaintiff repeats the snippets her Complaint (¶¶ 43-44) cherry-picked from public presentations from the 2014 Dallas conference, a technique her counsel employed without success in *OTC Hotel Booking*.[3] But the statements were **not made by any Defendant**, and Plaintiff does not allege they were discussed, approved of, or even heard by any representative of any Defendant.

The presentations also involved the sort of topics expected at industry conferences (*see* Br. 12 n.5), and neither touched on the alleged restraint here—keyword bidding:

- The first statement is from a consultant's public presentation about prevailing market conditions (not keyword bidding), described as his "Random . . . Thoughts." Compl. ¶ 43 (citing Lesser Presentation, slide 8, *available at* http://www.dallashotelconference.com/Documents/2014_Dallas_Hotel_Conference_ Presentations.pdf). Plaintiff does not contend that any Defendant took any action in response, much less agreed with any other Defendant to do so.

- The second set of statements comes from the AHLA president's public presentation touting the lobbying efforts of her organization, about the Affordable Care Act, wage laws, immigration reform, and unequal regulatory treatment of short term online rentals (like Airbnb)—and engaging the FTC and Congress on what it viewed as deceptive consumer practices by OTAs. Compl. ¶ 44 (citing Lugar Presentation). The Complaint suggests, misleadingly, that the presenter "*call[ed]* for 'Unity' and 'Stronger, better alignment,'" *id*., but the document makes clear that "Unity, Participation, and Focus" was "[d]riving" the AHLA **in these petitioning efforts**—

---

[3] 997 F. Supp. 2d at 542 ("[T]he 'pricing discussion' that took place at the EyeforTravel conferences are not suspicious at all. Plaintiffs cherry-pick words like 'price' and 'rate parity' from topic headings at the conferences in an effort to categorize these as 'pricing discussions' among competitors, but a fair reading of these topic headings reveals innocent business-related discussions that one would expect to see at an industry conference.").

facilitated by "[s]tronger, better alignment," membership growth, and "sustained focus on advocacy." Lugar Presentation, slides 2-5.[4]

- The Complaint also misleadingly suggests that when Ms. Lugar addressed "Deceptive Ad Buys: Unauthorized Purchase of Words," she was "referring to the purchase of branded keywords by OTAs." Compl. ¶ 44. But the slide (Lugar Presentation, slide 22) addresses OTAs' use of hotel brand names or URLs *in website links*, deceiving users to believe they would be directed to a hotel's official website when they would be routed to an OTA-owned one instead. The AHLA's concern was later vindicated by the FTC's enforcement action against Reservation Counter, LLC, which settled charges it had misled consumers through such means. *See* Fed. Trade Comm'n, Hotel Room Resellers Settle FTC Charges That They Misled Consumers (Dec. 22, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/hotel-room-resellers-settle-ftc-charges-they-misled-consumers.

In any event, there is nothing about these presentations to suggest that Defendants reached an agreement to restrict bidding for branded search terms. Plaintiff's effort to equate them to the "exchange of price information" at trade shows alleged in *Text Messaging* is entirely unsupported.

### 3. Plaintiff's Claimed "Plus Factors" Fail to Support Her Allegations of Conspiracy.

#### a. Plaintiff's allegations do not show a sudden, anomalous change in behavior.

Plaintiff attempts to prop up these insufficient allegations by invoking as a "plus factor" that "Defendants' actions suspiciously followed an important industry conference" (Opp. 8)— apparently referring to the hotel conference in November 2014.[5] But Plaintiff's own allegations do not describe the sort of sudden shift in behavior that courts recognize can suggest a preceding agreement. *See*, *e.g.*, *Twombly*, 550 U.S. at 556 n.4 ("[C]omplex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no

---

[4]   These joint petitioning efforts are protected under the First Amendment and cannot form the basis for an antitrust violation. *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 669-70 (1965).

