## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **KAREN TICHY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 18 C 1959** |
| | ) | |
| **HYATT HOTELS CORPORATION, HILTON** | ) | **Judge Rebecca R. Pallmeyer** |
| **DOMESTIC OPERATING COMPANY INC.,** | ) | |
| **SIX CONTINENTS HOTELS, INC.,** | ) | |
| **MARRIOTT INTERNATIONAL, INC., and** | ) | |
| **WYNDHAM HOTEL GROUP, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AMENDED MEMORANDUM OPINION AND ORDER

Karen Tichy ("Plaintiff"), on behalf of herself and a putative class of consumers, brings two claims against Defendants Hyatt Hotels Corporation ("Hyatt"), Hilton Domestic Operating Company Inc. ("Hilton"), Six Continents Hotels, Inc. ("Six Continents"), Marriott International, Inc. ("Marriott"), and Wyndham Hotel Group LLC ("Wyndham"), all of which are major U.S. hotel chains. Plaintiff alleges that Defendants violated the Sherman Act's prohibition on contracts or conspiracies in restraint of trade, 15 U.S.C. § 1. Specifically, Plaintiff alleges that Defendants conspired to stop using certain forms of branded keyword search advertising on the Internet, thereby increasing the costs of searching for and booking hotel rooms online. In Count I, Plaintiff alleges a *per se* violation of 15 U.S.C. § 1. In Count II, Plaintiff alleges, in the alternative, an unreasonable restraint on trade in violation of 15 U.S.C. § 1. Defendants now move to dismiss both counts of Plaintiff's complaint. For the following reasons, Defendants' motion is denied.

## FACTUAL BACKGROUND

The following facts are taken from Plaintiff's First Amended Class Action Complaint and recounted in the light most favorable to Plaintiff. *See, e.g.*, *Forgue v. City of Chicago*, 873 F.3d 962, 966 (7th Cir. 2017).

## A. The Parties

Plaintiff is a resident of Clarksville, Virginia.  (First Amended Class Action Complaint [58] ("First Am. Compl.") ¶ 15.)  She used the Internet to search for, reserve, and purchase hotel rooms from one or more of the Defendants in the United States in 2015, 2016, and 2017.  (*Id*. ¶¶ 1, 15.)

Defendant Hyatt is a Delaware corporation with its principal place of business in Illinois.  (*Id*. ¶ 16.)  Hyatt controls thirteen hotel brands, including 739 properties in fifty-seven countries.  (*Id.*)  Defendant Hilton is a Delaware corporation with its principal place of business in Virginia.  (*Id*. ¶ 17.)  Hilton's parent controls 5,168 hotels in 103 countries and territories.  (*Id.*)  Defendant Six Continents is a Delaware corporation with its principal place of business in Georgia.  (*Id*. ¶ 18.)  Six Continents' parent, InterContinental Hotels Group, PLC ("IHG") controls 5,273 hotels in nearly 100 countries.  (*Id.*)  Defendant Marriott is a Delaware corporation with its principal place of business in Maryland.  (*Id*. ¶ 19.)  Marriott controls more than 6,000 hotels in 122 countries and territories.  (*Id.*)  Defendant Wyndham is a Delaware corporation with its primary place of business in New Jersey.  (*Id*. ¶ 20.)  The Wyndham chain is the largest hotel company in the world.  (*Id.*)  It controls more than 8,300 hotels worldwide.  (*Id.*)  Collectively, Defendants "control a substantial percentage of available hotel rooms in the United States."  (*Id*. ¶ 61.)

## B. Online Travel Agencies

Most hotel rooms are sold either directly from a hotel's website or through online travel agencies (OTAs) and their affiliates.  (*Id*. ¶ 2; *see also id*. ¶ 61 (alleging that "[t]he online booking penetration rate in the United States is nearly 70%").)  OTAs, such as Expedia and Priceline, are entities "organized to effectuate travel plans, reservations, and purchases" through the Internet.  (*Id*. ¶ 31.)  OTAs were "virtually unknown" "[a]s recently as 1997," but the online travel industry "has seen explosive growth and consolidation" in recent years.  (*Id.*)

OTAs "obtain access to room inventories through lodging agreements with . . . hotels."  (*Id*. ¶ 34.)  Using OTAs' Internet portals, consumers can view a wide variety of hotel rooms

available in a particular location on a particular date.  (*Id.* ¶¶ 2, 33.)  Consumers can "easily view and compare prices, ratings, features, locations, and other relevant data about hotels from major chains, like the Defendants," and independent hotels.  (*Id.* ¶ 33.)  Many OTA websites also display consumers' written reviews of hotels.  (*Id.* ¶ 62.)  When a consumer finds a desirable room, he or she can book it on the OTA's website.  (*See id.* ¶ 33.)  OTAs have become more popular with consumers as technology has advanced.  (*Id.* ¶¶ 31, 33.)

OTAs "put downward pressure on the prices of hotel rooms because they expose the consumer to a wide variety of competitive choices."  (*Id.* ¶ 2; *see also id.* ¶ 35 (stating that OTAs put "negative pressure on room pricing" because they "make relevant pricing and quality information readily available to and easy for consumers to compare").)  Hotels, including Defendants, pay a price for OTAs' services:  When a customer books a hotel room on an OTA website, the hotel generally pays the OTA a commission.  (*Id.* ¶ 2.)  Defendants typically pay commissions ranging from twelve to twenty percent.  (*Id.* ¶ 36.)  And when a customer books a room on an OTA website rather than a hotel website, the hotel loses the chance to directly build customer loyalty and obtain "data associated with that customer."  (*Id.* ¶ 37.)

Despite the costs associated with OTAs, Defendants rely on them "to sell a large number and percentage of their rooms."  (*Id.* ¶ 35.)  Indeed, OTAs "are responsible for as much as 50% of" Defendants' online bookings.  (*Id.* ¶ 32.)  Collectively, Defendants and OTAs "account for over 75% of all hotel rooms reserved online."  (*Id.* ¶ 61.)  More than 90 percent of OTA bookings are made through Expedia, Priceline, and their affiliates.  (*Id.* ¶ 61.)

Because OTAs are popular with consumers, "any single Defendant that decided to stop making inventory available to the OTAs would be at a significant competitive disadvantage."  (*Id.* ¶ 38.)  In other words, if one Defendant stopped providing inventory to OTAs, OTA users might navigate directly to that Defendant's website, but "would likely see and book competitive alternatives on the OTA site."  (*Id.*)  Defendants therefore "find it in their business interest to continue to use the OTAs to sell their rooms."  (*Id.*)

## C.    Branded Keyword Search Advertising

A consumer who wants to book a hotel room online can do so in several ways.  (*See id.* ¶ 26.)  For example, she can navigate directly to a hotel website, such as Hilton.com.  (*Id.*)  Alternatively, she can navigate directly to an OTA website.  (*Id.*)  Or, she can begin her search by typing a query into an Internet search engine like Google.com or Bing.com.  (*Id.*)  Plaintiff alleges that "many" consumers "begin their search[es]" on Internet search engines.  (*Id.*; *see also id.* ¶ 72 (estimating that the putative class could comprise thousands of consumers and businesses).)

The words comprising a search term in an Internet search engine—such as "Honolulu Hyatt"—are called "keywords."  (*Id.* ¶ 27.)  When a consumer enters a keyword into a search engine, the search engine typically returns two types of results:  "algorithmic" results and "paid search" results (advertisements).  (*Id.* ¶ 28.)  Search engines generate revenue by auctioning keywords to advertisers.  (*Id.* ¶ 4.)  Advertisers bid an amount they are willing to pay for a consumer to click on a keyword, and if they win, their advertisement will appear in the paid search results for that keyword.  (*Id.*)  Paid search results typically appear at the top of search results, above algorithmic results.  (*Id.* ¶¶ 4, 28.)  The number of advertisements returned in response to a search can vary by search and search engine.  (*Id.* ¶ 28.)

Bidding to have an advertisement appear in response to a keyword containing a brand or trademarked name, such as "Hyatt," is called branded keyword search advertising.  (*Id.* ¶ 30.)  "Frequently, the brand owner will bid on these keywords, as will competitors and sellers." (*Id.* ¶ 5.)  Thus, for example, "a search for 'New York Hilton' might present advertisements for not only Hilton, but Hilton competitors like Marriott or Hyatt, and sellers of hotel rooms, like [OTAs]."  (*Id.*)  Branded keyword advertising is a "highly effective" strategy "because it allows an advertiser to target an audience of people searching for a particular product."  (*Id.* ¶ 30.)  The hotel owner, the hotel's competitors, and OTAs all have incentives to bid on that hotel's branded keywords.  (*See id.* ¶ 6.)

