## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| KAREN TICHY, MAARTEN ALBARDA, and BARRY BAGNATO,<br><br>                              Plaintiffs,<br><br>     v.<br><br>HYATT CORPORATION; HILTON DOMESTIC OPERATING COMPANY INC.; SIX CONTINENTS HOTELS, INC.; MARRIOTT INTERNATIONAL, INC.; WYNDHAM HOTEL GROUP LLC; and CHOICE HOTELS INTERNATIONAL, INC.,<br><br>                              Defendants. | No. 1:18-cv-01959<br><br>Chief Judge Rebecca R. Pallmeyer<br><br>Magistrate Judge M. David Weisman<br><br>**REDACTED** |

## FOURTH AMENDED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

I.    NATURE OF ACTION ...................................................................................... 1

II.    PARTIES............................................................................................................ 6

    A.    Plaintiffs ................................................................................................ 6

    B.    Defendants ............................................................................................ 8

III.    AGENTS AND CO-CONSPIRATORS..................................................... 9

IV.    JURISDICTION AND VENUE................................................................. 9

V.    SUBSTANTIVE ALLEGATIONS ........................................................... 10

    A.    There are several channels through which a consumer may find and rent a hotel room online. ........................................................................................... 10

    B.    Online Travel Agencies are indispensable to Defendants. ........................... 11

    C.    Defendants' agreement to forgo bidding on each other's branded keywords began before 2011 and has been adhered to and enforced by Defendants since its inception to the present. ........................................................................ 13

    D.    Between 2012 and 2014, Defendants expanded their unlawful agreement to not bid on each other's branded keywords to encompass OTAs. ........................... 24

        1.    Defendants and OTAs are direct competitors in the relevant market for online sales of hotel-room reservations. .......................................... 24

        2.    Defendants have long sought to decrease OTAs' share of the market and have worked together to accomplish this goal. ................................... 25

        3.    When OTAs' market share began growing dramatically between 2011 and 2014, Defendants expanded their antitrust conspiracy by agreeing to work jointly to stop OTAs' bidding on Defendants' branded keywords. .............. 28

        4.    ████████████████████████████████ ...................................................... 34

        5.    Each of the leading OTAs not only complied with its agreements with Defendants but also ensured that the unlawful agreements were enforced against competitor OTAs. .................................................... 36

6.      Defendants' scheme had the desired effect of essentially eliminating OTAs' bidding on Defendants' branded keywords. ........................................................38

VI.     THE RELEVANT MARKET AND DEFENDANTS' MARKET POWER ......................44

VII.    MARKET EFFECTS AND ANTITRUST INJURY CAUSED BY DEFENDANTS' ANTICOMPETITIVE CONDUCT............................................................................45

VIII.   CLASS ALLEGATIONS ....................................................................................47

IX.     CAUSES OF ACTION .......................................................................................49

COUNT 1: VIOLATION OF 15 U.S.C. § 1 (*PER SE* GROUP BOYCOTT/BID RIGGING AGREEMENTS)...........................................................................................49

COUNT 2: VIOLATION OF 15 U.S.C. § 1 (AGREEMENTS UNREASONABLY RESTRAINING TRADE) ...................................................................................51

RELIEF REQUESTED....................................................................................................53

JURY TRIAL DEMANDED...........................................................................................53

Plaintiffs Karen Tichy, Maarten Albarda, and Barry Bagnato, by and through their attorneys, on behalf of themselves and all others similarly situated, file this Fourth Amended Class Action Complaint ("Complaint") against Hyatt Corporation, Hilton Domestic Operating Company Inc., Six Continents Hotels, Inc., Marriott International, Inc., Wyndham Hotel Group LLC, and Choice Hotels International, Inc. (collectively "Defendants") and allege, based upon personal knowledge as to themselves and their own actions, and as to all other matters upon information and belief, as follows:

## I.  NATURE OF ACTION

1.  Plaintiffs paid for hotel rooms in the United States operating under brand names owned by one or more Defendants. Plaintiffs booked their rooms online. Plaintiffs bring this action to challenge Defendants' conspiracy and agreement to eliminate competition for paid search advertising[1] that employs brand names associated with Defendants, thereby depriving consumers of the free flow of competitive information, raising consumer prices for hotel rooms, and raising the cost of finding hotel rooms for consumers. Defendants engaged in anticompetitive horizontal agreements to restrain competition for consumers' hotel-room purchases. The scheme is simple: each hotel Defendant agreed it would refrain from using certain readily available online advertising methods to compete for consumers shopping for hotel rooms. The agreement prevents competitor hotels from bidding for online advertising in response to a consumer's search-engine query that uses

---

[1] "Paid search advertising" is also referred to as "search engine advertising," "search advertising," "search engine marketing," "SEM," or "Google advertising." Paid search advertising consists of ads that are displayed on search-engine results pages, primarily based on keyword bidding. Advertisers select keywords and bid to have their ad shown when someone makes search queries that are related to those keywords based on the search engine's algorithm and other factors selected by the advertiser.

To determine which ads appear on search engine results pages, the algorithms of search engines such as Google and Bing consider in part how much the advertiser has bid for an ad to be presented based on that keyword. In one type of paid search advertising—"pay-per-click" or "PPC"— advertisers whose ad is displayed in the search results pay the search engine a fee based on how many times people click on the ad.

a competitor's brand name. For example, Hilton Hotel could not create a paid search advertising campaign that might trigger a Hilton ad to display in response to a potential customer entering an online search query for "Hyatt" or "Marriott." This anticompetitive agreement is like Pepsi agreeing with Coca-Cola that it will never display an ad to potential customers searching online for Coca-Cola. Under such an agreement, Pepsi would not try to divert customers searching for a similar product by alerting them to the price and quality of its competing product. Likewise, Coca-Cola would never display ads to potential customers searching online for Pepsi products. Such an agreement between Coca-Cola and Pepsi would be restraining competition to the detriment of consumers. Defendants later expanded their unlawful conspiracy to similarly limit search-engine advertising by online travel agencies ("OTAs"), their direct competitors in the market for online hotel-room reservations.

2.     In the hotel industry, hotel rooms are booked primarily through two channels: (i) the hotels' websites and (ii) the websites of the leading OTAs such as Expedia, Priceline, and Booking.com ("the major OTAs") and their affiliates. OTAs, who generally receive a commission from the hotel when a room is booked on their website, offer consumers a wide choice of available hotels in a particular location and for a particular date range. While they are valuable sales channels for Defendants, OTAs also are costly to hotels and put downward pressure on the prices of hotel rooms because they expose the consumer to a wide variety of competitive choices.

3.     This case is about the major hotel companies, Defendants, seeking to reduce the likelihood that consumers expressing an interest in their brand would visit an OTA to book their room or visit a competitor hotel's website and book a room at one of the competitor's hotels. Defendants have done this by agreeing to and enforcing restrictions on the use of branded keywords in paid search advertising on the major internet search engines like Google and Bing.

4.      When a consumer searching for information on the internet enters a query into one of the major search engines like Google or Bing, the words a customer enters are called a "search term" or "search query." The word or set of words that search-engine advertisers select to target their ads to customers is called a "keyword." An ad could be eligible to appear on a customer's search engine results page based on the similarity of the advertiser's keywords to the customer's search terms.