[5]   Plaintiff's actual allegations about the formation of the alleged conspiracy are less definitive about its timing. *E.g.*, Compl. ¶ 49 ("Following the meeting in Dallas, and through that meeting *and* meetings of the AHLA, *in or about 2015*, . . . the Defendants agreed to prevent branded keyword advertising by three means and agreements.") (emphasis added).

other discernible reason" can be suggestive of collusion) (quotation marks omitted); *Text Messaging*, 630 F.3d at 628 ("[T]here is an allegation that **all at once** the defendants changed their pricing structures . . . , and then **simultaneously** jacked up their prices by a third.") (emphasis added). The Complaint alleges vaguely that "*[b]eginning* in 2015, the Hotel defendants executed their unlawful scheme," Compl. ¶ 50 (emphasis added), and, that Plaintiff searched Google for hotel rooms using Defendants' branded keywords "[i]n 2015, 2016, and 2017," and "*began to notice* fewer competitive options being presented," *id*. ¶ 15 (emphasis added). There are no other details than that, aside from screen shots of four incomplete and undated Google searches. *See id*. ¶¶ 56-59.

Plaintiff's vague allegations that Defendants engaged in a parallel shift in their practices over the course of a year or more does not suggest a preceding agreement. Such a gradual adoption of similar practices over time "'refute[s] rather than support[s]' allegations of conspiracy." *In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) (citing *In re Baby Foods Antitrust Litig.*, 166 F.3d at 131-32 (lag time of three to six months between price changes does not suggest conspiracy)). "[T]his kind of pricing pattern is 'just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market,' . . . as it is with an agreement on pricing." *Id.* at 962 (quoting *Twombly*, 550 U.S. at 554); *see also OTC Hotel Booking*, 997 F. Supp. 2d at 542-43.

The Complaint itself also describes those "common perceptions of the market," which existed far earlier than the supposed agreement. It cites a 2013 study that explained the costs imposed on hotels by OTA's brand bidding, and made suggestions for how individual hotel and OTA pairs could structure their agreements to control them. *See* Compl. ¶ 30 ("That study also noted that 'In certain situations, brand bidding by OTAs . . . may be harmful—reducing the

brand's traffic and direct bookings,'" leading to higher distribution costs).  The Complaint also describes the OTAs' "explosive growth" and "increased . . . popularity among consumers" "in recent years" (*id.* ¶ 31), while also acknowledging that OTAs impose greater distribution costs on hotels and deny them opportunities to develop customer loyalty through direct bookings.  Though Plaintiff now tries to downplay those aspects of her Complaint, they provide "an obvious alternative explanation" for Defendants' allegedly parallel conduct.  Contrary to Plaintiff's argument (Opp. 8 & n.51), courts should not ignore such "obvious alternative explanations" for parallel conduct in determining whether it can be "placed in a context that suggests a preceding agreement," particularly where the complaint itself provides that explanation.  *See Twombly*, 550 U.S. at 567-68 (plaintiff's "complaint itself gives reasons to believe that the ILECs would see their best interests in keeping to their old turf" in concluding that the ILECs' parallel conduct did not support plaintiff's conspiracy theory); *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1195 (9th Cir. 2015) (finding plaintiffs' Section 1 allegations insufficient where complaint provided "ample independent business reasons" why each defendant engaged in alleged parallel conduct).

The two decisions Plaintiff cites to support her argument about the supposedly "suspicious" timing of Defendants' alleged conduct involved allegations of far more detailed and suspect sequences of behavior than Plaintiff provides here.  Opp. 7-8 (citing *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071 (N.D. Ill. 2011) and *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772 (N.D. Ill. 2017)).  *Kleen Products* involved allegations of a series of specific industry meetings each followed in short order by uniform price increases or capacity reductions.  775 F. Supp. 2d at 1076-77.  And the complaint in *Broiler* alleged a similar series of conferences immediately preceding public pronouncements by multiple defendants of production cuts and calls, soon heeded, for further cuts industry-wide.  290 F. Supp. 3d at 782-83,