The hotel owner's incentives include "maximiz[ing] the chance of converting [the potential consumer] to a sale." (*Id.*) If the hotel owner is successful, it avoids paying a commission it might otherwise have paid to an OTA. (*Id.* ¶ 7; *see also id.* ¶ 36 ("[A]n identically priced room [booked] through the hotel website is usually more profitable to the Defendants.").) It also "get[s] the opportunity to establish a direct relationship with [the] customer, including the collection of commercially important data about [her] and the ability to introduce [her] to other offerings within that brand." (*Id.* ¶ 7.) Preventing the customer from visiting an OTA or competitor's website also "reduces the chances of that customer being exposed to competitive offerings that might prove more attractive or less expensive." (*Id.*)

For OTAs, the incentive to bid on the hotel's branded keyword "is the opportunity to get the customer to visit their website[s] to see offers on that hotel as well as many others, make the booking, earn a commission, and establish a relationship with that customer that might lead to additional business." (*Id.* ¶ 8.) And for the hotel's competitors, "the incentive is to present competing offers . . . in hopes it will prove more attractive than the brand for which the customer was searching." (*Id.* ¶ 9.) "Appearing at or near the top of a search results page" is in the interest of each of these market participants, and bidding on branded keywords "can help ensure that happens." (*Id.* ¶¶ 7-9.)

Prior to 2015, OTAs and competing hotel chains commonly bid for hotel branded keywords. (*Id.* ¶ 30.)[1] In 2013, a company called BrandVerity "monitored search results for hotels' branded keywords." (*Id.* ¶ 30.) BrandVerity produced a study that stated, "OTAs bid on hotels' branded keywords rather extensively. For example, on a given SERP (search engine results page) the brand's ad(s) will typically be situated among multiple OTA ads. OTAs will also occupy the #1 ad position on a significant percentage of SERPs." (*Id.*) The study also stated, "In

_____

[1] Earlier in the complaint, Plaintiff alleges that the same was true "[p]rior to 2014." (*See id.* ¶ 10.) Because Plaintiff alleges that Defendants reached and executed their conspiracy in 2015, the court assumes this was a scrivener's error.

certain situations, brand bidding by OTAs can be useful to the brand—ensuring that a potential customer doesn't book with a competitor. In others, it may be harmful—reducing the brand's traffic and direct bookings." (*Id.*)

Plaintiff alleges that branded keyword advertising in the hotel industry facilitated a "robust exchange of competitive marketplace information" and put downward pressure on hotel room prices. (*Id.* ¶ 10; *see also id.* ¶ 29.)

## D.    Industry Conferences

Defendants' representatives attended the Dallas Hotel Conference in November 2014. (*Id.* ¶ 43.) There, "industry expert Dan Lesser," who is not alleged to be a Defendant representative, gave a presentation in which he stated, "technology advances with OTA's continue negative pressure on room pricing." (*Id.* (quoting Daniel Lesser, *U.S. Lodging Fundamentals: Paradigm Shift or Movie Rerun?*, 4 (Nov. 19, 2014) ("Lesser Presentation"), available at http://www.dallashotelconference.com/Documents/2014_Dallas_Hotel_Conference_Presentations.pdf (last visited Mar. 17, 2019.) Lesser also "called on the hotels to 'RAISE ROOM RATES aggressively NOW.'" (First Am. Compl. ¶ 43 (quoting Lesser Presentation 8).)

Katherine Lugar, then the CEO of the American Hotel and Lodging Association (AHLA), also gave a presentation at the conference. (First Am. Compl. ¶ 44.) She "call[ed] for 'Unity' and 'Stronger, better alignment.'" (*Id.* (quoting Katherine Lugar, *AH&LA and Legislative Update: Policy Priorities*, 2 (Nov. 19, 2014) ("Lugar Presentation"), available at http://www.dallashotelconference.com/Documents/2014_Dallas_Hotel_Conference_Presentations.pdf (last visited Mar. 17, 2019.) Lugar also "identified 'Deceptive Ad Buys: Unauthorized Purchase of Words'" as "a practice that needed to be addressed." (First Am. Compl. ¶ 44 (quoting Lugar Presentation 22).) Plaintiff alleges that Lugar was "referring to the purchase of branded keywords by OTAs." (First Am. Compl. ¶ 44.) At the time Lugar gave her presentation, a representative from each of Hyatt, Hilton, Marriott, Wyndham, and IHG was serving on the AHLA board. (*Id.* ¶ 45.)

## E.    Defendants' Alleged Conspiracy

Plaintiff alleges that "in or about 2015"—"[f]ollowing the meeting in Dallas, and through that meeting and meetings of the AHLA"—"Defendants agreed to prevent branded keyword advertising by three means and agreements."  (*Id.* ¶ 49.)  First, Defendants "agreed with each other to stop bidding for each other's branded keywords."  (*Id.*)  Second, Defendants agreed, going forward, to incorporate provisions into their OTA lodging agreements that prohibited OTAs from bidding on Defendants' branded keywords, and required OTAs to attempt to prohibit affiliated OTAs from doing the same.  (*Id.* ¶¶ 12, 49.)  Third, each Defendant revised its existing written lodging agreements with OTAs Expedia and Priceline as just described.  (*Id.* ¶¶ 49, 51-53, 55.) The November 2015 agreement between Marriott and Expedia, for example, provides:

> No Party will knowingly use in any way, including a bid in paid search engine advertising, any other Parties [sic] intellectual property, including the trademarks that are listed in Exhibit G and are owned by or licensed to Expedia or Marriott, as applicable (whether or not registered) for use in connection with hotel services. Expedia will list Marriott Marks listed in Exhibit G as well as its common misspelling as negative keywords as indicated in order to prevent its ads from appearing as a result of a search for those terms.

(*Id.* ¶ 52.)  And the August 2015 agreement between Hilton and Expedia provides:

> [N]either Party shall knowingly bid on or otherwise use any of the other Party's trademarks … or common misspellings for use in connection with hotel services with the intent of targeting specifically the other Party's properties or services. Each Party shall actively apply negative keywords for the Marks and common misspellings of the other Party.

(*Id.* ¶ 53.)

In 2015, Plaintiff alleges, Defendants in fact stopped bidding on each other's branded keywords.  (*Id.* ¶ 50.)  They also began sending cease-and-desist letters to "affiliate OTAs," meaning OTAs that "obtain their inventory from top tier OTAs like Expedia or Priceline who have direct relationships with" Defendants.  (*Id.* ¶ 54.)  The cease-and-desist letters sought to prevent the affiliate OTAs from bidding on Defendants' branded keywords.  (*See id.*)  Plaintiff alleges that "Defendants did not act unilaterally or independently, or in their own economic interests, when: (a) entering into the agreements; (b) refusing to engage in competitive branded keyword

advertising against one another; and (c) imposing branded keyword advertising restrictions on the OTAs." (*Id.* ¶¶ 84, 93.)

**F.      Search Engine Results for Branded Hotel Searches In and After 2015**

The result of Defendants' alleged conspiracy, Plaintiff asserts, "is visible" in search results on major search engines. (*Id.* ¶ 55.) For example, a search for "Honolulu Hyatt" no longer yields "advertisements from Defendants other than Hyatt" or "advertisements from Priceline, Expedia, or any of their owned websites." (*Id.* ¶ 56.) "Instead, the ads that appear, if any, are from Hyatt, and from perhaps" an OTA that is (1) not owned by Priceline or Expedia and (2) "ha[s] not yet been intimidated by a cease-and-desist letter." (*Id.*) Plaintiff's complaint incorporates representative screen shots, including the following depiction of a search for "Honolulu Hyatt" on the search engine Bing.com:



(*Id.* ¶ 56.)

In her opposition to Defendants' motion to dismiss, Plaintiff acknowledges that her complaint "does not allege that Defendants' conspiracy affected *all* search results." (*See* Plaintiff's Mem. in Opp. to Defs.' Mot. to Dismiss [81] ("Pl.'s Opp."), at 14.) Rather, according to Plaintiff, the complaint "alleges only that Defendants' conspiracy has caused their websites to appear at the top of the search-results page when a consumer uses branded keywords." (*Id.*; *see also id.* at 12 ("Defendants harmed competition . . . by manipulating content that appears at the top of search-results pages . . . .").)

## G.     Federal Trade Commission Action Against Online Contact Lens Retailers

Plaintiff's complaint describes an action that the Federal Trade Commission ("FTC") brought against online retailers of contact lenses. (*See* First Am. Compl. ¶¶ 46-48.) To settle trademark litigation concerning branded keyword advertising, the retailers signed written agreements that prohibited them from bidding on each other's trademarked keywords. (*See id.*) The FTC alleged that the agreements "harmed consumers by reducing the quality and quantity [of] informative advertising displayed to consumers; causing consumers to pay higher prices; and artificially inflating prices across the board." (*Id.* ¶ 46.) The FTC prevailed: an administrative law judge found, among other things, that "[t]he challenged practice interferes with the flow of material information between buyers and sellers, including price information, which disrupts the proper functioning of the price-setting mechanism." (*Id.* ¶¶ 47, 48.)[2]

---

[2]     Plaintiff alleges that the administrative law judge issued this decision in December 2017, but the court has located only an October 2017 decision. *See In re 1-800 Contacts, Inc.*, Dkt. 9372, 2017 FTC LEXIS 125 (F.T.C. Oct. 27, 2017). There, an administrative law judge found that the settlement agreements violated Section 5 of the FTC Act. *See id.* at *243, *416. The FTC affirmed the decision, in relevant part, after Defendants' motion to dismiss in this case was fully briefed. *See 1-800 Contacts, Inc.*, Dkt. 9372, 2018 FTC LEXIS 184, at *5-6 (F.T.C. Nov. 7, 2018). The court notes that the legal standards governing Section 5 of the FTC Act are different from those governing Section 1 of the Sherman Act. *See, e.g.*, *Paddock Publications, Inc. v. Chicago Tribune Co.*, 103 F.3d 42, 46 (7th Cir. 1996) (stating that the FTC "has the authority under [Section 5] to forbid practices that pose risks to effective competition, even when they do not violate the Sherman Act").