5.      One way that search engines generate revenues is by auctioning these keywords to advertisers. Advertisers bid an amount they are willing to pay for a "click" on their ad from a consumer whose search term matches the advertiser's keyword. The likelihood of an ad showing is based on a combination of the advertiser's maximum bid and the quality score of the ad. A winning bidder's ad appears in the search results (typically above the "organic" search results presented to the user). As an example, a car manufacturer like Ford might bid for keywords such as "new cars" so that their ads may appear to consumers who enter a search query on Google or Bing for "new cars" or "new minivan," or "new Chrysler."  Similarly, Hilton might bid on the keyword "hotel Chicago" so that their ads appear to consumers who enter the search terms "hotel Chicago" or "Marriott Chicago."

6.      As the examples above demonstrate, an advertisement may be presented to the consumer even if the keyword that the advertiser bids is not *identical* to the consumer's search terms. This is because search-engine algorithms employ various forms of "broad match."

7.      "Broad match allows an ad to be matched to relevant variations of the ads keywords, including synonyms, singular or plural forms, possible misspellings, stemmings (such as floor and flooring), related searches, and other relevant variations. Broad match is a 'semantic' match; it seeks to match with the 'meaning of a user's search.' For example, a broad match keyword 'low-carb diet plan' may match with a search for 'carb-free foods' or 'Mediterranean diet plans.'"[2]

---

[2] *In re 1-800 Contacts, Inc.*, Docket No. 9372, 2017 FTC LEXIS 125, at *46–47 (F.T.C. Oct. 27, 2017) (some internal quotation marks omitted).

8.      In addition to bidding on so-called "generic keywords," advertisers can bid on "branded keywords"—keywords that include a brand or trademarked business name (for example, "Ford F-150" or, more pertinent here, "New York Hilton"). Frequently, the brand owner will bid on these keywords, as will their competitors. A search for "Ford F-150" might deliver advertisements from Ford, Chevrolet, and automobile dealerships seeking to connect with a user looking on the internet for Ford trucks. Similarly, a search for "New York Hilton" might present advertisements for not only Hilton but also for Hilton's competitors in the online market for hotel reservations— hotels like Marriott and Hyatt, and OTAs like Priceline and Expedia—all vying for the potential business of a user searching on the internet for New York Hilton. But because of the illegal scheme among Defendants, consumers no longer see those competing advertisements.

9.      There are various incentives for the different marketplace participants to bid for branded keywords. The brand owner wants to maximize the chance of converting that user to a sale, the competitor hotels seek to take that potential business by presenting their alternative offerings, and the OTAs want the reservation to be made through them so that, regardless of which hotel room the consumer books, they are paid a commission.

10.     For hotel branded-keyword searches, the hotel brand owner has various incentives to bid on their own brand. Getting the potential customer to their website for a sale means both avoiding a commission they might have to pay to an OTA and getting the opportunity to establish a direct relationship with that customer, including by collecting commercially important data about that customer and introducing that customer to other offerings within that brand. Keeping the customer from visiting an OTA or a competitor hotel's website reduces the chances of that customer being exposed to competitive offerings that might prove more attractive or less expensive. Appearing at or near the top of a search results page is in the brand owner's interest, and bidding for that keyword can help ensure that happens.

11.    For an OTA, the incentive to bid on hotel branded keywords is the opportunity to get the customer to visit their website to see offers on that hotel as well as many others, make the booking, earn a commission, and establish a relationship with that customer that might lead to additional business down the road. Appearing at or near the top of a search results page is in the OTA's interest, and bidding for that keyword can help ensure that happens.

12.    For a competing hotel, the incentive is to present competing offers in the hope that the offers will prove more attractive to the consumer than the brand for which the customer initially searched. Appearing at or near the top of a search results page is in the competing hotel's interest, and bidding for that keyword can help ensure that happens.

13.    Defendants' conspiracy unfolded in two parts.

14.    First, Defendants agreed at some point before 2011 to refrain from bidding on each other's branded keywords, and that agreement has continued from that time to the present.

15.    Second, when the OTAs' market share of online hotel-room reservations began skyrocketing between 2011 and 2014, Defendants agreed to work together to restrict OTAs from bidding on Defendants' branded keywords.

16.    Under this second part of Defendants' conspiracy, Defendants built on their initial agreement to not bid on each other's branded keywords by also agreeing (i) to insert into their lodging agreements with the major OTAs (e.g., Expedia, Priceline, Booking.com) provisions that prohibited those OTAs and their affiliates from bidding on Defendants' branded keywords and (ii) to strictly enforce these anti-bidding provisions or similar provisions that were in existing contracts but had previously been unenforced.

17.    Defendants began executing this expanded agreement in approximately 2012 and have continued to do so until the present.

18.     From approximately 2012 through 2017, Defendants updated their lodging agreements with the major OTAs to more stringently prohibit the OTAs and their affiliates from bidding on Defendants' branded keywords.

19.     Because of these agreements among and between Defendants and the OTAs, competitive advertising in response to branded keywords has largely ceased in the hotel industry. As a result, Plaintiffs and Class Members have been directly harmed by a reduction in the quality and quantity of informative advertising, by higher costs for searching for hotel room options, and by higher prices for hotel rooms than they would otherwise be paying absent the illegal agreements.

20.     Absent Defendants' anticompetitive and illegal agreements and conduct, Plaintiffs and other Class Members would have paid less for each of the hotel rooms purchased during the Class Period, and would have incurred lower transaction costs. The direct consequence of Defendants' unlawful conduct was that Plaintiffs and other Class Members paid overcharges on their purchases of hotel room reservations throughout the Class Period. Plaintiffs thus seek damages and equitable relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, for violations of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

## II.     PARTIES

### A.     Plaintiffs

21.     Plaintiff Karen Tichy is a resident of Clarksville, Virginia. In 2015, 2016, and 2017 on numerous occasions, Ms. Tichy searched for hotel rooms on Google using Defendants' branded keywords. Ms. Tichy recalls in her searches for hotel rooms on Google that she began to notice fewer competitive options being presented. As a result, Ms. Tichy, to save time, increasingly visited the Marriott website to search for hotel rooms. During this period, Ms. Tichy reserved and purchased Marriott-branded rooms online through the Marriott.com website. Ms. Tichy paid more for those rooms than she would have absent Defendants' illegal conduct. During this period, Ms.

Tichy also reserved and purchased hotel rooms from other Defendants using their branded websites. Ms. Tichy also incurred greater costs in time and effort to locate suitable hotel rooms as a result of Defendants' illegal conduct. Ms. Tichy has been damaged by the conduct alleged herein.

22.     Plaintiff Maarten Albarda is a resident of Cramerton, North Carolina. Throughout the Class Period, Mr. Albarda searched for hotel rooms online numerous times, generally via Google, and often using branded keywords. He also booked hotel rooms online. During the Class Period, Mr. Albarda reserved and paid for mostly Hilton- and Marriott-branded hotel rooms but also occasionally booked and paid for rooms at hotels owned by Defendants Hyatt, Six Continents, and Wyndham. Mr. Albarda generally booked rooms through Defendants' branded websites but occasionally booked rooms through online travel agencies such as Expedia. Mr. Albarda paid more for the rooms he booked than he would have absent Defendants' unlawful conduct. He also incurred greater costs in time and effort to locate suitable hotel rooms as a result of Defendants' unlawful conduct. Mr. Albarda has been damaged by the conduct alleged herein.