798. Far from supporting her case, these decisions highlight the inadequacy of Plaintiff's allegations.

**b.**     **Plaintiff's allegations do not show Defendants took any action against their unilateral self-interest.**

Plaintiff also claims as a "plus factor" that Defendants supposedly acted against their own self-interest by "ceasing to bid for each other's branded keywords." Opp. 8. This assertion is based only on the allegation that "[a]ppearing at or near the top of a search results page is in [a] competing hotel's interest, and bidding for [a competitor's] keywords can help ensure that happens." *Id.* at 5 (quoting Compl. ¶ 9). The *OTC Hotel Booking* court rejected plaintiffs' similar "contention that Defendants' actions go against Defendants' business interests" as "an unsupported conclusion." 997 F. Supp. 2d at 539. Here, Plaintiff's speculative conclusion that it is in each hotel's interest to bid for its competitors' keywords ignores that such advertising *isn't free*. She alleges no facts to suggest that this particular means of advertising, one targeted at consumers who have *already "express[ed] an interest" in a competitor's brand* by using it in their searches (Compl. ¶ 3), would be a sound use of Defendant's limited marketing resources.

Plaintiff also seeks to argue what her Complaint never pleads. The Complaint is careful to avoid actually alleging that any *Defendant* ever "regularly bid for [competitors'] branded keywords," only that "[OTAs] and competing brands" did. *See* Compl. ¶¶ 10, 30. And the only factual support for the Complaint's allegation about historical bidding practices comes from a 2013 study (*id.* ¶ 30) that never actually states that any Defendant ever bid on other hotel brands' keywords. In any event, the *Twombly* Court rejected a similar argument about business opportunities allegedly foregone by defendants.[6] The fact that a firm might not avail itself of

---

[6]  *See Twombly*, 550 U.S. at 551 (describing allegations that the defendants' "common failure 'meaningfully [to] pursue' 'attractive business opportunit[ies]' in contiguous markets where they possessed 'substantial competitive advantages'") (adjustments omitted).

every opportunity to pursue a particular customer—in this case through a particular form of advertising—does not suggest it is conspiring to restrain trade.[7]  Defendants' alleged respective choices to forego bidding on competitors' brands are thus not suspicious at all.  They are not like the allegations in *Text Messaging*—simultaneous and substantial increases in prices "in the face of steeply falling costs," accompanied by a rapid change from "heterogeneous and complex" pricing structures to uniform ones (630 F.3d at 628)—or in *Kleen Products*, where defendants made a series of "specific capacity and pricing decisions" to "cut capacity despite a favorable economic environment" and forecasts of "rising demand" (775 F. Supp. 2d at 1078-79).

Plaintiff also contends Defendants had a "motive to collude to steer consumers away from" OTA websites because the OTAs "'are costly to hotels and put downward pressure on the prices of hotel rooms,'" and an "incentive" to do so, because Defendants profit more when identical rooms are booked directly and they can maintain the customer relationship.  Opp. 4-5 (citing Compl. ¶¶ 2, 36-37).  But, as Defendants demonstrated, these are compelling *unilateral* incentives that would motivate *each* Defendant's individual behavior with no conspiracy needed to explain it.  Br. 9-11 (citing *OTC Hotel Booking*, 997 F. Supp. 2d at 538-39 ("[T]hese 'common motives' just as well explain why Hotel Defendants (because each wanted to control online prices for its own rooms) and OTA Defendants (because each wanted an assurance the minimum price it must publish would not be undercut) individually entered into RPM agreements.")).  That makes these allegations legally incapable by themselves of supporting the conspiracy Plaintiff posits.

### B.    Plaintiff's Opposition Confirms That Her Alleged Injury Is Far Too Remote, Speculative, and Implausible to Confer Antitrust Standing.

Plaintiff's theory, as refined in her brief, is that Defendants "manipulat[ed] content that

---

[7]    *Twombly*, 550 U.S. at 568 (recognizing firms "'do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets'") (quoting P. Areeda & H. Hovenkamp, Antitrust Law ¶ 307d at 155 (Supp. 2006)).

appears at the top of [online search engine] search-results pages," and that this "steer[ed] consumers away from [OTAs] and to Defendants' websites" despite OTAs' websites appearing on those same search results further down the page. Opp. 12. Although Plaintiff does not allege the OTAs charge lower prices for Defendants' rooms, she leaps to the conclusion that the effect of this "scheme" was to raise hotel prices (*id.*)—and indeed to do so for all hotel rooms nationwide (Compl. ¶ 70). The link between the conduct Plaintiff challenges and her claimed injury is far too remote and speculative to grant her antitrust standing. *See Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993) (antitrust standing requires "a direct link between the antitrust violation and the antitrust injury"); Br. 15-20.