## H.    Plaintiff's Claims

On "numerous occasions" in 2015, 2016, and 2017, Plaintiff used Defendants' branded keywords to search for hotel rooms on Google.com.  (*Id.* ¶ 15.)  She "began to notice fewer competitive options being presented," so "to save time," she "increasingly" navigated straight to the Marriott website to search for hotel rooms.  (*Id.*)  Between 2015 and 2017, Plaintiff reserved and purchased Marriott-branded rooms on Marriott.com.  (*Id.*)  She also "reserved and purchased hotel rooms from other Defendants using their branded websites."  (*Id.*)  Plaintiff alleges that she and the putative class members paid more for hotel rooms, and "incurred greater costs in time and effort to locate suitable" rooms, than they would have absent Defendants' conspiracy.  (*Id.*; *see also id.* ¶ 59.)[3]

Plaintiff has sued Defendants on behalf of herself and a putative class of similarly situated consumers in the United States who, from January 1, 2015 through the present, "paid for a room reserved from any OTA or Defendants' online websites."  (*Id.* ¶ 71.)  In Count I of her complaint, Plaintiff claims that Defendants' "horizontal . . . bid rigging and group boycott" agreements constitute a *per se* violation of 15 U.S.C. § 1.  (*Id.* ¶ 82.)  In Count II of her complaint, Plaintiff claims, in the alternative, that Defendants' alleged agreements unreasonably restrained trade in violation of 15 U.S.C. § 1.  (*See id.* ¶ 90.)  Plaintiff seeks damages and equitable relief under sections 4 and 16 of the Clayton Act, 15 U.S.C §§ 15(a), 26.  (*Id.* ¶ 14.)[4]

---

[3]    Plaintiff alleges that she and the putative class members incurred greater "transaction costs" and search costs, suggesting these costs are distinct.  (*See, e.g.*, *id.* ¶ 59.) Some of her allegations, however, suggest that these costs are one and the same.  (*See, e.g.*, *id.* ¶¶ 13, 14.)  Because Plaintiff does not plead any facts to explain the differences between the two, the court assumes they are the same, and refers only to "search costs" in this opinion.

[4]    On December 13, 2018, Plaintiff filed a notice of related case that was filed in the United States District Court for the Eastern District of Texas on December 6, 2018.  (*See* Pl.'s Notice of Related Case [94] (discussing *TravelPass Grp., Inc. v. Caesars Entm't Corp.*, No. 18 C 153 (E.D. Tex.)).)  On February 5, 2019, defendants in *TravelPass* moved to transfer venue to the Northern District of Illinois on the ground that a related action—the present case—is pending before this court.  On February 7, 2019, defendants in *TravelPass* moved to dismiss for failure to state a claim.  Six defendants filed a joint motion to dismiss and two defendants filed separate motions.  None of these motions (including the motion to transfer) are fully briefed.  In her notice

**LEGAL STANDARD**

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g.*, *Camasta v. Jos A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014); FED. R. CIV. P. 12(b)(6). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and "the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). "[D]etailed factual allegations" are not required, but "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. To state a viable claim, a plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Factual allegations "that are 'merely consistent with' a defendant's liability . . . 'stop[] short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted); *see also, e.g.*, *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010). In applying this standard, the court accepts the facts stated in the complaint as true and draws reasonable inferences in favor of Plaintiff. *See, e.g.*, *Forgue*, 873 F.3d at 966.

**DISCUSSION**

"The purpose of the Sherman Act is to protect consumers from injury that results from diminished competition." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 334-35 (7th Cir. 2012); *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 715 (7th Cir. 2006) (stating that the Sherman Act aims "to assure customers the benefits of price competition" (quoting

---

of related case, Plaintiff states that *TravelPass* "was filed on behalf of an online travel agency and involves many of the same issues of fact and law . . . ." (*Id.* ¶ 2.) Plaintiff asks that if the court dismisses her complaint, it does so without prejudice to amend using allegations from *TravelPass*. (*Id.* ¶ 9.) Defendants have not responded to Plaintiff's notice. Because the court has determined that Defendants' motion to dismiss should be denied, it need not address Plaintiff's request.

*Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 538 (1983))). Private civil actions to enforce the Sherman Act are permitted under Section 4 of the Clayton Act, 15 U.S.C. § 15. *See, e.g.*, *Associated Gen. Contractors*, 459 U.S. at 521; *Agnew*, 683 F.3d at 334.

Plaintiff brings claims for alleged violations of Section 1 of the Sherman Act, which declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . ." 15 U.S.C. § 1. To state a claim for a Section 1 violation, Plaintiff must plead facts plausibly suggesting (1) a contract, combination, or conspiracy (*i.e.*, an agreement); (2) a resulting unreasonable restraint of trade in a relevant market; and (3) an accompanying injury. *Deppe v. Nat'l Collegiate Athletic Ass'n*, 893 F.3d 498, 501 (7th Cir. 2018); *see also Agnew*, 683 F.3d at 335; *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011).

Defendants argue that Plaintiff fails to state a claim because her factual allegations of conspiracy "demonstrate nothing more than parallel conduct by Defendants." (Defendants' Mem. in Supp. of Mot. to Dismiss [65] ("Defs.' Mot."), 7.) In addition, Defendants contend that Plaintiff's "theory of injury—higher room rates from the alleged suppression of comparative information"— is too speculative to confer antitrust standing. (*Id.*) Defendants ask the court to dismiss Plaintiff's case for both reasons. As explained here, the court has determined that Plaintiff's complaint adequately alleges an agreement to restrain trade and resulting injury. Defendants' motion is therefore denied.

A.    **Conspiracy**

To adequately plead an agreement, Plaintiff must set forth "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.*; *see also In re Text Messaging Antitrust Litig.*, 630 F.3d at 629

(stating that "the test for whether to dismiss a case at [the complaint] stage turns on the complaint's 'plausibility,'" not on whether the evidence "is sufficient to *compel* an inference of conspiracy"). Plaintiff can satisfy this burden by pleading either direct or circumstantial evidence. *See In re Text Messaging Antitrust Litig.*, 630 F.3d at 629. But "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556. Allegations of parallel conduct state a Section 1 claim only if they are "placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 557; *see also id.* at 553 ("[T]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit or express." (internal quotation marks omitted)).

### 1. Direct Evidence

Defendants first argue that Plaintiff does not allege any direct evidence of an illegal agreement. (*See, e.g.*, Defs.' Mot. 8 (emphasizing that "[t]here are not even factual allegations of *any* communications through which an agreement supposedly formed").) The court agrees. Direct evidence is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661 (7th Cir. 2002) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999)); *see also Omnicare*, 629 F.3d at 706 (direct evidence constitutes a "smoking gun"). Plaintiff describes the subparts of the alleged agreement, characterizes it as anticompetitive, and claims that Defendants executed it beginning in 2015. She contends that these allegations comprise direct evidence of an agreement. They do not. As in *Twombly*, they are "stray statements that speak directly of agreement" but, "on fair reading . . .[,] are merely legal conclusions resting on the prior allegations." 550 U.S. at 564. The court is not required to accept these allegations as true, and they are insufficient to "raise [Plaintiff's] right to relief above the speculative level." *Id.* at 555.

### 2. Circumstantial Evidence

Circumstantial evidence may also support a finding of agreement. In considering whether Plaintiff's allegations are sufficient under that theory, the court asks whether Plaintiff has sufficiently alleged (1) parallel conduct and (2) additional factual circumstances, or "plus factors," indicating an agreement. *See Twombly*, 550 U.S. at 556-57 & n.4; *In re Text Messaging Antitrust Litig.*, 630 F.3d at 628-29; *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 790 (N.D. Ill. 2017). The court must also consider whether there are "alternative, non-conspiratorial explanations for Defendants' conduct." *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 790; *see Twombly*, 550 U.S. at 567-68.