23.     Plaintiff Barry Bagnato is a resident of Sedona, Arizona. Throughout the Class Period, Mr. Bagnato reserved and paid for hotel rooms online many times. When booking hotel rooms, he sometimes used branded keywords to search for hotels on Google. He stayed mostly at Hyatt- and Marriott-branded hotels, but occasionally stayed at hotels owned by other Defendants. Mr. Bagnato generally booked rooms directly through Defendants' branded websites. Mr. Bagnato paid more for the rooms he booked than he would have absent Defendants' unlawful conduct. He also incurred greater costs in time and effort to locate suitable hotel rooms as a result of Defendants' unlawful conduct. Mr. Bagnato has been damaged by the conduct alleged herein.

**B.     Defendants**

24.     Defendant Hyatt Corporation ("Hyatt") is a Delaware corporation with its principal place of business at 150 North Riverside Plaza, Chicago, Illinois 60606. Hyatt is a global hospitality company that controls 14 premier hotel brands, including more than 700 properties in more than 50 countries.

25.     Defendant Hilton Domestic Operating Company Inc. ("Hilton") is a Delaware corporation with its principal place of business at 7930 Jones Branch Drive, Suite 1100, McLean, Virginia 22102. Hilton's parent is one of the largest hospitality companies in the world, controlling 5,168 hotels in 103 countries and territories.

26.     Defendant Six Continents Hotels, Inc. ("Six Continents") is a Delaware corporation with its principal place of business in the United States at 3 Ravinia Drive, Suite 100, Atlanta, Georgia 30346. Six Continents' parent, InterContinental Hotels Group, PLC ("IHG"), is one of the largest hospitality companies in the world, controlling 5,273 hotels in nearly 100 countries around the world. The terms "Six Continents" and "IHG" are often used interchangeably. Six Continents employees typically refer to their employer as "IHG" in their email signature lines and in their LinkedIn profiles.

27.     Defendant Marriott International, Inc. ("Marriott") is a Delaware corporation with its principal place of business at 10400 Fernwood Road, Bethesda, Maryland 20817. Marriott is one of the world's largest hospitality companies, controlling over 6,000 hotels in 122 countries and territories.

28.     Wyndham Hotel Group LLC ("Wyndham") is a Delaware corporation with its primary place of business at 22 Sylvan Way, Parsippany, New Jersey 07054. The Wyndham chain is the world's largest hotel company, controlling over 8,300 hotels worldwide.

29.     Defendant Choice Hotels International, Inc. ("Choice") is a Delaware corporation with its primary place of business at 1 Choice Hotels Circle, Suite 400, Rockville, Maryland 20850. Choice controls over 7,000 hotels in more than 40 countries.

30.     Defendants Hilton, Hyatt, Marriott, Six Continents, Wyndham, and Choice control a substantial percentage of all hotel room inventory in the United States.

### III.     AGENTS AND CO-CONSPIRATORS

31.     Various other persons, firms, and corporations not named herein as Defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Some of these persons and entities are as yet unidentified. The acts alleged against Defendants in this Complaint were authorized, ordered, or done by Defendants' officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

32.     Whenever this Complaint refers to an act, deed, or transaction of a corporation or entity, the Complaint is alleging that the corporation or entity engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation or entity's business or affairs.

### IV.     JURISDICTION AND VENUE

33.     Plaintiffs brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit, and reasonable attorney's fees for Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. Subject matter jurisdiction is proper pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. §§ 1331 and 1337, because the action arises under the laws of the United States.

34.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), in that at least one of the Defendants resides in, is licensed to do business in, or is doing business in this judicial district.

## V.    SUBSTANTIVE ALLEGATIONS

**A.    There are several channels through which a consumer may find and rent a hotel room online.**

35.    Consumers that are looking to book hotel rooms online have a number of options. They can navigate directly to a hotel's website (like Hilton.com or Marriott.com), they can navigate directly to an OTA's website (like Expedia.com or Priceline.com), or as many do, they can begin their search at one of the online search engines like Google.com or Bing.com.

36.    The word or set of words that a consumer enters when using a search engine is called a "search term" or "search query." For example, a consumer might search for a hotel room on Google.com using the search terms "Hawaii resorts" or "Honolulu Hyatt."

37.    Users of online search engines are typically presented with both "organic" results, as well as paid advertisements. Paid ads often appear at the top of the search-engine results page. To have their ads appear in response to particular search terms, advertisers bid on keywords that are related to those terms. The number of advertisements presented can vary from search to search and from search engine to search engine.

38.    Bidding on branded keywords in a paid search advertising campaign (for example, "Honolulu Hyatt," which contains the trademarked brand name "Hyatt") is a highly effective advertising strategy because it allows an advertiser to target an audience of people who are searching for a particular product. Prior to about 2012, when Defendants implemented their agreement to prohibit OTAs from bidding on their branded keywords, it was very common in the hotel industry to see OTAs bidding for Defendants' branded keywords—i.e., aggressively competing for those customers' business.

39.     Likewise, before Defendants' agreement to forgo bidding on each other's branded keywords sometime before 2011, it was common for Defendants to bid on each other's keywords.

40.     Thus, before Defendants' conspiracy, consumers enjoyed the free flow of competitive information from potential sellers to buyers, as well as the downward pressure on pricing that the competition brought.

**B.     Online Travel Agencies are indispensable to Defendants.**

41.     As recently as 1997, the concept of an "internet travel company" or online travel agency—an entity organized to effectuate travel plans, reservations, and purchases via the worldwide web—was virtually unknown. But in recent years, the online travel industry has seen explosive growth and consolidation. Technology advances have increased OTAs' popularity among consumers.

42.     Today, OTAs are responsible for as much as 50% of online bookings for Defendants and an even higher percentage for "independent" hotels. OTAs are a critical and essential, but expensive, means of distribution for Defendants.

43.     Typically, through their web portals, the OTAs allow consumers to rent hotel rooms in many different hotels throughout the country and the world. The OTAs allow consumers to easily view and compare prices, ratings, features, locations, and other relevant data about hotels from major chains—like Defendants—as well as those of independent hotels. As technology has advanced, so has the popularity of online travel agencies with consumers who can now easily obtain relevant information about thousands of hotel rooms around the world.

44.     The major OTAs such as Expedia, Priceline, and Booking.com make their services available to hotels and obtain access to room inventories through lodging agreements with the hotels.

45.     Smaller OTAs are generally "affiliate OTAs," which obtain inventory from major OTAs by entering agreements with the major OTAs and paying them commissions on sales. Thus, affiliate OTAs usually do not have direct agreements with the hotels.

46.     While Defendants rely on OTAs to sell a large number and percentage of their rooms, Defendants are reluctant business partners with OTAs for a number of reasons.

47.     First, it is widely accepted in the hotel industry that OTAs provide downward pressure on room prices.[3] This is because OTAs make relevant pricing and quality information readily available and easy for consumers to compare. A consumer who might be considering renting a room at the New York Hilton and visits an OTA's website will also see offerings from competitors of the New York Hilton, both large and small, and will easily be able to see lower-priced offerings or offerings with preferable quality. Thus, pricing pressure from competitive alternatives is one reason Hilton would prefer that consumers interested in the New York Hilton instead use the hotel's website for booking rather than an OTA.