Plaintiff's brief makes clear that the supposed object of Defendants' alleged agreement is even meeker than pled. After being confronted with search-result pages that prominently include OTA websites renting Defendants' hotel rooms—results at odds with her theory—Plaintiff now characterizes her Complaint as alleging "only that Defendants' conspiracy has caused their websites to appear *at the top of the search-results page* when a consumer uses branded keywords." Opp. 14 (emphasis added). In other words, she alleges that when a consumer enters a search using "Hyatt," the first results returned are for Hyatt. And she admits that this is the case only some of the time, conceding that the alleged restraint yields results "inconsistent" with her claims. *Id.* at 15 & n.89. Although she claims in conclusory fashion that the purported agreement ultimately affected prices, what she alleges is anything but a "simple" "price-fixing agreement." *See* Opp. 10, 12. She does not allege Defendants agreed to set specific prices for their rooms, or to cease competing, or even to stop advertising, including on price. They instead supposedly set out to raise prices in a highly roundabout way. Plaintiff, however, once again fails to allege any *facts* to show that this attenuated chain caused her a direct injury.

Rather than offer any factual explanation, Plaintiff's brief rests on a facile analogy to an

FTC administrative law judge's recent decision in *In re 1-800 Contacts* and the District of Utah's decision denying a motion to dismiss a follow-on class action involving advertising restrictions. *See* Opp. 11-14 (discussing *Thompson v. 1-800 Contacts, Inc.*, No. 2:16-CV-1183, 2018 WL 2271024 (D. Utah May 17, 2018) and *In re 1-800 Contacts, Inc.*, Dkt. 9372, 2017 FTC LEXIS 125 (F.T.C. Oct. 27, 2017)). As an initial matter, 1-800 Contacts entered a series of written settlement agreements barring its competitors from bidding on its brand for keyword searches. There was thus no question that the plaintiffs in *Thompson* pled an "agreement" to support their Section 1 claim. Further, the contrasts between the *factual* circumstances underlying the theory of harm there and what is alleged in Plaintiff's Complaint are stark. The *1-800 Contacts* litigation casts a spotlight on the types of common sense, real-world market conditions that would need to exist—but which Plaintiff does not (and could not) allege here—to even begin to make her theory of harm plausible:

- *1-800 Contacts* involved online retailers of *identical* products, where customer demand is largely dictated by doctors' prescriptions. *See* 2017 FTC LEXIS 125, at **18, 339. For that reason, those retailers compete almost entirely based on price. *Id.* at *339. By contrast, hotels compete on many parameters beyond price, including brand loyalty, service, amenities, and the locations of their particular hotels.

- 1-800 Contacts was by far the largest online retailer of contact lenses, *id.* at *143, with a big leg-up in brand recognition, *id.* at *293. Thus, online contact lens customers had good reason to search using 1-800 Contacts' brand, yet no loyalty driving them to purchase identical products from it over another online retailer— thereby allowing smaller competitors to see real value in bidding for 1-800 Contacts' brand in particular.[8] Plaintiff alleges nothing like this dynamic here, where all Defendants have established brands and compete for customers' loyalty based on factors such as the quality of their service, amenities, and location as well as price. As Plaintiff concedes, a customer searching for "New York Hilton" most likely wants to book at a Hilton in New York. *See* Compl. ¶¶ 3, 5.

---

[8]    *See 1-800 Contacts*, 2017 FTC LEXIS 125 at **309-13, 317 ("displaying an ad in response to a search for 1-800 Contacts' trademark is an important method by which lower priced online contact retailers compete with 1-800 Contacts for customers"); *Thompson*, 2018 WL 2271024, at *4 (plaintiff alleged "online advertising" was "one of the primary ways in which" such retailers compete).