### a. Parallel Conduct

Plaintiff alleges that prior to 2015, hotels and OTAs "regularly bid for branded keywords." (First Am. Compl. ¶¶ 10, 29-30.)[5] "Beginning in 2015," Plaintiff alleges, each Defendant changed its behavior: it (1) stopped bidding on the other Defendants' branded keywords and (2) revised its contracts with OTAs Expedia and Priceline to prohibit them from bidding on its branded keywords. (*Id.* ¶¶ 50, 51.) The OTA agreements quoted in Plaintiff's complaint contain nearly identical terms—including that the *Defendant* stop bidding on the *OTA's* branded keywords. (*See id.* ¶¶ 52-53.) The agreements use similar language and were reached within three months of each other. (*See id.*) Plaintiff also alleges that, beginning in 2015, each Defendant began sending letters to affiliate OTAs demanding that they cease and desist from bidding on its branded keywords. (*See id.* ¶ 54.) These allegations appear to make a threshold showing of parallel

---

[5]     Defendants point out that Plaintiff does not expressly allege that *they*, rather than hotels generally, bid on each other's branded keywords. (*See* Defendants' Reply in Supp. of Mot. to Dismiss [88] ("Defs.' Reply"), 10; *see also id.* (stating that the 2013 BrandVerity study does not "state[] that any Defendant ever bid on other hotel brands' keywords").) Viewing Plaintiff's allegations in the light most favorable to her, the court is satisfied that the words "hotels" and "competing brands" can reasonably be interpreted to include Defendants. (*See* First Am. Compl. ¶¶ 10, 29-30.) Plaintiff's allegations that Defendants own thousands of hotels; that branded keyword bidding was prevalent in the hotel industry; and that Defendants *stopped* bidding on each other's branded keywords in 2015, support this reading.

conduct; indeed, Defendants have not explicitly argued otherwise. Instead, they contend that Plaintiff has not made any allegations that place the parallel conduct "in a context suggestive of conspiracy." (Defs.' Mot. 9.) For the reasons that follow, the court disagrees, and concludes that Plaintiff has "nudged [her] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

### b. Additional Factual Circumstances

Plaintiff argues that the following factual allegations show that Defendants' parallel conduct resulted from a conspiratorial agreement rather than from "chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties" (Pl.'s Opp. 4 (quoting *Twombly*, 550 U.S. at 556 n.4)): (1) Defendants had motive and incentive to "collude" to "steer customers away from" OTA websites; (2) a Defendant that unilaterally engaged in the alleged conduct "would be acting against its economic self-interest"; (3) Defendants used industry meetings in 2014 and 2015 "to discuss, coordinate, and arrive at their illegal scheme"; (4) Defendants' parallel conduct began soon after the meetings, in 2015; and (5) Defendants and OTAs frequently bid on Defendants' branded keywords before the conspiracy, and the result the conspiracy "is visible in the search results of the major search engines." (Pl.'s Opp. 4-8; *see also* First Am. Compl. ¶¶ 84, 93.)

### i. Motive and Incentive

Plaintiff notes, first, that OTAs exert downward pressure on online hotel room prices, charge Defendants booking commissions, and interfere with Defendants' customer relationships. Thus, Plaintiff asserts, Defendants had motive and incentive to conspire as alleged—that is, to divert customers away from OTA websites and to their own. As Defendants point out, however, these same conditions could have prompted each Defendant to unilaterally restrict OTA advertising. The court agrees with Defendants that the drawbacks OTAs pose for them do not, in isolation, suggest that Defendants conspired to address them. Rather, parallel behavior aimed at reducing OTA-related costs could "just as well be independent action" in "response[] to

common stimuli."  *Twombly*, at 556 n.4, 557; *cf. In re Baby Food Antitrust Litig.*, 166 F.3d at 133 (stating that if "a motive to achieve higher prices" were sufficient to allege conspiracy, "every company in every industry" would be accused of conspiracy).

### ii.    Actions Against Economic Self-Interest

A second argument has more traction:  Plaintiff contends that bidding on competitors' keywords benefits each Defendant, and that any Defendant's unilateral choice to stop the practice would be contrary to its economic self-interest.  (*See* Pl.'s Opp. 5.)  And, Plaintiff asserts, a Defendant would likewise act against its economic self-interest by unilaterally restricting OTA advertising as alleged.  (*See* First Am. Compl. ¶¶ 84, 93.)

Plaintiff's factual allegations, viewed in the light most favorable to her, reasonably suggest that the practice of bidding on competitors' keywords benefits each Defendant.  Many consumers begin hotel room searches by querying online search engines; a Defendant that bids on competitors' branded keywords can win prized advertising space in those search results; and a Defendant that wins prized advertising space gains an opportunity to take business away from its competitors.  Plaintiff's factual allegations also reasonably suggest that by unilaterally ceasing the practice, a Defendant (say, Marriott) would be acting against its economic interest.  Marriott would not only forego opportunities to take business away from the other Defendants, but also decrease the likelihood that consumers searching for Marriott would visit Marriott.com.  That is because, without coordinated action, all other Defendants' advertisements could appear at the top of the results for a Marriott-branded search.

Similar inferences can reasonably be drawn regarding the Defendant-OTA bidding practices.  Allowing OTAs to bid on a Defendant's keywords (say, Hilton's) can benefit Hilton if its competitors are also bidding on Hilton's keywords.  That is because OTA advertisements, presented alongside Hilton *and* competitors' advertisements, can provide Hilton a second chance to win consumers' business.  Hilton prefers that consumers book rooms directly on its website, but its next-best scenario is not losing bookings to competitors—it is winning bookings indirectly

through OTAs. A Defendant that unilaterally prohibits OTAs from bidding on its keywords loses this opportunity but continues to face the same amount of competition from other Defendants. Unilateral action, therefore, plausibly damages a Defendant's economic interest. Similarly, it is reasonable to infer that a Defendant (say, Wyndham) benefits from bidding on OTAs' branded keywords. This is because if Wyndham's advertisements appear in response to customers' searches for OTAs' words, Wyndham gains an opportunity to win bookings directly from its website. If Wyndham unilaterally agrees to stop bidding on OTAs' branded words, it loses that chance. Meanwhile, consumers could continue seeing advertisements for all other Defendants at the top of their OTA-branded search results. Unilaterally adopting the alleged OTA agreements, therefore, can reasonably be said to damage a Defendant's economic interest.

Defendants respond that there are obvious, alternative business reasons that would prompt a Defendant to unilaterally stop bidding on each other's keywords. First, according to Defendants, they do not necessarily benefit from bidding on competitors' keywords. (Defs.' Reply 10.) Keyword advertising "isn't free," Defendants contend, and bidding on competitors' keywords targets only "consumers who have already expressed an interest in a competitor's brand by using it in their searches." (*Id.*) Plaintiff "alleges no facts," Defendants argue, "to suggest that this particular means of advertising . . . would be a sound use of [a] Defendant's limited marketing resources." (*Id.*) Defendants further argue that it is perfectly normal for a business to refrain from chasing down every possible opportunity to compete. (*Id.*; *see also id.* at 10-11 & nn.6-7 (noting that in *Twombly*, the Court found that allegations regarding defendants' "common failure" to pursue seemingly advantageous business opportunities did not plausibly suggest a conspiracy because no business "enters every market that an outside observer might regard as profitable" (quoting 550 U.S. at 551, 568 (internal quotation marks omitted))).)

Defendants make similar arguments regarding parallel adoption of the alleged OTA agreements. Defendants emphasize that the complaint itself references the costs OTAs impose on Defendants, and argue that restricting OTA advertising as alleged could reduce those costs.

The alleged advertising restrictions, Defendants maintain, channel the services OTAs provide into targeting consumers who have not already expressed a branded interest. (Defs.' Mot. 9-10.) Defendants explain the alleged cease-and-desist letters similarly: the costs that OTAs impose on Defendants would justify sending the letters, as would the need for each Defendant to enforce its contracts with Expedia and Priceline. (*See id.* at 11 n.3.) More generally, Defendants argue that "[s]imilar contract terms can reflect similar bargaining power and commercial goals" rather than conspiratorial behavior. (*Id.* at 10 (quoting *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007).)

For a handful of reasons, the court finds Defendants' alternative explanations unconvincing. First, Defendants examine each form of keyword advertising in isolation, ignoring how any Defendant's unilateral choice to restrict only one form would leave it more vulnerable to competition from the other Defendants. Defendants also overemphasize consumers' brand loyalty. Indeed, viewing the allegations in the light most favorable to Plaintiff, hotels' willingness to spend money bidding on branded keywords—and search engines' common practice of auctioning them—reasonably suggest that branded keyword advertising works. That is, even brand-interested hotel consumers are willing to (and do) book rooms from other hotels, depending on the advertisements they see.

Even if Defendants' alternative explanations are plausible, they do not negate the plausibility of Plaintiff's competing explanation: that Defendants would not have unilaterally restricted branded keyword advertising as alleged without a preceding agreement, because doing so would harm their economic interests. At the pleading stage, the court is not "to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (noting that the "plausibility standard" articulated in *Twombly* and *Iqbal* "is not akin to a probability requirement" at the pleading stage); *see also In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 953 (N.D. Ill. 2018) ("'[U]nder *Twombly*, the Court abdicates probability

weighing, assumes that all the well-pleaded 'allegations in the complaint are true (even if doubtful in fact),' and decides whether the totality of those allegations 'suggest that an agreement was made.'" (quoting *Twombly*, 550 U.S. at 556)); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 801 ("It is not necessary that the factual allegations tend to exclude the alternative explanation offered by defendants.  That is the standard appropriate for a summary judgment motion." (quoting *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1002 (N.D. Ill. 2011)); *cf. Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 934 (7th Cir. 2018) ("[A]t the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to *rule out* the possibility that the defendants were acting independently." (emphasis added) (quoting *Twombly*, 550 U.S. at 554)).