48.     Second, OTAs' services come at a cost to Defendants. Defendants typically pay commissions ranging from 12 to 20% depending upon property type, location, and time of booking. Bookings made on Defendants' websites cost the hotel less, and thus an identically priced room made through the hotel website is usually more profitable to Defendants.

49.     Third, because OTAs offer a wide variety of competitive alternatives, Defendants would prefer that the customer relationship—and any data associated with that customer—be directly with the hotel rather than with an OTA so the hotel can build customer loyalty and sell other hotels within their group for future trips made by that customer.

50.     While Defendants would prefer that consumers use their websites rather than OTAs, the consumer preference for the comparative market information offered by the OTAs makes them popular with consumers and means that any single Defendant that decided to stop making inventory

---

[3] *See, e.g.*, Ex. 1, *Surprising Airbnb Adoption Slowdown in US/EU, and What It Means for Hotels and OTAs*, MORGAN STANLEY RESEARCH, at MAR-TK-00245666 (Nov. 10, 2017) (stating that "traditional hotels [are] discounting rates to compete with OTAs").

available to the OTAs would be at a significant competitive disadvantage to their competitors. For example, if Hilton pulled its inventory from Priceline, some current customers using Priceline to book rooms with Hilton might migrate to the Hilton website to book their rooms, but many would likely see and book competitive alternatives on the OTA site. Thus, despite the cost to the Defendants and the downward pressure on pricing that OTAs propagate, the Defendants find it in their business interest to continue to use OTAs to sell their rooms.

**C.      Defendants' agreement to forgo bidding on each other's branded keywords began before 2011 and has been adhered to and enforced by Defendants since its inception to the present.**

51.      Defendants' agreement to not bid on each other's branded keywords is longstanding. Although the exact date of the agreement's inception is unclear, the agreement predates 2011 and continues to the present.

52.      By 2011, all six of the Defendants—Hyatt, Hilton, Six Continents, Marriott, Wyndham, and Choice—had entered into a gentlemen's agreement to not bid on each other's branded keywords.

53.



54. ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

██████ [5]



55. ████████████████████████████████████

██████████████████ [6]

56. ███████████████████████████████████████████

███████████████████████████████████





57.     Defendants went beyond simply not bidding on each other's branded keywords. Because the appearance and placement of ads on a search-results page is determined by multiple factors—including, among other things, the *relevance* of the ad to the consumer—it is possible that a company's paid ad will appear on a results page even if that company did not bid on the branded keyword used by the consumer conducting the search. For example, even if Choice does not bid on Six Continents' branded keywords, a consumer who types in "Six Continents" may nonetheless be shown an ad for Choice hotels if Choice bid on a related generic keyword, used the search engine's broad-match setting, and the search engine's algorithm determines that Choice's ad is highly relevant to the consumer.

58.     To get around this problem—to ensure that consumers would not be shown a competitor Defendants' ads based on broad match and relevance—Defendants also agreed to implement lists of "negative keywords" in their search-engine advertising accounts.

---

[7]

59.     A negative keyword is simply a keyword that prevents an ad from being triggered by a search query containing a certain word or phrase. For example, if Hilton added "Marriott" as a negative keyword in Hilton's Google Ads account, Hilton ads would not appear when a consumer searched for "Marriott" even if Google's algorithm would normally determine that the Marriott ad was highly relevant to the consumer and thus should appear on the search-results page. In other words, negative keywords override a search engine's determination of an ad's relevance.

60.     

61.     When a Defendant detected that a co-conspirator had violated the agreement, it would contact the co-conspirator and request that the violation cease. (Defendants' violations of the alleged agreement often were inadvertent—e.g., the result of not keeping an up-to-date list of competitors' negative keywords.)

---



62. ███████████████████████████████

███████████████████████████████

███████████████████████████████

██████████████████[9]



63. ██████

███████████████████████████████

███████████████████████████████

███████████████████████████

████████████████[10]

---

[9] ███████████████████████████████
███████████████████████████████
████████████████████

[10] ███████████████████████████████
███████████████████████████████



64.

65.

Defendants did not bid on each other's keywords and implemented negative keywords to ensure that a Defendant hotel's ad would not appear in response to a search-engine query containing a competitor Defendants' brand names.

66.

Defendants' anticompetitive agreement predates 2011 and continues to the present.

---

[11]

67.     As to the origins of the conspiracy, while the exact date of its inception is unclear, Defendants' collusion began as early as 2005, through trade groups such as Hotel Consumer Protection Coalition, the Hospitality Sales and Marketing Association International, the American Hotel & Lodging Association, and the Hotel Electronic Distribution Network Association, as well as through Defendants' joint venture Roomkey, a hotel metasearch engine.

68.     The Hotel Consumer Protection Coalition ("HCPC") was founded around 2005 by Hyatt, Marriott, Starwood (now owned by Marriott), and InterContinental Hotels Group ("IHG"), Six Continents' parent company.[12] The HCPC's membership eventually included all six Defendants.[13]

69.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[14]

70.     In reality, one of the central purposes of the HCPC was and is to provide a forum for Defendants and other competitor hotels to collude by, among other things, entering an agreement not to bid on each other's branded keywords and maintaining relationships through which that agreement is enforced.

---

[12] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[13] Letter from HCPC to ICANN (Mar. 24, 2014) (stating that HCPC's "members include the world's largest hotel companies, namely, Accor; Choice Hotels; Hilton Worldwide; Hyatt; Intercontinental Hotels Group (IHG); Marriott; Starwood Hotels and Resorts; and Wyndham Hotel Group"), *available at* https://bit.ly/3iqFkyK.

[14] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮

71. ███████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████ [15]



72. ████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████ [16]

73. ███████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████ [17]

    74.    The Hospitality Sales and Marketing Association International ("HSMAI"), a trade group to which all Defendants belong, likewise provided a forum for Defendants' collusion.

    75.    Through HSMAI, Defendants' executives established relationships with competitors and used those relationships to enforce Defendants' anticompetitive agreement.



[15] ████████████████████
[16] ██████████████████████████████████████
[17] ██████████████████████

76. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

███████████ [18]

77.     HSMAI also formed a Chief Digital Officer Task Force in which executives of all six

Defendants participated. ██████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

███████████ [19]

78. ████████████████████████████████████████████

██████████████████████ [20]

---

[18] ███████████████████████████████████████████
███████████████████████████

[19] ██████████████████████████████████████████████
████████

[20] ███████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████████████
█████████████████████████████████████
█████

79.     The American Hotel & Lodging Association ("AHLA") is an association with a stated mission of "serving, supporting, and advocating on behalf of the American Hospitality Industry."[21]

80.     During the time period relevant to this Complaint, all Defendants were members of the AHLA ███████████████████████████████████████████[22]

81.     AHLA and the CIF served as yet another venue for Defendants' collusion regarding branded-keyword bidding.

82.     
████████████████████████████████████████████████
████████[23]

83.     



---

[21] *Who We Are*, AHLA (last visited Aug. 24, 2020), https://www.ahla.com/who-we-are.