- 1-800 Contacts' competitors generally sold their (identical) contacts at lower prices than it did. 2017 FTC LEXIS 125, at **203-04, 342. Thus, any impact on the price paid by a customer who might not have known about those competitors' offerings and purchased instead from 1-800 Contacts was much more proximate to the bidding restrictions. Here, the Complaint does *not* allege that OTAs offered identical rooms at lower prices than any Defendant's own website (which would be contrary to the rate-parity allegations her attorneys sponsored in *OTC Hotel Booking*). Nor does it allege any Defendant systematically priced comparable rooms lower than any other.

Based on these market realities, the specific settlement agreements demanded by 1-800 Contacts to bar its competitors from bidding to have their websites included in search-results for its brand arguably could translate directly into higher consumer prices. Plaintiff's Complaint utterly lacks these or similar factual allegations—and it is undisputed that there is vigorous interbrand competition (including from the many hotels brands that are not named as defendants here).

But in perhaps the most critical difference, there is nothing in the online market for contact lenses like the OTAs here—*i.e.*, popular, massive, and growing resources for side-by-side comparison shopping, Compl. ¶¶ 31-33, 38, which can be accessed by any consumer searching online for hotel rooms just as easily as she can navigate to a hotel's website. Given the alleged popularity and continued growth of the OTAs, there is no basis—and Plaintiff has alleged none—to assert that comparative pricing information was hidden from consumers' view such that there would be higher hotel room prices across-the-board. Unlike in *Thompson* and the other cases Plaintiff cites, consumers here *do* "have the benefit of price advertising" for hotel rooms. *Contra* Opp. 13 n.78 (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 388 (1992)). Plaintiff's conclusory assertion that she paid higher rates for hotel rooms because of the alleged agreement fails to satisfy her pleading burden, because "[p]ure speculation [and] vaguely defined links are not sufficient to establish a chain of causation that demonstrates a threat of antitrust injury." *O'Neill v. Coca-Cola Co.*, 669 F. Supp. 217, 222-24 (N.D. Ill. 1987) (plaintiff lacked antitrust standing where complaint relied on "[m]ere opinion or conclusory statements of what may

14

happen" and did "not specifically allege how higher prices will result from" vertical acquisitions).

The fact that the OTAs provide comparative price information at the click-of-a-button also means that any "higher search costs" in comparing hotel room rates that Plaintiff supposedly incurred were the result of her choices about how to conduct her searches, *i.e.* to search individual hotel websites one-by-one rather than navigating to an OTA. Plaintiff does not allege that she (or any consumer searching for hotels online) is unaware of the existence of the OTAs—and given her own allegations about their size and growth, she could not allege otherwise. Any "injury" she suffered on this ground is thus self-inflicted and cannot give her antitrust standing.[9]

To the extent the *1-800 Contacts* decision suggests that *any* advertising restraint *itself* constitutes an anticompetitive effect no matter how small and regardless of whether it actually affected prices or output, *see* Opp. 14 (citing 2017 FTC LEXIS 125, at *338)—a questionable proposition still subject to appeal—that alone would not give Plaintiff antitrust standing. Plaintiff, unlike the FTC, must also prove that she was in fact injured. 15 U.S.C. § 15. Plaintiff has failed to sufficiently allege any such injury and thus lacks antitrust standing.

## III. CONCLUSION

For each of the foregoing reasons and those in their Brief, Defendants respectfully request that Plaintiff's Complaint be dismissed. Further, because Plaintiff has already amended her Complaint once and her brief says nothing about what more she could allege, dismissal with prejudice is warranted since any further amendment would be futile. *See* Br. 20.