Defendants point to several cases in which courts credited alternative explanations for parallel conduct and determined that plaintiffs had not stated a claim for conspiracy.  None of them persuade the court that it should do the same here.  In *Twombly*, the complaint itself presented "reasons to believe that" foregoing a new form of competition would be in the defendants' "*best* interests."  550 U.S. at 568 (emphasis added).  Here, Plaintiff has plausibly alleged that curtailing an existing, effective form of competition would, absent the conspiracy, damage Defendants' economic interests.  In *In re Musical Instruments and Equipment Antitrust Litigation*, 798 F.3d 1186, 1195 (2d Cir. 2015), the complaint "provid[ed] ample independent business reasons" for the parallel conduct, including that manufacturers decided "to heed similar demands made by a common, important customer."  Here, Plaintiff does not allege that any Defendant used its market power to coerce other Defendants into action.  And the court is not satisfied that OTA-related costs are so oppressive that a Defendant would take risky unilateral action just to reduce them, particularly where Plaintiff alleges that "any single Defendant that decided to stop making inventory available to OTAs" altogether would be at a competitive disadvantage.  (First Am. Compl. ¶ 38.)

*In re Online Travel Co. (OTC) Hotel Booking Antitrust Litigation*, 997 F. Supp. 2d 526 (N.D. Tex. 2014) ("*In re OTC*") presents the closest analogy to Plaintiff's case. (*See, e.g.*, Defs.' Mot. 2 (discussing factual similarities).) There, a putative class of consumers alleged that OTAs and major U.S. hotel chains "conspired to eliminate, on an industry-wide basis, *intra*-brand competition—that is, competition among each hotel's online distribution channels, including its own website and OTA-run websites." *Id.* at 530. Plaintiffs' antitrust claims were based only the industry-wide conspiracy. *Id.* at 534. But as circumstantial evidence of the conspiracy, plaintiffs pointed to alleged sub-agreements between Defendants. First, each hotel defendant allegedly signed a vertical written contract, called a resale price maintenance ("RPM") contract, with each OTA defendant. *Id.* at 531. The RPM agreements ensured that (1) "each OTA would not discount below each hotel website's published rate," and (2) "each hotel was providing each OTA with its lowest online rate." *Id.* Second, the OTA defendants allegedly agreed not to compete with each other. *Id.*

The court determined that "common economic experience and the Complaint itself" offered obvious explanations for the individual RPM agreements, which were the "real nub" of the complaint. *Id.* at 537 (internal quotation marks omitted). Namely, hotels "highly value" "the right to control online pricing for their rooms," and OTAs, "[h]aving given up the right to discount prices below each Hotel Defendant's published rate," would "naturally want an assurance that competitors will also be prohibited from" doing so. *Id.* at 538. The court next determined that defendants' common motives for the parallel conduct were, "at best, merely consistent with a conspiracy"; characterized as "unsupported conclusion[s]" plaintiffs' arguments that defendants' actions were against their economic interests; and offered economic explanations for why any hotel-OTA pair would adopt and enforce an RPM agreement absent the conspiracy. *Id.* at 538-39. Other alleged "factual enhancements" were also insufficient to plausibly suggest a conspiracy, so the court dismissed plaintiffs' antitrust claims without prejudice. *Id.* at 539-43.

Here, the court has carefully considered Plaintiff's factual allegations concerning branded keyword advertising in the hotel industry, including Defendants' pre-conspiracy use of it and the potential it creates even for brand-interested consumers to change their purchasing behavior in response to strategically-placed advertisements. For the reasons already discussed, Plaintiff goes beyond offering "unsupported conclusion[s]" in contending that a Defendant would damage its economic interest by unilaterally adopting the alleged advertising restrictions. *In re OTC*, 997 F. Supp. 2d at 539. The court reaches this conclusion even though vertical restrictions on advertisements might be less overtly anticompetitive than the alleged vertical price restrictions in *In re OTC*. (*See* Defs.' Mot. 3.) And although Defendants have offered alternative, self-interested explanations for their parallel behavior, the court has concluded that it would be improper at this stage to credit them when Plaintiff has placed Defendants' parallel behavior in a context suggestive of a conspiracy. To the extent the court's findings in *In re OTC* are inconsistent with this opinion, this court respectfully disagrees with them.

### iii.     2014 Dallas Hotel Conference and AHLA Board Membership

Plaintiff identifies other circumstances she deems indicative of conspiracy, as well. The court finds these other circumstances less compelling, but addresses them for completeness. Thus, Plaintiff alleges that hotels frequently discussed their frustration with OTAs at industry events and meetings, and that Defendants used the 2014 Dallas Hotel Conference and unspecified "AHLA meetings" to discuss and formulate their conspiracy (*See* First Am. Compl. ¶¶ 39, 43, 45; *see also* Pl.'s Opp. 5.) As Defendants note, however, these allegations lack relevant detail. Plaintiff contends that at the conference, Lesser gave a presentation in which he mentioned that OTAs exert negative pressure on room prices and stated, "RAISE ROOM RATES aggressively NOW." (*Id*. ¶ 43.) The complaint does not indicate, however, that the OTA comment had any relation to the pricing comment. (*See id.*) Nor does Plaintiff allege that Lesser encouraged hotels to set prices in coordination, let alone fix prices through branded advertising

restrictions. (*See id.*) Plaintiff does not even allege that any Defendant attended Lesser's presentation. (*See id.*)

Plaintiff's allegations concerning Lugar's presentation at the conference are similarly underwhelming. Plaintiff alleges that Lugar, then the CEO of the AHLA, "called upon hotels" to unify, including to "stop the 'unauthorized purchase of words.'" (First Am. Compl. ¶¶ 44-45.) But as Defendants point out, Plaintiff takes this comment out of context. Lugar's slides unequivocally demonstrate that her comment concerned OTAs' apparent practice of "fooling" consumers by putting hotel names or parts of hotel Internet addresses into links that lead to OTAs' websites—not that hotels wanted OTAs to stop bidding on their branded keywords. (*See* Lugar Presentation 35-36.) In addition, although Plaintiff alleges that specific Defendant representatives were on the AHLA board when Lugar gave the presentation, she does not allege that any of them (or any other Defendant representatives) attended the presentation. (*See* First Am. Compl. ¶¶ 44-45.) Finally, Plaintiff claims that Defendants formulated and "arrive[d] at" their scheme "through" the AHLA board members and meetings, but alleges no other details. (*See id.* ¶ 45.)

These allegations show, at best, that Defendants had an opportunity to conspire; they do not support an inference that a conspiracy occurred. *See Twombly*, 550 U.S. at 567 n.12 (rejecting said inference from mere allegation that defendants "belong[ed] to various trade organizations"); *In re Musical Instruments & Equipment Antitrust Litig.*, 798 F.3d at 1196 ("Gathering information about pricing and competition in the industry is standard fare for trade associations. If we allowed conspiracy to be inferred from such activities alone, we would have to allow an inference of conspiracy whenever a trade association took almost any action." (quoting *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999)); *In re Text Messaging Antitrust Litig.*, 630 F.3d at 628-29 (noting that trade association meetings can "facilitate[] price fixing," but assessing alleged factual circumstances of the meetings to determine whether they supported a "plausible case of price fixing"); *Moore v. Boating Indus. Ass'ns*, 819 F.2d 693, 712 (7th Cir. 1987) ("[M]ere membership in a trade association, attendance at trade association meetings and

participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws." (internal quotation marks omitted)); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 799-800 ("The context within which [industry and trade association] meetings take place is key to determining the significance of the occurrence of those meetings to the plausibility of a conspiracy claim.").

### iv. Suspicious Timing of Industry Events

Plaintiff also points a finger at what she deems suspicious timing as supporting an inference of an illegal agreement. She asserts that, as in *In re Broiler Chicken Antitrust Litigation*, 290 F. Supp. 2d at 800, and *Kleen Products LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1080 (N.D. Ill. 2011) ("*Kleen I*"), Defendants' actions in this case "suspiciously followed an important industry conference." (Pl.'s Opp. 8.) She alleges, further, that Defendants reached their agreement "[i]n or about 2015," stopped bidding on each other's branded keywords in 2015, entered the vertical agreements with OTAs in 2015, and began sending cease-and-desist letters to affiliate OTAs in 2015. (First Am. Compl. ¶¶ 12, 50-51, 54.) But Plaintiff identifies only one specific meeting that occurred before Defendants allegedly took these actions: the November 2014 Dallas Hotel Conference. As discussed above, Plaintiff fails to plead any facts that plausibly link that conference to Defendants' alleged conspiracy. Furthermore, Plaintiff's allegations concerning *when* in 2015 Defendants reached and executed their agreements are vague. Plaintiff's most detailed allegation in this regard is that Hilton and Marriott reached agreements with OTAs in August 2015 and November 2015, respectively—nine months and a year after the Dallas conference.

Plaintiff's allegations thus differ sharply from those in *In re Broiler Chicken Antitrust Litigation* and *Kleen I*, where plaintiffs alleged patterns of meetings closely followed by anomalous market behavior. *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d at 800 ("Here, where Plaintiffs' [sic] have alleged suspicious timing of important industry conferences in January 2008 and 2011, followed by unusual producer actions and market movements, those meetings

plausibly help to fill-out the picture of Defendants' alleged conspiratorial agreement."); *Kleen I*, 775 F. Supp. 2d at 1080 ("It is striking that all Defendants repeatedly—twice in each of 2005 and 2006 and once in each of 2007 and 2008—raised their prices soon after an industry event. . . . Where as here price increases are consistently and closely timed soon after industry gatherings, significant weight is lent to allegations of conspiracy.").  In contrast with these cases, Plaintiff's allegations concerning the timing between industry conferences and parallel conduct do not raise suspicions, and therefore do not provide "factual context suggesting agreement." *Twombly*, 550 U.S. at 549.