[22] *See, e.g.*, *Our Members*, AHLA (last visited Aug. 19, 2020), https://www.ahla.com/our-members;
████████████████████████████████████████████████

[23] ████████████████████████████████████████

[24] ████████████████████████████████████████████
████

84.  ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████ [25]

85.  ████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████ [26]



86.     Hotel Electronic Distribution Network Association ("HEDNA") is a nonprofit trade association whose purpose is to "advance[] hospitality distribution."[27] During the time period relevant to this Complaint, all Defendants were members of HEDNA and currently, several of Defendants' executives are on HEDNA's board of directors.[28]

87.  ████████████████████████████████████████████

████████████████████████████████████████████████

---

[25] ████████████████████████████

[26] ████████████████████████████████████████████████

████████████████████████████████████████████████

[27] *HEDNA*, HOSPITALITYNET (last visited Aug. 24, 2020), https://www.hospitalitynet.org/organization/17000710/hedna.html.

[28] *See Who We Are – HEDNA*, HEDNA (last visited July 16, 2020), https://hedna.org/who-we-are/;

████████████████████████████████████████████████

████████████████████████████████████████████

[REDACTED]

[29]

[REDACTED]

88.     Roomkey—a joint venture founded in 2012 by Hilton, Hyatt, Marriott, Choice, Wyndham, and IHG (Six Continents)—served as a key vehicle to advance the conspiracy. Further details about the role of Roomkey in enforcing the Defendants' agreement to refrain from bidding on each other's keywords are set forth below.

**D.      Between 2012 and 2014, Defendants expanded their unlawful agreement to not bid on each other's branded keywords to encompass OTAs.**

**1.      Defendants and OTAs are direct competitors in the relevant market for online sales of hotel-room reservations.**

89.     Hotels are both suppliers and distributors in the market for online sales of hotel-room reservations.

90.     As suppliers in this market, hotels have a vertical relationship with OTAs. A hotel provides the major OTAs with inventory (hotel rooms); the major OTAs and their OTA affiliates sell reservations directly to consumers and get paid a commission by the hotel (or the major OTA) for each sale.

91.     But hotels also are distributors in this market because they sell room reservations directly to consumers through their own websites. (In industry jargon, a hotel's own websites is referred to as "brand.com.")

---

[29] [REDACTED]

[REDACTED]

92.     In their capacity as distributors, hotels have a horizontal relationship with OTAs as they compete in the market for online sales of hotel-room reservations.

93.     ██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████ [30]

███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

**2.      Defendants have long sought to decrease OTAs' share of the market and have worked together to accomplish this goal.**

94.     Hotels have long been frustrated with OTAs because, among other things, (1) OTAs exert downward pressure on room prices by making comparison shopping easy for consumers, (2) OTAs charge the hotels high commissions, and (3) OTAs sometimes bid on the hotels' branded keywords, which both raises the hotels' cost of bidding on the keywords and often diverts a consumer searching for a brand away from brand.com and to an OTA's website.

95.     Problems posed by the OTAs were frequent topics of internal discussions by Defendants. They also were discussed by Defendants through trade groups and at industry events, meetings, and conferences.

96.     Defendants' efforts to foreclose OTAs' ability to bid on Defendants' branded keywords are longstanding.

───────────────────

[30] ████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████

97. ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ [31]

98.     More recently, Defendants attempted to stem their revenue losses to OTAs by launching in 2012 a joint venture called Roomkey (formerly "Room Key"—a "metasearch engine") for hotels. As a metasearch engine, the Roomkey website enabled users to search for hotel rooms and compare rates, just like OTA websites do. But unlike an OTA site, when a consumer using the Roomkey website decided to book a room, clicking on that room took the consumer directly to the hotel's website. In this way, Roomkey aimed to give consumers the ability to comparison shop while at the same time enabling Defendants to avoid both the OTAs' high commission fees and having to bid against OTAs for their own branded keywords.

99.     Unfortunately for Defendants, Roomkey was a failure.[32] The number of visitors to the site was dwarfed by the number of consumers who visited the websites of OTAs and even Defendants' own websites: "For the month of June [2016] its total number of visits was about 1.6 million. For the same period, Booking.com had 323 million visits and Expedia.com had



[31]

[32] Deanna Ting, *The Disappointing Life of Hotel Industry Booking Site Roomkey*, SKIFT (July 11, 2016), https://skift.com/2016/07/11/the-disappointing-life-of-hotel-industry-booking-site-room-key/.

60.8 million, while Marriott.com had 28.2 million, Hilton.com had 22.9 million, and IHG.com had 17.5 million."[33]

100.    In June 2020, Roomkey suspended its operations and announced that it was "in the process of redefining [its] business operations."[34]

101.    But by at least one metric, Roomkey was a success: it gave Defendants yet another vehicle for colluding with regard to bid rigging in their paid search advertising campaigns.

102.    Roomkey was founded and owned by the six Defendant hotels: Choice Hotels, Hilton, Hyatt, IHG (the parent company of Six Continents), Marriott, and Wyndham.[35]

103.    ███████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████[36]

---

[33] *Id.*

[34] Cameron Sperance, *Hotels-Backed Online Search Platform Roomkey Suspends Operations*, SKIFT (June 8, 2020) (internal quotation marks omitted), https://skift.com/2020/06/08/hotels-backed-online-search-platform-roomkey-suspends-operations/.

[35] *Id.*

[36] ████████████████████████████████████████████

████     Ex. 25 Barbara De Lollis, *Hotel Giants Launch uncluttered search site*, USA TODAY ONLINE, at HYAKT00068261 (Jan. 15, 2012) (describing Chuck Sullivan as "top Hilton exec who helped work on RoomKey's formation")████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

**3.** **When OTAs' market share began growing dramatically between 2011 and 2014, Defendants expanded their antitrust conspiracy by agreeing to work jointly to stop OTAs' bidding on Defendants' branded keywords.**

104.    Between 2012 and 2014, Defendants realized that Roomkey was failing to slow the

OTAs' growth, and they became increasingly concerned about the OTAs' negative impact on their

revenues. ████████████████████████████████████████████

████████████████████████████ [37]

105.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████



106.    ████████████████████████████████████████████

████████████████████████████████████████████████

---

[37] ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

[38] ████████████████████████████████████████
████████████████████



107.

108.     Recognizing the increasing threat posed by OTAs to their bottom lines, Defendants

expanded the scope of their anticompetitive conspiracy between 2012 and 2014 to include the OTAs.

109.     Building on their agreement to not bid on each other's branded keywords,

Defendants agreed (i) to insert into their lodging agreements with the major OTAs (e.g., Expedia,

Priceline, Booking.com) provisions that prohibited those OTAs and their affiliates from bidding on Defendants' branded keywords and (ii) to strictly enforce those anti-bidding provisions.

110.    Defendants began executing this expanded agreement in approximately 2012 and have continued to do so until the present.

111.    From approximately 2012 through 2017, Defendants updated their lodging agreements with the major OTAs to more stringently prohibit the OTAs and their affiliates from bidding on Defendants' branded keywords.

112.    Defendants' updates to their lodging agreements were contemporaneous but not simultaneous, because the contracts between each Defendant and OTA did not expire simultaneously and thus were renewed or renegotiated over a period of several years.

113.    Indeed, contract-renewal negotiations often took two or more years to complete. Thus, a contract negotiation that began in 2013 may not have resulted in a final contract with enhanced keyword restrictions until 2015 or 2016.