---

[9] *US Airways Grp., Inc. v. British Airways PLC*, 989 F. Supp. 482, 489 (S.D.N.Y. 1997) (defendant's failure to assist in obtaining regulatory approval "cannot have caused antitrust injury since [plaintiff] could have sought and obtained the authority on its own"); *El Aguila Food Prods., Inc. v. Gruma Corp.*, 301 F. Supp. 2d 612, 621 (S.D. Tex. 2003) (challenged agreements were not cause of plaintiffs' loss of retail shelf space where they "refused, based on principle, to negotiate" for that space and thus "suffer[ed] a self-inflicted wound"); *Kissing Camels Surgery Ctr., LLC v. Centura Health Corp.*, No. 12-CV-3012, 2016 WL 8416760, at *6 (D. Colo. July 13, 2016) (no antitrust injury from "paying an illegally inflated price . . . when the paying party disregards its right to pay less or nothing at all," as any such injury is "self-inflicted").

Dated: August 10, 2018

Respectfully submitted,

/s/ Zachary Fardon (with consent)
Zachary Fardon (IL Bar No. 6292156)
KING & SPALDING LLP
444 W Lake Street Suite 1650
Chicago, IL 60606
Telephone: (312) 995-6333
Facsimile: (312) 995-6330
zfardon@kslaw.com

Jeffrey S. Cashdan (IL Bar No. 6203950)
KING & SPALDING LLP
1180 Peachtree Street, NE
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
jcashdan@kslaw.com

*Counsel for Six Continents Hotels, Inc.*


/s/ Carrie C. Mahan (with consent)
Carrie C. Mahan (IL Bar No. 459802)
carrie.mahan@weil.com
WEIL GOTSHAL & MANGES LLP
2001 M Street, N.W.
Washington, D.C. 20036
(202) 682-7000

Stephen J. Siegel (IL Bar No. 6209054)
ssiegel@novackmacey.com
Brian E. Cohen (IL Bar No. 6303076)
bcohen@novackmacey.com
Novack and Macey LLP
100 North Riverside Plaza
Chicago, IL 60606
(312) 419-6900

*Counsel for Hilton Domestic Operating Company Inc.*

/s/ Sean M. Berkowitz
Sean M. Berkowitz (ARDC No. 6209701)
sean.berkowitz@lw.com
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile: (312) 933-9767

Christopher S. Yates (admitted pro hac vice)
chris.yates@lw.com
Brendan A. McShane (admitted pro hac vice)
brendan.mcshane@lw.com
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

*Counsel for Hyatt Corporation*


/s/ Shari Ross Lahlou (with consent)
Shari Ross Lahlou (admitted pro hac vice)
  SLahlou@crowell.com
Jeffrey L. Poston (admitted pro hac vice)
  JPoston@crowell.com
Luke van Houwelingen (admitted pro hac vice)
  LvanHouwelingen@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2500
Fax: (202) 628-5611

Adam A. Kelly
Andrew R. DeVooght
John A. Cotiguala
LOEB & LOEB LLP
321 North Clark Street, Suite 2300
Chicago, IL 60654
Tele: (312) 464-3100
Fax: (312) 873-4187

*Counsel for Defendant Marriott
International, Inc.*

/s/ Paula J. Morency (with consent)
Paula J. Morency
Ann H. MacDonald
Michael K. Molzberger
SCHIFF HARDIN LLP
233 S. Wacker Drive, Suite 7100
Chicago, IL 60606
Telephone:  (312) 258-5500
Facsimile:  (312) 258-5600
pmorency@schiffhardin.com
amacdonald@schiffhardin.com
nnolzberger@schiffhardin.com

Robert J. Wierenga
SCHIFF HARDIN LLP
350 South Main Street, Suite 210
Ann Arbor, MI 48104
Telephone:  (734) 222-1500
Facsimile:  (734) 222-1501
rwierenga@schiffhardin.com

*Counsel for Defendant Wyndham Hotel
Group, LLC*

## CERTIFICATE OF SERVICE

I, Sean M. Berkowitz, hereby certify that on this 10th day of August, 2018, I caused the foregoing to be electronically filed with the Clerk of the Court of the United States District Court for the Northern District of Illinois, Eastern Division, using the CM/ECF system, which sent notification of such filing to all filing users.

/s/ Sean M. Berkowitz
Sean M. Berkowitz (ARDC No. 6209701)