### v.        Abrupt Shift in Internet Search Results

Finally, Plaintiff appears to argue that an abrupt, visible change in Internet search results is an additional factual circumstance that plausibly suggests Defendants reached an illegal agreement.  Plaintiff, for example, alleges that before 2015, OTAs and competing hotels commonly "bid[] for branded keywords, aggressively competing for those customers' business." (First Am. Compl. ¶ 30 (citing 2013 BrandVerity study).)  She also alleges that during that time, consumers searching for a Defendant's branded keyword might see advertisements for not only that Defendant's hotels, but also other Defendants' hotels and OTAs.  (*See id.* ¶ 29.)  Plaintiff alleges that as a result of Defendants' conspiracy, the search results now look much different:  if advertisements for other Defendants' hotels or OTAs appear at all, they no longer appear at or near the top of the results.  (*See id.* ¶¶ 55-58.)

In response, Defendants emphasize Plaintiff's allegation that she "began to notice" the change in 2015, 2016, and 2017.  (*See, e.g.*, Defs.' Reply 8; First Am Compl. ¶ 15.)  They argue that a "gradual adoption of similar practices" "over the course of a year or more" refutes an inference of a preceding agreement because it could just as easily reflect rational, independent responses to common market conditions.  (Defs.' Reply 8.)  The court disagrees.  First, reading Plaintiff's allegation in the light most favorable to her, it can be interpreted as alleging that the shift in search results occurred abruptly, but that Plaintiff herself noticed it gradually.  Second, even

assuming the shift occurred over a year or more, Plaintiff's First Amended Complaint can reasonably be read to allege that there was a stable pattern of advertising in the market for online hotel rooms followed by a noticeable and lasting change. Considered with the plausible allegations that a Defendant would have harmed its economic interest by unilaterally adopting the advertising restrictions at issue, the court is satisfied that the visible change in search results supports an inference that Defendants agreed to adopt the restrictions.

*****

The court recognizes that most of the factual circumstances alleged in Plaintiff's complaint do not provide "context suggesting agreement, as distinct from identical, independent action." *Twombly*, 550 U.S. at 549. In this regard, Plaintiff's allegations are readily distinguishable from those in cases like *In re Broiler Chicken Antitrust Litigation*, 290 F. Supp. 3d at 788, *In re Text Messaging Antitrust Litigation*, 630 F.3d at 628, and *Kleen I*, 775 F. Supp. 2d at 1078-81, where courts determined that detailed allegations concerning numerous "plus factors" plausibly supported an inference of conspiracy. *See, e.g.*, *In re Broiler Chicken Antitrust Litigation*, 290 F. Supp. 3d at 788 ("There is simply too much unusual market movement, unusual public statements, unusual information sharing . . . and a coincidence of business strategies that make dismissal of Plaintiffs' claims at this point in the case inappropriate.").

But Plaintiff does plausibly allege that each Defendant would have acted against its economic interest by unilaterally restricting branded advertising as alleged. Specifically, by ceasing to bid on other Defendants' (or OTAs') branded keywords, the independently-acting Defendant would sacrifice opportunities to win direct bookings and decrease the chance that a consumer searching for Defendant would visit its website. And by prohibiting OTAs from bidding on its keywords, the independently-acting Defendant would decrease the likelihood of winning indirect bookings, yet continue to face just as much advertising competition from other Defendants. Plaintiff's allegations in this regard are, if not overwhelming, certainly sufficient to support an inference that Defendants reached a preceding agreement to restrict branded

advertising. *See Twombly*, 550 U.S. at 549. So, too, are her allegations that Defendants departed from an established advertising pattern, and that search results reflect the departure. Plaintiff's case, therefore, is also unlike *Frantzides v. Northshore University HealthSystem Faculty Practice Associates, Inc.*, where this court dismissed plaintiffs' antitrust claims because the complaint presented "'a bare assertion of conspiracy' accompanied by 'a conclusory allegation of agreement at some unidentified point.'" 787 F. Supp. 2d 725, 731 (N.D. Ill. 2011); *see* Defs.' Mot. 14 (citing same). Here, the court is satisfied that Plaintiff has moved her claims beyond the "conceivable" to the "plausible." *Twombly*, 550 U.S. at 570.

**B.     Antitrust Injury and Antitrust Standing (Proximate Causation)**

Having determined that Plaintiff's complaint should not be dismissed for failure to plausibly allege a conspiracy, the court addresses Defendants' argument that the complaint fails for lack of antitrust standing.[6] To bring a private antitrust claim, a plaintiff must establish that she (1) has suffered an antitrust injury; and (2) has antitrust standing (*i.e.*, that the alleged harm proximately caused her injury). *See Kochert*, 463 F.3d at 715-16; *see also Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 481 (7th Cir. 2002). For the following reasons, the court concludes that Plaintiff has sufficiently pleaded both elements.

**1.     Antitrust Injury**

To satisfy the injury requirement, Plaintiff must allege that her "claimed injuries are 'of the type the antitrust laws were intended to prevent' and 'reflect the anticompetitive effect of either the violation or of anticompetitive acts made possible by the violation.'" *Tri-Gen Inc. v. Int'l Union*

---

[6]     In *Supreme Auto Transport, LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743 (7th Cir. 2018), the Seventh Circuit explained that "antitrust standing" refers to proximate causation. The court "eschew[ed] the term 'antitrust standing'" and instead referred only to requirements plaintiffs had to meet to prevail under the statutes at issue. *Id.* (discussing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)). For private antitrust claims, proximate causation is "an essential element." *Id.* Defendants' motion to dismiss was fully briefed before the Seventh Circuit issued its opinion in *Supreme Auto*, and the parties use the term "antitrust standing" in their briefing. Accordingly, the court refers to both antitrust standing and proximate causation in this opinion.

*of Operating Eng'rs, Local 150*, 433 F.3d 1024, 1031 (7th Cir. 2006) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *Greater Rockford Energy & Tech Corp. v. Shell Oil Co.*, 998 F.2d 391, 395 (7th Cir. 1993) ("In establishing antitrust injury, courts must first delineate the *type* of interests protected by the antitrust laws" and then "determine whether the violation was the cause-in-fact of the injury:  that but for the violation, the injury would not have occurred." (internal quotation marks omitted)); *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992) ("The antitrust injury doctrine . . . requires every plaintiff to show that its loss comes from acts that reduce output or raise prices to consumers." (internal quotation marks omitted)).

Defendants have not briefed antitrust injury separately from antitrust standing.  The court understands Defendants to have conceded that the injuries Plaintiff alleges she and the putative class members suffered are the kind that the antitrust laws aim to prevent, and the court concludes she has plausibly alleged this.  The Sherman Act seeks to ensure that consumers benefit from price competition, *see Kochert*, 463 F.3d at 715, and Plaintiff alleges that due to Defendants' anticompetitive conduct in the online market for hotel rooms, she and other consumers paid artificially inflated prices to search for and purchase hotel rooms online.

Defendants do not appear to have conceded that Plaintiff sufficiently pleads but-for causation.  *See Greater Rockford Energy*, 998 F.2d at 395.  Although most of Defendants' causation-related arguments concern the remoteness of the alleged injuries, *i.e.*, proximate causation, Defendants contend that Plaintiff fails to plead *any* facts demonstrating how the alleged misconduct caused the alleged injuries.  *See, e.g.*, Defs.' Mot. 19 (Plaintiff "fails to allege facts showing how the narrow alleged paid keyword search limitations resulted in her paying higher prices for Marriott hotel rooms, much less facts showing how *all* online hotel room prices nationwide could have been higher across the entire putative class").  The court interprets this argument as a challenge to but-for causation but finds it unpersuasive.

Plaintiff has alleged that Defendants agreed to manipulate paid search results so that when a consumer queries an Internet search engine using a Defendant's hotel name, only

advertisements for that Defendant's hotel appear at the top of the search results.  (*See* Pl.'s Opp. 12, 14; First Am. Compl. ¶¶ 55-57.)  In other words, according to Plaintiff, Defendants "interfer[ed] with the free flow of information from sellers to buyers" in the market for online hotel room bookings.  (First Am. Compl. ¶ 59.)  Plaintiff alleges that the effect of Defendants' conspiracy was to reduce "downward pricing pressure" from OTAs and competing hotel advertisements.  (*Id.*; *see also id.* ¶ 10.)  According to Plaintiff, she and the putative class members paid more to find and book hotel rooms online "than they would [have] in the absence of [Defendants'] agreements." (*Id.* ¶ 59.)

Accepting these allegations as true, Plaintiff has plausibly alleged that she and the putative class members suffered losses stemming from anticompetitive acts that "raise[d] prices to consumers."  *Stamatakis Indus.*, 965 F.2d at 471 (internal quotation marks omitted); *see also Reiter v. Sonotone Corp.*, 442 U.S. 330, 342 (1979) (where a consumer "alleges a wrongful deprivation of her money because the price of the [product] she bought was artificially inflated by reason of [defendants'] anticompetitive conduct, she has alleged an injury in her 'property'" under Section 4 of the Clayton Act).