114.    Nonetheless, by 2013, **all** Defendants were demanding that similar keyword restrictions be inserted into lodging agreements with major OTAs.

115.    Just as significantly, from 2012 to the present, Defendants have diligently monitored search-results pages to detect violations by both the major OTAs and their affiliates, and aggressively enforced the recently added contractual prohibitions as well as the keyword-bidding prohibitions in existing lodging agreements that had previously gone unenforced.

116.    Each Defendant sent cease-and-desist letters to both major OTAs and smaller affiliate OTAs instructing them to cease bidding on their branded keywords and threatening legal action.

117. ████████████████████████████████████████████[41]

██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████
██████████████████████

118. ██████████████████████████████████████████████████

████████████████████[42]

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

119. ████████████████████████████████████

████████████████ [43]



120. ████████████████████████████

---

[43] ██████████████████████████████████
████████████████

[44] ████████████████████████████

121.    Each Defendants' contemporaneous updating of contract language and increased policing of violations by OTAs was not a coincidence but part of a coordinated effort by Defendants.

122.    As with the gentlemen's agreement under which Defendants agreed to not bid on each other's branded keywords, Defendants used inter-hotel relationships they had built through trade associations and Roomkey to effect this expanded conspiracy.

123.    

124.    At the time, all six Defendants were members of both the HSMAI Task Force and the HCPC. As alleged above, part of the core mission of the HCPC was to stop competitors from displaying ads in response to hotel-branded search terms.

125.    When Defendants sought to impose the stringent keyword-bidding restrictions in their lodging agreements, the major OTAs recognized that their revenues were at risk if they didn't agree to the restrictions.

126.    The major OTAs also recognized that the united front presented by the six Defendants could have a significant financial impact on the major OTAs, as online bookings at Defendants' hotels accounted for a substantial portion of the OTAs' revenue generated via search-engine advertising.

---

45 ████████████████████████████████████

46 ████████████████████████

**4.** ███████████████████████████████████
████████████

127. ████████████████████████████████

███████████████████████████████████[47]



128. ███████████████████████████████

███████████████████████████

████████████████████[48]

129. ███████████████████████████████

██████████████████████████████

██████████████████████████████

███████████████████[49]





130.

[50]

[51] Hotel industry participants often use the term "chains" or "flags" to refer to the leading hotel companies, which are primarily the Defendants.

[52]

[53]

131. ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████ [54]



132. ███████████████████████████████████████

█████████████████████████████████████

██████████████████████████ [55]

**5.**  **Each of the leading OTAs not only complied with its agreements with Defendants but also ensured that the unlawful agreements were enforced against competitor OTAs.**

133.    Although the major OTAs were pressured by Defendants into entering the unlawful horizontal agreements, these OTAs also worked to ensure that the branded-keyword bidding restrictions sought by Defendants were imposed on all competing OTAs.

134.    The reason for these OTAs' efforts is straightforward: each OTA recognized that if it agreed to—and adhered to—Defendants' keyword-bidding restrictions but its competitor OTAs

---

[54] ███████████████████████████████████████████████████

[55] ████████████████████████

did *not*, the competitor OTAs would have a competitive advantage in that they could still make use of Defendants' branded keywords to attract consumers to their sites.

135.    Thus, one of the conditions for the major OTAs' agreeing to the keyword-bidding restrictions sought by Defendants was that identical restrictions be included in Defendants' agreements with *other* major OTAs.

136.    Similarly, once the restrictive agreements were in place, major OTAs would refuse to abide by the agreements unless Defendants ensured compliance by competitor OTAs.

137.    

138.

---





139.     Some of these agreements for parity were informal. But in some instances, provisions for keyword parity were included in the contracts between Defendants and OTAs.

140.     Defendants further conspired to require the major OTAs to enforce the keyword-bidding restrictions on the OTA affiliates who operate under their banners. Although major OTAs such as Expedia profit from hotel bookings by their affiliates such as Partner Fusion, they have agreed with Defendants to enforce the keyword-bidding restrictions on their OTA affiliates.

**6.      Defendants' scheme had the desired effect of essentially eliminating OTAs' bidding on Defendants' branded keywords.**

141.     Defendants' scheme was successful in suppressing OTAs' bidding on Defendants' branded keywords.

142.     ████████████████████████████████████████

████████████████████████████████████████████████



143.    The result of these agreements between Defendants, and between Defendants and leading OTAs such as Booking.com, Expedia, and Priceline, is visible in the search results of the major search engines.

144.    For example, a 2018 search-engine results page generated by the query "Honolulu Hyatt" carried no advertisements from Defendants other than Hyatt, and contained no ads from any major OTAs or any of their owned websites. Instead, the ads that appeared were from Hyatt, and from perhaps one smaller OTA affiliate who had not yet been intimidated by a cease-and-desist letter. The screenshots below offer examples.

─────────────────────

145.    A search in early 2018 for "Honolulu Hyatt" on Bing yielded ads from only Hyatt and from a smaller OTA affiliate:



146.    A search for "Detroit Marriott" on Google yielded only a single ad from Marriott.



147.    Neither search yielded any ads from competitor hotels, nor any from major OTA websites that represent over 90% of the OTA market.[59]

148.    A search in early 2018 for "Los Angeles InterContinental" yielded advertisements for only InterContinental:



149.    Likewise, a Google search for "Chicago Hilton" in early 2018 yielded advertisements only for Hilton:



---

[59] *Four key developments keeping the U.S. OTA market exciting*, PHOCUSWRIGHT RESEARCH (Feb. 4, 2019) (stating that Expedia and Booking Holdings—which includes, among other OTAs, Booking.com and Priceline—"collectively represent[ ] 92% of the OTA market").

150.    Search results conducted shortly before the filing of this Complaint demonstrate that Defendants' agreements—with each other and with the leading OTAs—are still in effect and are being effectively enforced.

151.    A July 2020 search-results page for the query "choice hotel" displayed a single ad, and that ad was for Choice Hotels:



152.    Similarly, a July 2020 search-results page for the query "wyndham hotel" displayed a single ad, for Wyndham:



153.    And a July 2020 Google search for "marriott hotel" yielded exactly one ad—an ad for Marriott:



154.    The effect of these agreements is to impair competition, resulting in direct harm to consumers in interfering with the free flow of information from sellers to buyers, raising the costs to consumers of finding the most suitable offering, increasing transaction prices, and raising the price of hotel rooms sold online by reducing the downward pricing pressure exerted by OTAs and competitor hotels.

155.    As a result of the illegal agreements, Plaintiffs and the Class have been damaged by paying more for hotel rooms than they otherwise would in the absence of the agreements, and by incurring search and transaction costs higher than they would in the absence of the agreements.

## VI.  THE RELEVANT MARKET AND DEFENDANTS' MARKET POWER

156.  Plaintiffs in Count I allege a *per se* violation of the antitrust laws. For this reason, there is no need to plead a relevant product or geographic market.

157.  To the extent it is required for Counts I or II, Plaintiffs allege that the relevant product market in this case is the direct online sale of hotel room reservations, which includes (among other things) bookings through any of Defendants' websites and those of OTAs—including the major OTAs, their affiliates, and smaller unaffiliated OTAs.