In *Thompson v. 1-800 Contacts, Inc.*, No. 2:16-CV-1183-TC, 2018 WL 2271024, at *2-4 (D. Utah May 17, 2018), the court found similar allegations sufficient to establish but-for causation. There, defendant 1-800 Contacts, an online retailer of contact lenses, reached bilateral agreements with competitors to restrict branded keyword advertising on Internet search engines. *See id.* at *1.[7]  Each agreement prohibited 1-800 Contacts and the competitor "from bidding on any search keywords or phrases with the other company's names, websites or trademarks in them."  *Id.* at *2.  It also required each entity "to use 'negative keywords' to prevent" its own

---

[7]        These are the settlement agreements underlying the FTC proceeding referenced in Plaintiff's complaint.  *See generally In re 1-800 Contacts, Inc.*, Dkt. 9372, 2017 FTC LEXIS 125 (F.T.C. Oct. 27, 2017); *In re 1-800 Contacts, Inc.*, Dkt. 9372, 2018 FTC LEXIS 184 (F.T.C. Nov. 7, 2018).

advertisements from appearing in a response to a search that contained the other entity's words. *Id.* The *Thompson* plaintiffs alleged that "[b]y suppressing one of the primary ways in which they compete," defendants "made it more difficult to communicate their goods and services to consumers. This, in turn, made it less likely for defendants to compete on price . . . ." *Id.* at *4. As a result, prices stabilized, competition waned, and consumers incurred "higher search costs and higher prices." *Id.* at *3-4.

The court determined that plaintiffs' allegations sufficiently "link[ed] the agreements to higher prices." *Id.* at *4. It rejected defendants' argument that plaintiffs must provide a more detailed economic analysis at the pleading stage. *Id.* And it found that the Supreme Court's commentary on the likely market effects of advertising restrictions buttressed plaintiffs' but-for causation theory. *See id.* (citing, among other cases, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 388 (1992), in which the Court recognized in dicta that advertising "inform[s] the public" about "prices of products and services," whereas restrictions on advertising interfere with "'discovering the lowest cost seller . . . and [reduce] the incentive to price competitively'" (quoting *Bates v. State Bar of Arizona*, 433 U.S. 350, 377 (1977))). Although *Thompson* is not binding on this court, its reasoning is persuasive. The court concludes that Plaintiff alleges facts sufficient to support her theory that, but for Defendants' advertising restrictions, she and the putative class members would not have suffered the alleged injuries.[8]

## 2. Antitrust Standing (Proximate Causation)

Antitrust standing "examines the connection between the asserted wrongdoing and the claimed injury to limit the class of potential plaintiffs to those who are in the best position to vindicate the antitrust infraction." *Greater Rockford Energy*, 998 F.2d at 395; *see Associated Gen. Contractors*, 459 U.S. at 529, 531-35 (applying common-law tort principles to Section 4 of

---

[8] Plaintiff also relies on *Thompson* to rebut Defendants' argument that she has failed to plead proximate causation; Defendants' challenge to that argument is addressed in section B.2, below.

the Clayton Act and holding that a plaintiff whose injuries are indirect and speculative falls outside "[t]he class of persons who may maintain a private damage action under the antitrust laws"). "Essentially, the doctrine of antitrust standing is the equivalent of the common-law tort limitation of proximate cause." *Sanner v. Bd. of Trade of City of Chicago*, 62 F.3d 918, 927 (7th Cir. 1995); *see also Supreme Auto*, 902 F.3d at 743. A court weighs six factors in determining whether a plaintiff has adequately alleged antitrust standing, or proximate causation. *Kochert*, 463 F.3d at 718. The factors are:

> (1) [t]he causal connection between the alleged anti-trust violation and the harm to the plaintiff; (2) [i]mproper motive; (3) [w]hether the injury was of a type that Congress sought to redress with the antitrust laws; (4) [t]he directness between the injury and the market restraint; (5) [t]he speculative nature of the damages; (6) [t]he risk of duplicate recoveries or complex damages apportionment.

*Id.* (internal quotation marks omitted) (citing *Associated Gen. Contractors*, 459 U.S. at 537-46); *see also Supreme Auto*, 902 F.3d at 743.

Defendants focus on the first and fourth *Associated General Contractors* factors, so the court examines only those.[9] Specifically, Defendants argue that Plaintiff has "fail[ed] to allege an injury sufficiently direct and concrete to establish antitrust standing." (Defs.' Mot. 15.) In support of this argument, Defendants first contend that Plaintiff is not a participant in the market where the challenged conduct occurred. Defendants say that the relevant market is branded keyword advertising, and that the only market participants are search engines and online advertisers. (*See id.* at 16.) Defendants then cite several cases in which courts determined that plaintiffs lacked antitrust standing because their alleged injuries were derivative of harm that buyers and sellers in the relevant market suffered directly. (*See id.* at 16 & n.11 (citing, among other cases, *Midwest Gas Servs., Inc. v. Indiana Gas Co.*, 317 F.3d 703, 710-11 (7th Cir. 2003); *Tal v. Hogan*, 453 F.3d 1244, 1258 (10th Cir. 2006))). Defendants are correct that Plaintiff may not recover for injuries

---

[9] Defendants also contend that Plaintiff's alleged damages are "too speculative" (Defs.' Mot. 16), but the court cannot identify arguments in this regard that are distinct from Defendants' arguments concerning the remoteness of Plaintiff's injuries.

derivative of those suffered by others; but "different injuries in distinct markets may be inflicted by a single antitrust conspiracy." *Loeb*, 306 F.3d at 481. Accordingly, "differently situated plaintiffs might be able to raise claims." *Id.* Plaintiff alleges that the relevant market is "the direct online sale of hotel room reservations." (First Am. Compl. ¶ 61.) Consumers, like Plaintiff, who search for and purchase hotel rooms online are undoubtedly participants in that market. Their alleged injuries are distinct from, not derivative of, harm that online search engines may have suffered. Plaintiff properly asserts claims arising from these injuries. *See Loeb*, 306 F.3d at 481.

Defendants next argue that Plaintiff's claims must fail because, contrary to Plaintiff's allegations, searches for a Defendant's branded keywords do still return advertisements for competing Defendants' hotels and OTAs. Defendants have attached four examples of search results to their motion. (*See* Defs.' Mot. 17-18 (citing Exs. A to D to Defs.' Mot. (Google Search Results for "Honolulu Hyatt," "Detroit Marriott," "Los Angeles Intercontinental," and "Chicago Hilton," respectively).)) Furthermore, Defendants contend that their Google Search Result for "Honolulu Hyatt" undermines even Plaintiff's allegation that Defendants manipulated only the search results that appear at the top of the page: the first search result for "Honolulu Hyatt," Defendants say, is a Google Maps box that contains three links, each of which leads to a different webpage that contains links to OTA websites. (Defs.' Mot. 17 (citing Google Search Result for "Honolulu Hyatt"); Defs.' Reply, 12 (referring to same).) Plaintiff acknowledges that Defendants' "Honolulu Hyatt" search result is "inconsistent" with the one she cites in her complaint. (Pl.'s Opp. 15 & n.89; *see* First Am. Compl. ¶ 56). Plaintiff, however, has provided the court with a third example of the search, where the first result is a link to Hyatt's website, not the Google Maps box. (Pl.'s Opp. 15 & n.89; Ex. 1 to Decl. of Zoran Tasic in Supp. of Pl.'s Opp. [81-2].)

The court will consider the search results attached to the parties' briefing because they directly relate to, and provide a fuller picture of, the search results Plaintiff cites in her complaint. *See 188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) ("[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's

complaint and are central to his claim." (internal quotation marks omitted)).  The search results contain visibly more advertisements for the owner of the branded keyword—including at the top of the page—than for competitors and OTAs.  Notably, even the Google Maps box that appears in the results for Defendants' "Honolulu Hyatt" search does not itself contain advertisements for OTAs.  (*See* Ex. A to Defs.' Mot.)  Rather, a consumer sees OTA links only if she clicks Hyatt-labeled links in the Google Maps box, which take her to a different page.  (*See id.*)  Accepting as true Plaintiff's allegations that pre-2015 searches would likely generate a much wider variety of competitive advertisements, including at the top of the page, the newly submitted search results (along with those cited in Plaintiff's complaint) support Plaintiff's theory that Defendants manipulated the results of searches for their branded keywords.

The court is also unpersuaded by Defendants' related argument that, because advertisements for OTAs and competing hotels still appear somewhere in (or are indirectly accessible from) search results, Plaintiff fails to sufficiently allege proximate causation.  Accepting Plaintiff's allegations as true and drawing reasonable inferences in her favor, Plaintiff plausibly alleges that many consumers query Internet search engines using branded hotel keywords to find, compare, and book hotel rooms.  She also plausibly alleges that before 2015, Defendants bid on each other's (and OTAs') branded keywords to win those consumers' business.  And she plausibly alleges that "the quality and quantity of informative advertising" that those consumers see today is inferior to that which they saw before 2015.  (First Am. Compl. ¶¶ 12-13.)  For example, in the search results before the court, OTA advertisements do not occupy "the #1 ad position[s]" (*id.* ¶ 30 (quoting 2013 BrandVerity study)), and advertisements for the Defendant whose keyword was searched dominate the top results.  Considering these allegations, together with the claim that OTAs and branded keyword advertising exert "downward pressure" on room prices, the court is satisfied that Plaintiff's theory of causation is sufficiently direct:  armed with knowledge that consumers are seeing inferior comparative information in a popular forum where Defendants once vigorously competed, Defendants face less pressure to price competitively,

prices increase, and consumers pay more. *See Thompson*, 2018 WL 2271024, at \*4 (rejecting defendants' argument that the alleged "downstream effect on contact lens pricing" was "too far removed from the alleged anticompetitive agreements," reasoning that "[p]laintiffs purchased the contact lenses directly from Defendants in the market that was allegedly restrained"); *see also Morales*, 504 U.S. at 388 (recognizing that advertising restrictions "[reduce] the incentive to price competitively" (quoting *Bates*, 433 U.S. at 377)).