158.  In 2018, 71% of U.S. travelers booked a hotel room online.[60]

159.  Defendants control approximately 50% of available hotel rooms in the United States.[61]

160.  As of 2016, the major OTAs owned by Expedia Inc. (e.g., Expedia and Orbitz) and Booking Holdings, Inc. (e.g., Priceline and Booking.com) accounted for more than 90% of OTA bookings in the United States.[62]

161.  In 2017, Defendants and OTAs accounted for over 80% of all hotel rooms booked online.[63]

162.  Online reservations have unique functional characteristics which make them attractive to travelers. They permit travelers to easily search many different hotel types and locations

---

[60] Nir Dupler, *Hotel distribution post-pandemic – How not to throw caution to the wind*, PHOCUSWIRE (June 29, 2020), https://www.phocuswire.com/hotel-distribution-post-covid-19.

[61] *Three hotel companies exceed 500,000 rooms in North America*, STR (May 30, 2019), https://str.com/press-release/str-three-hotel-companies-exceed-500000-rooms-north-america.

[62] Douglas Quinby, *Hotels vs. the (OTA) World*, PHOCUSWRIGHT (May 2017), https://www.phocuswright.com/Travel-Research/Research-Updates/2017/Hotels-vs-the-OTA-World.

[63] *OTAs vs Hotels: The Age-Old Battle Over Online Booking*, REVENUE HUB (Sept. 10, 2017), https://www.micrometrics.com/the-guest-otas-vs-hotels-the-age-old-battle-over-online-booking/ (showing that total share of online bookings for just the top three OTAs (Expedia, Booking.com, and Priceline) and three of the Defendants (Hilton, IHG, and Marriott) is 80%).

in their desired areas. Many OTA websites also have reviews provided by consumers that allow users to evaluate different properties. There is a distinct—and ever-growing—group of travelers who want to book hotel rooms online, rather than in person or over the telephone.

163.    Consumers prefer the ease of internet hotel bookings, which has led to the explosive growth of the online hotel room booking market.

164.    The relevant geographic market in this case is the United States.

165.    To the extent the Rule of Reason needs to be applied to these facts, no elaborate industry analysis is necessary. Defendants and OTAs make up a substantial percentage of the marketplace for online sales of hotel room reservations and compete against each other as distributors in this market. Thus, Defendants and the OTAs are parties to a horizontal agreement to withhold competitive information from consumers and to require their competitors to withhold the information as well.

166.    The refusal to compete in this way, and interference with the free flow of information from sellers to buyers, causes direct harm to buyers. There is no countervailing pro-competitive justification.

167.    Even without proof of market power, there is no justification for such a naked restraint of trade by agreement among competitors. Nonetheless, Defendants together do possess market power, controlling a substantial percentage of the hotel rooms in the United States, and the contracts with OTAs have foreclosed over 90% of online travel agents.

## VII.    MARKET EFFECTS AND ANTITRUST INJURY CAUSED BY DEFENDANTS' ANTICOMPETITIVE CONDUCT

168.    The overall effect of Defendants' anticompetitive, exclusionary scheme has been to substantially foreclose and impair competition from each other and from OTAs offering lower-priced or higher quality room reservations. Indeed, the very purpose of the agreement was to

reduce the likelihood that a consumer searching for a branded hotel would be exposed to relevant and potentially attractive information—including information about price—from competing hotels.

169.    As alleged above, had Defendants not improperly foreclosed or stifled each other and OTAs from providing relevant competitive information to consumers in the marketplace, consumers would have enjoyed lower transaction costs and lower room rates.

170.    There is a consensus in economic literature that restrictions on advertising among rivals impairs competition and results in harm to consumers. Here, Defendants recognize the downward pricing pressure that OTAs and their provision of information about competitive alternatives exert on room rates. Limiting consumers' information about OTAs and those alternatives reduces that downward pricing pressure.

171.    There is no credible countervailing pro-competitive justification for the agreements to impede the free flow of competitive information in the marketplace.

172.    The presence of unfettered information about competitors that were selling lower-priced or higher quality rooms would have forced Defendants to lower the prices for their rooms in order to remain competitive.

173.    The illegal scheme alleged herein harmed inter-brand as well as intra-brand competition.

174.    During the relevant period, Plaintiffs and other members of the Class purchased hotel rooms directly from Defendants and from OTAs.

175.    As a result of Defendants' alleged illegal conduct, members of the Class were compelled to pay, and did pay, artificially inflated prices for the hotel rooms they purchased. Plaintiffs would have been able to, among other things, purchase less expensive hotel rooms had competitors and the agents of competitors been able to engage in unfettered competition.

176. The prices that Plaintiffs and other Class Members paid for hotel rooms during the Class Period were greater than the prices that Plaintiffs and Class Members would have paid absent the illegal conduct alleged herein because: (1) the prices of all online hotel rooms were higher due to Defendants' illegal conduct; and (2) Class Members were deprived of information about the opportunity to purchase hotel rooms from Defendants' competitors at lower prices. Thus, Plaintiffs and the Class have sustained damages in the form of overcharges and higher transaction costs.

## VIII.   CLASS ALLEGATIONS

177. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this class action on behalf of themselves and all members of the following class (the "Class"):

> All persons in the United States who, during the period January 1, 2011 through the present ("the Class Period"), paid for a hotel room in the United States operating under a brand name owned by one of the Defendants, where the room was reserved online.

178. Plaintiffs believe that Class Members include thousands of consumers and businesses across the United States, though the exact number and the identities of Class Members are currently unknown.

179. The members of the Class are so numerous that joinder of all Class Members is impracticable.

180. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Nearly all factual, legal, and statutory relief issues raised in this Complaint are common to each of the members of the Class and will apply uniformly to every member of the Class. Among the questions of law and fact common to Class Members are:

> a.   whether Defendants agreed with each other to forgo bidding on each other's branded keywords;

b. whether Defendants agreed with each other to insert prohibitions on branded-keyword bidding into their lodging agreements with OTAs and to enforce those provisions;

c. whether Defendants' agreements were carried out by Defendants and the OTAs;

d. whether Defendants' agreements constitute *per se* violations of the antitrust laws;

e. whether Defendants engaged in agreements, contracts, combinations, and conspiracies, which had the purpose and/or effect of unreasonably restraining competition and limiting purchaser access to information about competing and lower-priced hotel rooms;

f. whether Defendants unreasonably restrained trade;

g. whether Defendants' anticompetitive contracts, combinations, and conspiracies have caused Plaintiffs and the other members of the Class to suffer antitrust injury in the nature of overcharges and inflated transaction costs;

h. whether Defendants' unlawful conduct caused Plaintiffs and other members of the Class to pay more for the hotel rooms than they otherwise would have paid;

i. the appropriate Class-wide measure of damages;

j. whether, and in what amount, Plaintiffs and the other Class Members are entitled to recover treble damages, court costs, and attorneys' fees; and

k. whether Defendants' anticompetitive conduct is continuing, thus entitling the Class to injunctive relief to promote unrestrained trade and free and fair competition.

181. Plaintiffs' claims are typical of the claims of other members of the Class because Plaintiffs and every member of the Class have suffered similar injuries as a result of the same practices alleged herein. Plaintiffs have no interest adverse to the interests of the other members of the Class.

182. Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained able counsel with extensive experience in class action litigation. The interests of Plaintiffs are coincident with—and not antagonistic to—the interests of the other Class Members.