Defendants argue that *Thompson* has no bearing on this case because there, unlike here, the characteristics of the online market for contact lenses could arguably have caused the restrictive agreements to "translate directly into higher consumer prices." (Defs.' Reply 14.) Specifically, contact lenses are identical products, meaning that "retailers compete almost entirely based on price" and consumers lack brand loyalty. (*Id.* at 13 (citing *In re 1-800 Contacts, Inc.*, 2017 FTC LEXIS, at \*339).) In addition, 1-800 Contacts had significantly more brand recognition than its competitors, so consumers were more likely to search for 1-800 Contacts than for competing brands. (*See id.* (citing *1-800 Contacts, Inc.*, 2017 FTC LEXIS, at \*293).) Branded keyword advertising was therefore a crucial form of competition for 1-800 Contacts' competitors. (*See id.*) Finally, 1-800 Contacts' competitors "generally sold their (identical) contacts at lower prices." (*Id.* at 14 (citing *1-800 Contacts, Inc.*, 2017 FTC LEXIS, at \*203-04, \*342.) In these conditions, Defendants contend, the advertising restrictions could have prevented consumers from discovering 1-800 Contacts' competitors. (Defs.' Reply 14.) As a result, the consumers would have purchased contacts from 1-800 Contacts, which charges higher prices. (*See id.*) The market for online hotel rooms lacks each of these qualities, Defendants urge.

Indeed, hotels are not identical products, and some consumers are loyal to certain brands. But for reasons previously discussed, Plaintiff's allegations reasonably permit the inference that hotel consumers' brand loyalty is not absolute: consumers are willing to book hotels from different Defendants depending on the comparative information they see. Plaintiff's allegations—including that many consumers begin their hotel searches by querying Internet search engines with

branded keywords—also permit the inference that before 2015, a major form of competition among Defendants was the battle for advertising space associated with those searches. So although Plaintiff does not allege that OTAs "offered identical rooms at lower prices than" those on Defendants' websites (Defs.' Mot. 18; Defs.' Reply 14), her allegations nonetheless permit the inference that Defendants feel less pressure to price competitively now than they did before 2015, when consumers were more likely to see competing advertisements at the top of their branded searches. Just as in *Thompson*, therefore, the alleged advertising restrictions in this case could plausibly have caused consumers to pay higher prices for hotel rooms purchased online.

Defendants next argue that Plaintiff does not sufficiently plead proximate causation because the information available to consumers about competing hotel rooms is "pervasive" and the alleged advertising restrictions affect only a "tiny subset" of it. (Defs.' Mot. 19; *see also* Defs.' Reply 14-15 (distinguishing *Thompson* and *Morales* on the basis that consumers of online hotel rooms "do 'have the benefit of price advertising'" (quoting *Morales*, 504 U.S. at 388)); Defs.' Reply 15 (challenging the proposition that "any advertising restraint itself constitutes an anticompetitive effect no matter how small and regardless of whether it actually affected prices or output").) Defendants point out that consumers can navigate directly to hotel websites, and that the alleged advertising restrictions do not prevent Defendants from advertising "against each other" on price, quality, and other parameters. (Defs.' Mot. 19.) Defendants also point out that the alleged restrictions do not prevent advertisements for non-Defendant-owned hotels from appearing at the top of search results for Defendants' branded keywords. (*See id.*) Finally, Defendants emphasize that consumers can navigate directly to OTA websites. In this vein, Defendants seize on Plaintiff's allegations that OTAs are becoming more popular and continue to exert downward pressure on pricing. (*See id.*)

The court is not persuaded that to adequately plead proximate causation, Plaintiff must allege that Defendants' conspiracy eliminated all comparative information from the marketplace. In suggesting that Plaintiff must do so, Defendants cite *CDC Technologies, Inc. v. IDEXX*

*Laboratories, Inc.*, 186 F.3d 74, 81 (2d Cir. 1999), where the court, on summary judgment, determined that defendant's exclusive dealing arrangements with distributors did not have an anticompetitive effect. Plaintiffs in *CDC Technologies* had offered "scant evidence" that the exclusive dealing arrangements "impeded [plaintiff's] ability to reach the ultimate consumers" of the product. *Id.* Again, in this case the court is enforcing a pleading standard, not requiring Plaintiffs to identify relevant admissible evidence in support of their claim, as it would on summary judgment. Plaintiff here plausibly alleges that Defendants' advertising restrictions affect much more than a "tiny subset" of comparative information. Rather, they reduce the likelihood that significant numbers of consumers will see or take the extra step to find such information. Viewing Plaintiff's allegations in the light most reasonable to her, this is true even of OTA websites: OTAs' popularity might be increasing, but the alleged restrictions block consumers' paths to them. And although OTAs may continue to exert negative pressure on pricing, Plaintiff plausibly alleges that they are doing so to a lesser degree now than before the alleged conspiracy.

That Plaintiff visited Marriott.com and purchased hotel rooms there does not mean that she has insufficiently pleaded proximate causation, either. (*See* Defs.' Mot. 18 (quoting First Am. Compl. ¶ 15).) Indeed, Plaintiff alleges that she visited the Marriott.com website only after she queried Google.com using hotel keywords and noticed fewer competitive advertisements. (*See* First Am. Compl. ¶ 15.) As a result, she purchased hotel rooms directly from a Defendant. (*See id.*) These allegations reasonably permit the inference that Defendants' conspiracy operated exactly as intended. The court declines to credit the competing inference that Defendants offer: Plaintiff caused her own injuries by using ineffective search methods. (*See* Defs.' Reply 15.) Likewise, Plaintiff's allegation that she navigated directly to Marriott.com to "save time" does not necessarily mean she did not incur higher search costs. (*See id.*) Rather, on at least one occasion, she first queried an Internet search engine using a branded keyword, and then, unsatisfied with the comparative information she saw, navigated directly to Marriott.com. (First Am. Compl. ¶ 15.) These allegations adequately plead that searching the Internet for hotel rooms

requires more time and effort now than it did before Defendants' alleged conspiracy.

Defendants' cited cases do not change the court's conclusion that Plaintiff has sufficiently alleged proximate causation. For example, although the court in *Loeb* determined that apportioning damages for copper scrap dealers' harm would be too complex because so many factors affect scrap pricing, it did so based on evidence, including expert analysis, produced during the class certification stage. *See* 306 F.3d at 478-80, 486. Notably, even in that case the district court had determined that the scrap dealers' "bare-bones allegations were sufficient to state a claim." *Id.* at 478. The *Loeb* court also determined that the scrap dealers were not the direct victims of the alleged wrongdoing, which for reasons already explained, is not true here. *See id.* at 485. Finally, the *Loeb* court determined that apportioning damages for the direct victims would not be too speculative and complex, despite that doing so would require isolating the effects of defendants' wrongdoing from the effects of "normal economic forces." *Id.* at 492-93.

In *In re Digital Music Antitrust Litigation*, 812 F. Supp. 2d 390, 401-02 (S.D.N.Y. 2011), the court dismissed a complaint by compact disc ("CD") purchasers who alleged they were injured when defendants fixed prices for music purchased on the Internet. The court determined that the CD purchasers lacked antitrust standing because they failed to allege "any kind of tie— contractual, historical, or correlative, for example—between CD pricing and Internet Music pricing." *Id.* at 402. Here, by contrast, Plaintiff alleges that Defendants' anticompetitive behavior in the market for online hotel rooms affected prices in that same market. Finally, in *Spanish Broadcasting System of Florida, Inc. v. Clear Channel Communications, Inc.*, 376 F.3d 1065 (11th Cir. 2004), the court affirmed dismissal of a plaintiff-competitor's Section 1 claims because they contained "no allegations at all" describing "how the defendants' alleged behavior would be likely to harm competition." *Id.* at 1072, 1074. The court in *Spanish Broadcasting* also found significant that the plaintiff-competitor's business and the relevant market had been "expand[ing] considerably." *Id.* at 1074. As previously recounted, Plaintiff's complaint contains specific allegations regarding how Defendants' alleged conspiracy has harmed competition, even as

OTAs' popularity increases.

The court concludes that the complaint is sufficient on this score. Plaintiff has adequately alleged that Defendants' conspiracy proximately caused the alleged injuries. Plaintiff and the putative class members, who directly participated in the allegedly restrained market by searching for and purchasing hotel rooms online, are "in the best position to vindicate the antitrust infraction." *Greater Rockford Energy*, 998 F.2d at 395.

## **CONCLUSION**

For the foregoing reasons, the court denies Defendants' motion to dismiss [dkt. no. 65].

ENTER:

_____
REBECCA R. PALLMEYER
United States District Judge

Date: March 22, 2019