183. The questions of law and fact common to members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

184. Plaintiffs and other members of the Class have suffered damages as a result of Defendants' unlawful and wrongful conduct. Absent a class action, Defendants will retain substantial funds received as a result of their wrongdoing, and such unlawful and improper conduct shall, in large measure, go unremedied. Absent a class action, the members of the Class will not be able to effectively litigate these claims and will suffer further losses, as Defendants will be allowed to continue such conduct with impunity and retain the proceeds of their ill-gotten gains.

185. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class Members is impracticable. Moreover, because the damages suffered by individual members of the Class are relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. The Class is readily definable, and prosecution of this action as a class action will eliminate the possibility of repetitious litigation. There will be no difficulty in the management of this action as a class action.

## IX.   CAUSES OF ACTION

### COUNT 1:
### VIOLATION OF 15 U.S.C. § 1
### (*Per Se* Group Boycott/Bid Rigging Agreements)

186. Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein. This Count is asserted against all Defendants.

187. Agreements among and between competitors—to refuse to bid on each other's branded keywords and to implement negative keywords—restrained trade and the free flow of information from sellers to buyers. These agreements to implement keyword-bidding restrictions—

and the scheme in restraint of trade—have harmed competition and caused the prices for hotel rooms to be higher than they would have been without the horizontal agreement between Defendants and the horizontal agreement between Defendants and OTAs.

188.     The agreement not to compete by bidding on one another's branded keywords by Defendants and OTAs is a horizontal *per se* bid rigging and group boycott.

189.     The agreement by Defendants to each separately require OTAs to stop bidding on hotel branded keywords further restrained trade.

190.     The attendant agreements between Defendants and OTAs to prevent competitive advertising were specifically intended to protect Defendants from price competition from one another and to reduce the downward pressure on pricing that OTAs impose upon Defendants. By agreeing to refuse to compete to place advertisements on the major search engines, Defendants agreed to restrain trade, lessen the flow of information to consumers, disrupt the price setting mechanism of the free market, reduce downward pressure on pricing, and enable them to maintain or raise prices above a competitive level. This scheme achieved its goals and thereby substantially inflated prices to consumers like Plaintiffs.

191.     Defendants did not act unilaterally or independently, or in their own economic interests when:

     a.   entering into the agreements;

     b.   refusing to engage in competitive branded keyword advertising against one another; and

     c.   imposing branded keyword advertising restrictions on the OTAs.

192.     The agreements—which amount to a group boycott or bid rigging—are designed to maintain and raise prices, and their execution and enforcement constitute contracts, combinations, and conspiracies that substantially, unreasonably, and unduly restrain trade in the relevant market(s), and harmed Plaintiffs and the Class thereby.

193.     Defendants possess market power.

194.     There is no legitimate, pro-competitive business justification for these agreements or any of them that outweighs their harmful effect. Even if there were some conceivable justification, the agreements are broader than necessary to achieve such a purpose.

195.     Plaintiffs and members of the Class were injured in their business or property by the collusion and conspiracy alleged above, which facilitated, enabled, assisted, or furthered Defendants' substantial foreclosure and exclusion of competition in the relevant market(s).

196.     Without limiting the generality of the foregoing, Plaintiffs and the other members of the Class have been forced to incur higher transaction costs and to pay higher prices for rooms than they would have paid in the absence of Defendants' unlawful conduct.

## COUNT 2:
## VIOLATION OF 15 U.S.C. § 1
### (Agreements Unreasonably Restraining Trade)

197.     Plaintiffs hereby incorporate each preceding and succeeding paragraph as though fully set forth herein. This Count is brought in the alternative if the conduct at issue is not a *per se* violation.

198.     The horizontal agreements to stop competitive paid search advertising using branded keywords—and the scheme in restraint of trade—have harmed competition in the relevant market and caused prices to be higher in the relevant market than the prices would have been without the horizontal agreements between Defendants and the horizontal agreements between each of the Defendants and OTAs.

199.     The agreements to restrict and eliminate the competitive use of branded keywords in paid search advertising campaigns were specifically intended to reduce the availability to consumers of competitive information, including information concerning price and quality of competitive alternatives, in order to reduce downward pricing pressure. Thus, Defendants sought to—and

succeeded in—restricting the availability of competitive information in the marketplace, interfering with the free flow of information from sellers to buyers, and reducing the downward pricing pressure that free flow of information exerted. This scheme achieved its goals, directly harming consumers and substantially inflating prices to consumers like Plaintiffs.

200.    Defendants did not act unilaterally or independently, or in their own economic interests, when:

    a.   entering into the agreements;

    b.   refusing to engage in competitive branded keyword advertising against one another; and

    c.   imposing branded keyword advertising restrictions on the OTAs.

201.    The agreements, and their enforcement, constitute contracts, combinations, and conspiracies that substantially, unreasonably, and unduly restrain trade in the relevant market(s), and harmed Plaintiffs and the Class thereby.

202.    These agreements cover a sufficiently substantial percentage of relevant market(s) to harm competition.

203.    Defendants are liable for the creation, maintenance, and enforcement of the agreements under a "quick look" and/or rule of reason standard.

204.    Defendants possess market power.

205.    These agreements harm intra-brand and inter-brand competition by artificially impeding the flow of competitive information to consumers and raising prices.

206.    There is no legitimate, pro-competitive business justification for these agreements or any of them that outweighs their harmful effect. Even if there were some conceivable justification, the agreements are broader than necessary to achieve such a purpose.

207. Plaintiffs and members of the Class were injured in their business or property by the collusion and conspiracy alleged above which facilitated, enabled, assisted, or furthered Defendants' substantial foreclosure and exclusion of competition in the relevant market(s).

208. Without limiting the generality of the foregoing, Plaintiffs and the other members of the Class have been forced to incur higher transaction costs and to pay higher prices for rooms than they would have paid in the absence of Defendants' unlawful conduct.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

A. For an Order certifying this case as a class action against Defendants, appointing Plaintiffs as Representatives of the Class and their counsel of record as Class Counsel, and directing that notice of this action be given to the Class once certified.

B. For a judgment that the unlawful conduct, conspiracy, or combination alleged herein constitutes a violation of Section 1 of the Sherman Act;

C. For money damages against Defendants and in favor of Plaintiffs and the Class on all claims asserted in this Complaint as allowed by statute;

D. For treble damages to the extent allowed by law;

E. For costs of suit incurred herein;

F. For pre- and post-judgment interest to the extent allowed by law;

G. For penalties as allowed by law;

H. For permanent injunctive relief to enjoin further violations of the law;

I. For attorney's fees; and

J. For such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues triable of right by jury.

DATED: September 4, 2020

Respectfully submitted,

By: _/s/ Steve W. Berman_

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com

Jeannie Evans
Zoran Tasić
HAGENS BERMAN SOBOL SHAPIRO LLP
455 Cityfront Plaza Drive, Suite 2410
Chicago, IL 60611
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
Email: jeannie@hbsslaw.com
         zorant@hbsslaw.com

*Counsel for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that on September 4, 2020, a true and correct copy of the foregoing was filed electronically via CM/ECF, which caused notice to be sent to all counsel of record.

       /s/ Steve W. Berman
       Steve W. Berman